**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

```
FILED STAMP: JULY 30, 2008
08CV4330
JUDGE NORGLE
MAG. JUDGE VALDEZ
```

| | | |
|---|---|---|
| URBAN RETAIL PROPERTIES, LLC, | ) | |
| fka URBAN RETAIL PROPERTIES CO., | ) | |
| | ) | Civil Action No. _____ |
| Plaintiff, | ) | |
| | ) | J. N. |
| v. | ) | |
| | ) | (Removed from Circuit Court |
| HCW DEVELOPMENT COMPANY, LLC, | ) | of Cook County, Illinois) |
| | ) | |
| Defendant. | ) | |

## <u>NOTICE OF REMOVAL</u>

Defendant HCW Development Company, LLC ("HCW"), without waiving any defenses to the claims of Plaintiff, files this Notice of Removal to remove to the United States District Court for the Northern District of Illinois, Eastern Division, Plaintiff's Complaint, Cook County, Illinois Case No. 08 L 7023, based on the following grounds:

1.    On or about June 26, 2008, the above-mentioned Complaint was filed in the Circuit Court of Cook County, Illinois.  The Complaint was served on HCW's agent for service of process on July 3, 2008.

2.    The Complaint, as amended on or about July 18, 2008, alleges that HCW breached a written "Property Management and Leasing Agreement" that it entered into with Plaintiff.  Although Plaintiff does not specify the amount it seeks in damages, it alleges that the amount is "substantial," and will include (1) "all of the fees that it would have received during the remaining portion of the term of the Agreement"; (2) "prejudgment interest"; (3) "all of the costs and expenses incurred by (Plaintiff) in connection with the transfer and termination of its management functions"; and (4) "its attorneys' fees in this action."  *See* Amended Complaint at ¶ 13.  Because the Property Management and Leasing Agreement provided for a <u>minimum</u>

monthly management fee to Plaintiff of $12,000, and because more than 30 months remained under the Agreement at the time it was terminated by HCW, there is much more than a "reasonable probability" that the amount in controversy in this case exceeds $75,000 in order to meet 28 U.S.C. §1332's jurisdictional requirement. *See, e.g., Shaw v. Dow Brands*, 994 F.2d 364, 366 fn. 2 (7th Cir. 1993); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178 (1936). A copy of the Property Management and Leasing Agreement was attached to Plaintiff's Amended Complaint, which is included within the materials attached hereto as Exhibit "A."

3.      Per the Amended Complaint, Plaintiff is a corporation duly organized and existing under the laws of the State of Delaware, and having its principal place of business in Chicago, Illinois.

4.      HCW is a limited liability company duly organized and existing pursuant to the laws of the State of Missouri and maintains its principal place of business in Branson, Missouri.

5.      Based upon the foregoing, the United States District Court for the Northern District of Illinois has original jurisdiction over this matter pursuant to 28 U.S.C. §1332 and within the meaning and requirements of 28 U.S.C. §1441. As shown by the foregoing, complete diversity of citizenship of all parties existed at the time the Complaint was filed in state court, and such diversity continues to exist at the time of removal noticed herein.

6.      Pursuant to 28 U.S.C. §1446, within thirty days of receipt of the Summons and Petition, HCW has caused this Notice of Removal and copies of all process, pleadings and orders currently filed in the State Court Proceeding, copies of which are attached hereto as Exhibit "A," to be filed in this Court. A copy of the Civil Information Cover Sheet filed by HCW in this case is attached hereto as Exhibit "B."

7. Further, as required by 28 U.S.C. §1446(d), a copy of this Notice of Removal will be filed in the State Court Proceeding and written notice thereof will be provided to all adverse parties.

8. Removal of this action to this Court is proper pursuant to 28 U.S.C. §§1441 and 1446.

9. This Notice of Removal has been filed within thirty (30) days of service of process and is therefore timely.

**WHEREFORE**, Defendant, HCW Development Company, LLC, prays that this Notice of Removal be deemed sufficient and that this matter proceed in this Court as an action properly removed hereto from the Circuit Court of Cook County, Illinois. HCW further prays for all general and equitable relief to which HCW may be entitled to receive.


Respectfully submitted,

HCW DEVELOPMENT COMPANY, LLC


By: ___/s James P. White_____
    One of its attorneys

James P. White (ARDC No. 3001032)
J. Aron Carnahan (ARDC No. 6242642)
HUSCH BLACKWELL SANDERS LLP
120 South Riverside Plaza
22nd Floor
Chicago, IL 60606
Phone: (312) 655-1500
Fax: (312) 655-1501

## <u>CERTIFICATE OF SERVICE</u>

 The undersigned hereby certifies that on this 30th day of July, 2008, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served via hand delivery upon the following:

Gregory J. Scandaglia
Scandaglia & Ryan
55 E. Monroe, Suite 3930
Chicago, IL 60603


       /s James P. White

JUDGE NORGLE
MAG. JUDGE VALDEZ
J. N.

URBAN RETAIL PROPERTIES, LLC,   )
fka URBAN RETAIL PROPERTIES CO.,  )
               Plaintiff,   )
v.   )
   )
HCW DEVELOPMENT COMPANY, LLC,)
             Defendant.   )

Civil Action No. _____

(Removed from Circuit Court
 of Cook County, Illinois)

# Exhibit "A"

## Part 1 (pp. 1-35)

| | |
|---|---|
| 2120 – Served | 2121 – Served |
| 2220 – Not Served | 2221 – Not Served |
| 2320 – Served By Mail | 2321 – Served By Mail |
| 2420 – Served By Publication | 2421 – Served By Publication |
| SUMMONS | ALIAS – SUMMONS | CCG N001-10M-1-07-05 (         ) |

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
COUNTY DEPARTMENT, _LAW_ DIVISION

(Name all parties)
URBAN RETAIL PROPERTIES, LLC f/k/a
URBAN RETAIL PROPERTIES, CO.

v.

HCW DEVELOPMENT PROPERTIES, CO.,

2008L007023
CALENDAR/ROOM Y
TIME 00:00
Breach of Contract

No. _____

HCW Development Properties, Co.
3027 West Highway 76
Branson, MO 65616

### SUMMONS

To each Defendant:

     YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

   ☑ Richard J. Daley Center, 50 W. Washington, Room _801_____, Chicago, Illinois 60602

   ❑ **District 2 - Skokie**    ❑ **District 3 - Rolling Meadows**    ❑ **District 4 - Maywood**
     5600 Old Orchard Rd.      2121 Euclid         1500 Maybrook Ave.
     Skokie, IL 60077         Rolling Meadows, IL 60008   Maywood, IL 60153

   ❑ **District 5 - Bridgeview**    ❑ **District 6 - Markham**     ❑ **Child Support**
     10220 S. 76th Ave.      16501 S. Kedzie Pkwy.    28 North Clark St., Room 200
     Bridgeview, IL 60455      Markham, IL 60426      Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

To the officer:

     This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: _43575_

Name: _Gregory J. Scandaglia / Scandaglia & Ryan_

Atty. for: _Plaintiff_

Address: _55 East Monroe, Ste. 3930_

City/State/Zip: _Chicago, IL 60603_

Telephone: _312-580-2020_

Service by Facsimile Transmission will be accepted at: _____

WITNESS, _____

DOROTHY BROWN
CLERK OF CIRCUIT COURT
JUN 2 6 2008

(SEAL)

_____
Clerk of Court

Date of service: _____
(To be inserted by officer on copy left with defendant or other person)

312-782-3806
(Area Code) (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

URBAN RETAIL PROPERTIES, LLC, f/k/a )
URBAN RETAIL PROPERTIES Co. a )
Delaware corporation, )
                           )
          Plaintiff, )         Case No.
                           )
    vs. )
                            )       JURY TRIAL DEMANDED
HCW DEVELOPMENT PROPERTIES CO., )
a Missouri limited liability company, )
                            )
         Defendant. )
                            )

## COMPLAINT

     Plaintiff, Urban Retail Properties, LLC f/k/a Urban Retail Properties Co. ("Urban"), by and through its attorneys, Scandaglia & Ryan, alleges as follows:

     1.     Urban is a corporation duly organized and existing under the laws of the State of Delaware. Urban formerly conducted business under the name Urban Retail Properties Co. Urban's principal place of business is in Chicago, Illinois. Urban is duly authorized to do business in this County and State. Urban was founded over 35 years ago, and has become one of the most preeminent managers and developers of commercial real estate (office properties, mixed use properties, and primarily shopping malls) in the United States. As the manager of such properties, Urban is responsible for, among other things, leasing, marketing and tenant coordination.

     2.     Defendant HCW Development Properties Co. ("HCW") is a limited liability company organized and existing under the laws of the State of Missouri and is the owner of the property that is the subject of this action, as more fully alleged below.

     3.     On or about February 22, 2005, Urban and HCW executed and entered into a written contract entitled "Property Management and Leasing Agreement" (hereinafter, the "Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**, pursuant to which HCW engaged Urban to manage certain property owned by HCW in Branson, Missouri

known as "Branson Landing" (referred to in the Agreement and hereinafter as "the Center").

4. Venue is proper in this Court under 735 ILCS 5/2-101 because although the Center is located in Branson, Missouri, the negotiations that led up to the execution of the Agreement took place in significant part in Chicago, Illinois. In addition, the Agreement was executed, by Urban, in Chicago, Illinois. Furthermore, some of the obligations that Urban is required to perform under the Agreement have been performed in Chicago, Illinois.

5. The Agreement provides, in Section I, that its term would, subject to Section 7.1, commence on the date of the Agreement and terminate on the 5th anniversary of the date of the grand opening date of the Center, anticipated to be May 1, 2006, unless the Agreement is terminated as provided in Section VII. Section VII provides that the Owner may terminate the Agreement upon certain occurrences, one of which is that the Manager, i.e., Urban, fails "to observe or perform any material obligation to be observed or performed by Manager under [the] Agreement, which failure shall continue uncured for a period of thirty (30) days after written notice thereof to Manager...."

6. At all times relevant to this action, Urban was in compliance with its obligations under the Agreement.

7. On or about June 17, 2008, Urban received an undated letter from HCW ("Termination Notice"), a copy of which is attached hereto as **Exhibit B**, in which HCW stated that it was terminating the Agreement, purportedly because Urban had "failed to observe or perform a material obligation" under the Agreement by "repeatedly" failing to respond to tenant complaints.

8. The Termination Notice did not comply with the provisions in the Agreement relating to the circumstances and manner in which HCW is allowed to terminate the Agreement, and HCW has not otherwise complied with such provisions. In particular:

a. Urban has not failed to observe or perform any material obligations under the Agreement, and certainly has not "repeatedly" failed to observe or perform such obligations.

2

b.     The Termination Notice does not sufficiently identify the manner or respects in which Urban supposedly failed to observe or perform any material obligation under the Agreement, nor does it identify any such obligation. For example, the Termination Notice does not identify the tenants who supposedly had complaints, how the complaints were made, when the complaints were made, or the nature of such complaints. As a result, Urban was deprived of its right to cure or attempt to cure any alleged failure or non-performance.

c.     The Termination Notice alleges that the purported breaches were not curable. Although Urban contends that no such breaches have occurred, Urban alleges, on information and belief, any such breaches were curable and, therefore, that the allegation in the Termination Notice is false.

d.     If there were any tenant complaints relating to or resulting from any conduct on Urban's part, such conduct was the direct result of management decisions made by HCW that HCW directed Urban to implement.   Therefore, HCW was and is estopped or otherwise barred from terminating the Agreement on the basis of such conduct or complaints about it.

9.     Urban is informed and believes, and on that basis alleges, that HCW is using the allegation relating to tenant complaints as a pretext to terminate the Agreement, and that any such complaints have nothing to do with the real reason for terminating the Agreement. Urban is informed and believes, and on that basis alleges, that HCW terminated the Agreement because it did not like the economic terms in the Agreement and wanted to enter into a management agreement with one of Urban's competitors.

10.    On information and belief, Urban asserts that certain persons, whose names and identities are as yet unknown, were aware of the Agreement and, and for the purpose of obtaining an advantage for themselves, deliberately induced or caused HCW to breach its contractual obligations to Urban, proximately causing damages to Urban.   Urban will amend its complaint, if necessary, once the identity of these individuals has been ascertained.

**Count I – Breach of Contract**
**(Against HCW Development Properties Co.)**

11.    Urban restates and incorporates paragraphs 1 through 10 as if fully set forth herein.

12.    HCW has breached its obligations to Urban by terminating the Agreement prior to the end of the term without complying with the termination provisions in Section VII and in the absence of any condition or circumstance justifying early termination. In addition, HCW has breached the covenants of good faith and fair dealing implicit in the Agreement by terminating the Agreement in bad faith and without any factual or legal basis to do so, thus depriving Urban of its substantial rights under the Agreement.

13.    As a result of the foregoing, Urban has suffered substantial damages, the amount of which will be established at trial. Urban's damages include, but are not limited to, all of the fees that it would have received during the remaining portion of the term of the Agreement, prejudgment interest thereon, and all costs and expenses incurred by Urban in connection with the transfer and termination of its management functions. In addition, pursuant to Section 8.9 of the Agreement, Urban is entitled to recover its attorneys' fees in this action.

WHEREFORE, Urban prays for judgment in its favor and against HCW as follows:

    a.      For all of its actual and consequential damages, according to proof;

    b.      For prejudgment interest;

    c.      For its attorneys' fees and costs incurred herein; and

    d.      For such other and further relief as to the Court deems just and proper.

June 26, 2008

                      Respectfully submitted,
                      URBAN  RETAIL  PROPERTIES, LLC  f/k/a
                      URBAN RETAIL PROPERTIES CO.

                      By: _____
                          One of its attorneys

Gregory J. Scandaglia
SCANDAGLIA & RYAN (FIRM NO. 43575)
55 E. Monroe, Suite 3930
Chicago IL 60603
Telephone: (312) 580-2020
Facsimile: (312) 782-3806

OF COUNSEL:

James L. Goldman(CA No. 57127) (*Pro Hac Vice* to be filed)
PIRCHER NICHOLS & MEEKS
1925 Century Park East, Suite 1700
Los Angeles, California  90067
Telephone: (310) 201-8900
Facsimile: (310) 201-8922

# Exhibit A

## PROPERTY MANAGEMENT AND LEASING AGREEMENT

THIS PROPERTY MANAGEMENT AND LEASING AGREEMENT (the "Agreement") made as of the 22ⁿᵈ day of February, 2005, by and between HCW Development Company, L.L.C., a Missouri limited liability company ("Owner"), and Urban Retail Properties Co., a Delaware corporation ("Manager").

## WITNESSETH, THAT:

WHEREAS, Owner is to operate and lease the shopping center to be known as known as Branson Landing ("Center"), located in Branson, Missouri;

WHEREAS, Manager possesses the personnel, skills and experience necessary for the professional management and leasing of the Center.

WHEREAS, Owner wishes to appoint Manager for the purpose of managing and leasing the Center, and Manager wishes to accept such appointment, all on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION I
## TERM

Section 1.1    Duration.  Subject to the provisions of Section 7.1 hereof, the term (the "Term") of this Agreement shall be for a period commencing on the date hereof and terminating on the fifth (5th) anniversary of the date of the grand opening date of the Center (the "Grand Opening Date") (which date shall be determined solely by the Owner and communicated to the Manager) unless earlier terminated as provided in Section VII below.  It is anticipated that the Grand Opening Date will be May 1, 2006. Unless

1

terminated as provided in Section VII below, the Term shall automatically renew on a year to year basis.

**SECTION II**

**APPOINTMENT AND AUTHORITY OF MANAGER**

Section 2.1    Appointment and Authority of Manager.    On and subject to the terms and conditions herein set forth, Owner hereby appoints Manager as an independent contractor to be the exclusive leasing agent (except as otherwise specifically provided herein) and managing agent for the Center and hereby authorizes Manager, subject to the limitations herein set forth, to exercise such powers in an efficient and satisfactory manner to the best of its abilities and to have such authority with respect to the Center as are customary for a manager and leasing agent of premium waterfront destinations in a major tourist area in accordance with first class shopping center standards and, in addition, such powers and authority as may be reasonably necessary for the performance of Manager's duties set forth herein and as more specifically described in Section IV below. Manager hereby accepts such appointment and agrees to make available to Owner the advice, expertise and judgment of its organization relating to the management, operation, leasing, maintenance and repair of the Center.

Section 2.2    Certain Limitations on Authority; Emergencies.    Owner expressly withholds from Manager any power or authority to: (a) convey or otherwise transfer, pledge or encumber the Center, pledge the credit of Owner (except for purchases or transactions otherwise expressly authorized under this Agreement), or borrow money or execute any promissory note, mortgage, deed of trust, or security agreement in the name of or on behalf of Owner, or (b) make any structural changes in any building or make any other major alterations or additions in or to any such building or equipment therein, or incur any expense chargeable to Owner other than expenses arising from (i) Manager's exercise of the express powers vested herein in Manager, (ii) matters included in the Approved Annual Budget under Section III, or (iii) such emergency repairs or actions as may be required because of danger to persons or property or which are immediately necessary for compliance with Laws (as defined in Section 8.6 hereof) or are required to

2

avoid the suspension of any necessary service to the Center; provided, however, that with respect to such emergency repairs or actions, Manager will notify Owner as soon as reasonably possible as to the nature of and cost of such repair or action.

Section 2.3    Compliance with Underlying Documents. Manager acknowledges that (i) the Center is subject to a Redevelopment Contract dated February 1, 2003 (the "Redevelopment Contract") between Owner and the City of Branson, Missouri (the "City"), and a Ground Lease (the "Ground Lease") executed by the Owner and the City; (ii) the Center may be subject to additional agreements such as mortgage or other loan documents (the "Financing Documents"); (the Redevelopment Agreement, Ground Lease, and the Financing Documents are herein collectively called the "Underlying Documents"). Manager agrees to amend this Agreement to the extent it is in conflict with, or as is necessary to affect the purpose and duties of Owner in accordance with the Financing Documents, but only if such amendment does not materially alter Manager's rights and obligations hereunder.

Section 2.4    Confidentiality. Manager shall keep confidential (and will require any of its employees, officers and directors to keep confidential), and shall not disclose to any third party without Owner's direction or approval, any information regarding the Center to which Manager gained access as a result of Manager's performance of the services and not otherwise available to the public, unless required to do so by a court or governmental agency of competent authority.

## SECTION III
## ANNUAL BUDGET

Section 3.1    Preparation of Budget; Contents. Within thirty (30) days after the commencement of the Term, and on or before October 1 of each year with respect to the calendar year thereafter, Manager shall prepare and submit to Owner a budget (the "Annual Budget") substantially in the form then being used by Manager as a standard for similar properties managed by Manager, provided, however, that Manager shall produce a final budget for submission to public authorities in the form and manner directed by Owner. The Annual Budget shall include, among other matters:

3

3.1.1  Operating Budget.  An operating budget which shall set forth, among other matters, anticipated operating income, expenses, working capital and reserve requirements for such year.

3.1.2  Capital Budget.  A capital budget which shall set forth, among other matters, anticipated and proposed capital expenditures for such year and the source of funds in respect thereto.

3.1.3  Leasing Plan.  A statement of: (a) the space Manager expects to be leased or renewed during such year, (b) the rent it expects to obtain for such space, and (c) the other material economic provisions of the leases, including, as appropriate for commercial property, free rent, rebates and other concessions, any improvement allowances, brokerage commissions (including any payable to Manager hereunder), and payments by tenants toward operating expenses and taxes.

Section 3.2    Approval of Budget.  The term "Approved Annual Budget" shall mean the Annual Budget (as modified by revisions thereof) approved by Owner in accordance with the provisions hereof.  An Annual Budget or a revision thereof shall be deemed approved by Owner only if it is approved in writing by Owner (and Manager acknowledges and agrees that Owner may be required to obtain approval of governmental entities prior to Owner giving approval to an Annual Budget).  Any disapproval by Owner shall be specific with respect to particular items objected to in the Annual Budget submitted by Manager.

If Owner has not approved the proposed Annual Budget for any year prior to the commencement of such year, Manager shall continue to manage the Center during the year in accordance with the Approved Annual Budget in effect for the immediately preceding fiscal year (except as it relates to capital expenditures and leasing expenditures, which shall not be incurred until Owner approves the same) until the time that an Annual Budget for such fiscal year is approved, with the right, until such approval, to incur (i) the expenses specified in clauses (b), (c), (d) and (e) of Section 3.3 and, (ii) except to the extent, if any, that the same would duplicate the coverage of clause (i) above, the expenses (other than capital expenditures or leasing expenditures) allowed in the Approved Annual Budget for the immediately preceding year.

4

Section 3.3    <u>Permitted Expenses</u>.  The Manager shall not incur any expenses other than:  (a) expenses projected in the Approved Annual Budget (or supplements or revisions thereto); or (b) expenses which are required in connection with an emergency which, if in the reasonable judgment of Manager, are necessary to protect persons from death or injury or to preserve property, provided that the Manager shall notify Owner within five (5) business days after incurring such expenses ("Emergency Expenses") and with respect to which it is either impractical to seek prior approval of Owner, or if such approval is being sought, is not received in a timely manner: or (c) expenses which do not exceed five  percent (5%) in excess of the amount projected for (i) the respective item of expense in the Approved Annual Budget, or (ii) with respect to a line item which has not yet been approved, for the immediately preceding calendar year (the amounts set forth in clauses (i) and (ii) of clause (c) referred to herein as "Non-Projected Expenses"), provided, however, that the sum of all Non-Projected Expenses of all types shall not exceed $100,000 in any fiscal year without the prior written consent of Owner; or (d) expenses which, regardless of amount, result from increases in property taxes or other assessments or levies, insurance premiums; per capita labor costs, ground rent, debt service and utility charges, which are not within the reasonable control of Owner or Manager; but which are necessary for the operation of the Center; or (e) expenses which are specifically authorized by the terms of this Agreement.

## SECTION IV
## MANAGER'S SERVICES

Section 4.1    <u>Services in General</u>.  Manager agrees, in performing its duties hereunder, to use that level of the premium standard of skill for waterfront destinations in a major tourist area in accordance with the standards required of a first class shopping center.  Manager shall, with respect to the Center, perform such duties as are customarily performed with respect to similar properties by such management firms and, without limitation on the foregoing, shall perform those duties set forth in this Section IV, subject to all express limitations on Manager's authority contained in other provisions of this Agreement.  Without limiting the generality of the foregoing, Owner hereby grants

5

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205IV-clean.doc

Manager the authority and power (all or any of which may be exercised by Manager as agent on behalf of Owner) to perform the services more specifically described hereinafter in this Section IV (at Owner's expense).

Section 4.2    Advertising and Promotion.    Manager shall be authorized to advertise and conduct promotional activities relating to the Center and to display signs thereon as limited by the Approved Annual Budget.   Such advertising and promotion shall include: developing a property-specific marketing plan, including advertising, tourism, special events, public relations, websites, and customer service; developing a customized marketing budget; and directing cost-savings programs, including holiday décor purchases, advertising agency fees, and creative and media placement costs.

Section 4.3    Books and Records. Manager shall maintain the books, records and accounts of Owner with respect to the management and operation of the Center and shall retain those records during the Term and, shall deliver the same to Owner upon termination of the Term (provided Manager may retain photocopies thereof for Manager's files).

Said records and accounts shall be the property of Owner and shall be available to Owner, or its duly designated representative, for examination and inspection at any reasonable time during usual business hours at Manager's office at the Center and for audit as provided in Section 4.3.1 hereof.

At all times during the Term, Manager shall maintain, on an accrual and on a cash basis (with cash basis records and accounts to be computed with reserves for such items as real estate taxes and insurance), and in accordance with generally accepted accounting principles, consistently applied, records and accounts that accurately reflect all revenues earned, funds received, expenses incurred and disbursements made in connection with Manager's duties hereunder.

Within twenty (20) days after the end of each and every month during the Term, the Manager shall furnish Owner with an operating statement containing a statement of cash receipts and disbursements for the month then ended and a description of all other pertinent information reasonably requested.  Each such statement shall:

6

(a)    Accurately reflect all revenues received, funds received and expenses and disbursements made, by relevant category of the Approved Annual Budget, or in the case of unbudgeted revenues, receipts, expenses and disbursements on an itemized basis;

(b)    Compare the amounts received and expended with the estimated receipts and expenses set forth in the Approved Annual Budget, for the preceding calendar month, calendar quarter and calendar year to date ;

(c)    Show the balance in any Account (as defined herein) and other information reasonably requested by Owner;

(d)    Contain such information as may be necessary to permit Owner to prepare its financial statements and tax returns;

(e)    Be accompanied by an aged statement of all delinquent rentals and other charges for the use and occupancy of the Center;

(f)    Be accompanied by copies of current bank statements of the Accounts;

(g)    Be accompanied by a lease status report; and

(h)    Be accompanied by a statement showing detailed calculations of percentage rent payable in such month under the Leases; and with respect to the operating statement related to each December during the Term, such statement shall be accompanied by (x) a summary in reasonable detail of the operations of the Center on a cash basis for the preceding twelve (12) month period and (y) a statement indicating the estimated portion of income attributable to the operation of escalation provisions for taxes and operating expenses provided in the leases for the Center for such twelve (12) month period.

4.3.1    Owner shall be entitled to examine or audit the books and records maintained by Manager with respect to the Center during normal business hours, after two (2) days written notice to Manager (unless Manager is the defaulting party hereunder or Owner has the right terminate this Agreement, in which event no notice shall be required). In the event that any audit permitted hereunder discloses an overpayment or underpayment of management fees or other compensation or reimbursement payable to Manager hereunder, Owner or Manager shall promptly pay to the other party the amount of such overpayment or underpayment, as the case may be. If such audit discloses (x) an

7

overpayment of such fees through incorrect billing by Manager of more than five percent (5%) of the correct management fee due or (y) any other material failure of Manager to comply with this Agreement, then Manager shall pay all costs and expenses of such audit without any right whatsoever to be reimbursed by Owner. If such result occurs more than two (2) times during the Term, Owner shall have the right to terminate this Agreement.

Section 4.4    Employment of On-Site Personnel. Manager shall be authorized to hire, discharge and pay all on-site personnel, including without limitation (but subject to the Approved Annual Budget); (a) a property manager, one or more assistant property managers and/or operations managers, marketing personnel, specialty leasing personnel (on or off-site prior to the Grand Opening Date of the Center and on-site thereafter), bookkeepers and accountants, clerical and secretarial personnel, all of whom shall be on Manager's payroll with reimbursement by Owner, and (b) engineers, janitors, maintenance, landscaping, custodial, parking, and security personnel (subject to the provision of Section 4.5 hereof, all or any of whom shall at Manager's option, be on Manager's payroll with reimbursement by Owner, or on the payroll of an independent contractor whose costs and fees will be paid by Owner). All employees placed on Manager's payroll shall be bonded in amounts and with a company reasonably determined by Manager and Owner. Owner shall have the right to approve the property manager and leasing representatives assigned to the Center, which approval shall not be unreasonably withheld or delayed.

Section 4.5    Maintenance and Repairs. Manager shall, on behalf of Owner, maintain the Center in a good, clean, sanitary and sightly condition and perform all ordinary repairs, maintenance and decorating, and purchase all supplies necessary for the proper operation of the Center. Manager, in its capacity as such, shall not be required (without additional compensation satisfactory to Manager) to undertake the making or supervision of extensive construction or reconstruction of the Center or any part thereof. All such work shall be provided by independent contractors or employees of the Manager at a cost not in excess of the prevailing market rate in the area of which the Center is located. Manager hereby agrees to give an affiliate of the Owner the first opportunity to perform any landscaping or normal maintenance work at the Center so long as such

8

services are performed at a cost not in excess of the prevailing market rate and subject to customary terms in the area where the Center is located. Owner may notify Manager at any time during the Term that it requires such affiliate to perform such services.

Section 4.6    Collection and Disbursement of Revenue.    Manager shall collect rent and all other revenue from the Center and deposit the same promptly in a bank account (the "Operating Account") established in the name of and for the benefit of Owner.    All receipts collected by Manager shall be received, held and disbursed by Manager through the Operating Account for the account of Owner. Either Owner or Manager shall be entitled to draw upon such Operating Account, but all such money shall be deemed to be the property of Owner.  Such monies of Owner shall not be commingled with the funds of Manager.  Manager may withdraw from the Operating Account (subject to the limitations set forth in this Agreement) disbursements required or permitted to be made under this Agreement; provided, however, that except as otherwise agreed in writing by Owner, disbursements by Manager out of the Operating Account shall be limited (subject to the provisions of this Agreement) to the purposes set forth in the Approved Annual Budget and to the amounts for such purposes which do not exceed the corresponding sums allocated to the same in the Approved Annual Budget or as otherwise allowed hereunder.  Manager shall render monthly reports to Owner showing the fees and other compensation and reimbursement to which Manager is entitled under this Agreement.  In addition, upon Owner's request, Manager shall provide to Owner such other periodic reports as may be required to satisfy the requirements of any loan or other agreement affecting the Center. If Manager is a defaulting party or Owner otherwise has the right to terminate this Agreement under Article VII hereof, the representatives of Manager shall have no further authority as signatories of  the Operating Account or Security Account (as hereinafter defined) until such default is cured and the right to terminate is no longer applicable. The Operating Account and Security Account (collectively referred to herein as the "Accounts") shall be segregated and in no event commingled with other funds of Manager, Owner or any other person. Such Accounts shall be, if available, interest bearing at the highest available rates payable where deposited, consistent the primary objective of preservation of principal, and in all events

9

shall be insured by the Federal Deposit Insurance Corporation. Income realized from the investment of the Accounts shall be for the benefit of and payable to Owner.

Section 4.7    Security Deposits.    Manager shall deposit all security deposits for the Center in a separate project account (the "Security Account") in the name of Owner on which either Owner or Manager may draw. Manager shall be authorized to withdraw monies from the Security Account at such time as the security deposits are returnable to tenants or in the event of a tenant default.  It is expressly understood and agreed that all disbursements, transfers and refunds made by Manager from the security deposits shall be made by a check drawn on the appropriate account or appropriate journal or bookkeeping entries and shall be substantiated by appropriate records and accounting procedures.

Section 4.8    Payments.    Except as otherwise directed from time to time by Owner, Manager shall make or cause to be made (but only to the extent cash receipts from the Center are available therefor or to the extent Owner provides the funds therefor) the payment when due of all obligations, the existence of which was approved by Owner as part of the Approved Annual Budget or otherwise or which were incurred in accordance with the provisions hereof, including, without limitation, Section 3.3 hereof

Section 4.9    Contracts and Leases.

4.9.1    Service and Purchase Contracts.    Manager may, without the prior written consent of Owner, to the extent the obligations of Owner thereunder do not exceed the amounts provided for in the Approved Annual Budget or the other amounts set forth in Section 3.3 hereof, negotiate and enter into on behalf of Owner contracts for terms no longer than one (1) year for electricity, gas, fuel, water, telephone, window cleaning, vermin extermination, janitorial services, landscape maintenance and such other supplies, materials, services and other matters for the Center, and so long as such contracts are terminable without cause by Owner upon no more than 30 days notice. Any contracts with a term of more than one (1) year must be approved by Owner. Manager shall not enter into any single contract on behalf of the Owner requiring payment, in the aggregate, of more than $50,000 per fiscal year without the prior written consent of Owner unless the same (x) is already in the Approved Annual Budget or (y) constitutes an Emergency Expense. All work for maintenance and repair of the Center shall be performed by

-10

independent contractors or employees of Manager, at Manager's discretion, subject to Section 4.5 hereof. Any cash and trade discounts, refunds, credits concessions or other incentives obtained by Manager in connection with any such contracts shall belong to Owner.

4.9.2. <u>Leases</u>. Subject to the subsequent provisions of this Section 4.9.2, Manager shall use reasonable efforts to rent and keep the Center rented by procuring tenants for the Center pursuant to leases in accordance with the Approved Annual Budget. Without limitation on the foregoing, Manager shall negotiate, on behalf of Owner, in accordance with the Approved Annual Budget, the business terms of new leases, expansions, amendments, cancellations, or extensions thereof (all such new leases, expansions, amendments, cancellations, or extensions now existing or hereafter entered into being herein individually and collectively referred to as a "Lease" or "Leases"). All Leases shall be subject to Owner's direction and approval and shall be executed by Owner. Manager will assist Owner in the negotiation of Leases, but Owner may engage outside legal counsel (or use Owner's in-house counsel) to negotiate and prepare Leases on behalf of the Owner, and Owner shall be responsible for all outside legal fees and expenses incurred in connection therewith. If any Lease, operating agreement or other document or instrument affecting the Center requires the consent of a third party, upon request of Owner, Manager will assist Owner in obtaining such consent. Owner's approval or execution of a Lease shall serve as authorization for Manager to expend such amounts as are required to comply with the Lease on Owner's behalf (whether or not contained in the Approved Annual Budget). Manager shall provide reports of leasing activity to Owner on a monthly basis unless Owner otherwise directs. Manager shall deliver at least three (3) original tenant-executed copies of each Lease hereafter made and any and all amendments or modifications to Owner so that the same may be approved and executed by Owner.

4.9.2.1 <u>Excluded Leases</u>. Notwithstanding the foregoing, in the event Owner elects to negotiate any Lease with, or market any space in the Center to, a Related Party (as hereinafter defined), (a) Owner shall notify Manager thereof, identifying the tenant and premises in question, and (b) Manager shall not receive any commissions

provided herein with respect to such Lease with a Related Party. A "Related Party" shall mean Owner; BLR Development Company, L.L.C. ("BLR"); the members and subsidiaries of Owner and BLR; and any entity in which the members or subsidiaries of Owner and BLR hold a 25% or more ownership interest. Manager will not be entitled to any commission for the Lease entered into with Bass Pro Shop or Westgate Resorts, Ltd.

4.9.3    Other Contracts. Manager, in its capacity as such, shall not enter into any other contract or agreement on behalf of Owner, unless the same is consented to in writing in advance by Owner.

4.9.4    Manager's Affiliates. For purposes of this Agreement, the term "Affiliate" means any corporation, partnership, venture or other entity which controls, is controlled by, or is under common control with Manager, and the officers, employees, partners and venturers of such entity.

Section 4.10    Legal Action. Manager shall, on behalf of and at the cost of Owner, institute through competent counsel approved in writing by Owner, all necessary legal action or proceedings for the collection of rent or other income from the Center, or for the ousting or dispossessing of tenants or other persons therefrom, and shall promptly notify Owner of the institution of all such actions. In addition, Manager shall promptly notify Owner of any lawsuit or threat thereof involving or affecting the Center of which Manager receives actual knowledge. Manager shall not be authorized to settle, compromise and release such actions or suits or reinstate tenancies without the prior written consent of the Owner. The retention or use of any attorneys or legal assistants approved by Owner shall be at Owner's sole cost and expense. Any use of Manager's in-house legal staff for such services shall be subject to the advance approval of Owner and Manager. This Agreement shall not be construed to require that Manager or its Affiliates provide legal services, and the provision of such services shall not be construed as the practice of law by such parties.

Section 4.11    Tenant Requests. Manager shall receive and respond to complaints and requests of tenants. Records shall be maintained showing the action taken with respect to each complaint or request. Complaints or requests of a material nature shall, after investigation of such complaints by Manager, be promptly reported in writing by

12

Manager to Owner.  Manager shall include in such written report to Owner all relevant details and appropriate recommendations.

Section 4.12  Impounds and Capital Reserves.  In the event that under the terms or provisions of any mortgage or deed of trust to which the Center is subject, the mortgagor or trustor is required to deposit in installments an amount against or based upon taxes, insurance premiums or other sums, then Manager shall make such deposits to the extent of available funds from receipts from the Center collected by Manager or if Owner provides the funds therefore and notice of such requirements.

Section 4.13  Payments to Owner.  Within twenty (20) days after the end of each calendar month or partial calendar month during the term of this Agreement, Manager shall pay to Owner, but only to the extent out of Receipts remaining in the Operating Account after the payment of all expenses and other and other amounts required or provided to be paid by Manager pursuant to this Agreement and after (a) setting aside the amount of any reserves required under an Approved Annual Budget in effect from time to time, and (b) retaining a reasonable minimum balance in the Operating Account, the balance of such Receipts.

Section 4.14  Fidelity Bonds.  Manager shall maintain throughout the Term hereof, at Owner's expense, such fidelity bonds as Owner shall from time to time require for the full protection of the interests of Owner and Manager and such other parties as may be required by the provisions of any Underlying Document. Any such bond or bonds shall be in such reasonable amount as required by Owner from time to time and obtained from such companies as may be required by the Underlying Documents, or as Owner shall approve. Manager shall furnish certificates to Owner showing such bonds to be in effect, together with an agreement that the company will endeavor to notify Owner not less than ten (10) days prior to the expiration, modification or cancellation of such bonds.

## SECTION V

## BEARING OF EXPENSES

13

To the extent available, Manager shall use the cash receipts from the Center to pay the cost and expense of discharging its obligations and duties hereunder which are attributable to or arise during or with respect to the Term. Any excess of such costs and expenses over such cash receipts (whether or not contained or accurately reflected in the Annual Budget submitted by Manager or the Approved Annual Budget as approved by Owner), shall be borne solely by Owner and Manager shall not be obligated to advance its own funds therefor.

## SECTION VI

## COMPENSATION

Section 6.1    Management Fees.  Manager shall be entitled to receive a monthly management fee in accordance with the schedule attached as Exhibit A hereto and as further described therein.

Section 6.2    Leasing Commissions and Other Compensation.

6.2.1    Leasing Commissions.  Manager shall be entitled to receive commissions for all leases executed with tenants for the Center, and other compensation, in accordance with the schedule attached as Exhibit A hereto and as further described therein.

6.2.2    Other Compensation.  Manager shall be entitled to receive such additional fees and commissions as specified in Exhibit A hereto.

Section 6.3    Renovation Fees.  If Owner desires to perform a renovation, expansion, base building improvement or redevelopment at the Center, and Owner requests Manager to provide such services and Manager is willing to provide additional services in connection therewith, Owner shall pay additional fees on such terms as the parties shall mutually agree in writing.  If this Agreement is terminated while any such project is pending, the fees for such project shall be equitably prorated.

Section 6.4    Manager's Office.    Owner shall provide a reasonable and appropriate space within the Center, rent-free, to serve as Manager's on-site office, shall fully furnish and equip the same, and shall pay all direct costs of operating said on-site office, including, without limitation, utilities, telephone and office supplies. All of such personal property furnished by Owner shall remain the property of Owner and shall remain at the Center upon termination of this Agreement.

14

Section 6.5    <u>Payments and Reimbursements.</u>  Manager may pay directly out of the Operating Account, or Manager shall be entitled to receive reimbursement (which it may withdraw from the Operating Account) for the fees and commissions earned pursuant to this Section VI, on the dates provided in Exhibit A attached hereto, and for the following costs to the extent such costs are directly allocable to the Center and if such costs are included within an Approved Annual Budget:  (a) the cost of long-distance telephone and data communication between the Center and Manager's regional and home offices, and Manager's on-site costs, including software and hardware, associated with financial reporting and property accounting for the Center; (b) Manager's travel (including transportation, lodging and meals) and entertainment costs; (c) amounts paid to third parties in connection with architectural and engineering design, plan review, lease outline drawing preparation, printing and copying costs, messenger and courier charges and review, supervision and inspection, both on and off-site, relating to construction in the Center; (d) amounts paid to third parties in connection with real estate or property tax consulting (including preparation of documents related thereto), and efforts to maintain or reduce taxes applicable to or against the Center; (e) the costs of marketing brochures and the expenses, both direct and indirect, incurred relative to on- and off-site marketing and promotional services rendered or contracted for by Manager for the Center; (f) any sales tax, gross receipts tax, license fee or other tax, fee or charge imposed on the payment or receipt of fees, commissions or other amounts hereunder (other than any income or franchise tax payable by Manager); (g) costs and expenses referred to in Section 6.4 hereof; and (h) color or other non-routine photocopying charges and courier charges incurred at Manager's home or regional office.

Except as expressly provided otherwise herein or as expressly set forth in an Approved Annual Budget, in no event shall Owner be required to pay, or shall Manager be entitled to any reimbursement for (i) Manager's home or regional office overhead, office or administrative expenses or (ii) the cost of gross salary and wages and other compensation, payroll taxes, insurance, workers' compensation, pension benefits and any other benefits of Manager's home or regional office personnel; or (c)  any travel and lodging costs of employees of Manager above the level of regional manager located at

the Manager's home office, except for travel of such employees done at the request of Owner to provide services for the Center. No reimbursement to the Manager shall be allowed for the compensation of the leasing staff of the Manager, other than the temporary leasing person assigned to the Center through the Grand Opening Period (as defined in Paragraph 6 of Exhibit A hereto) and any on-site temporary leasing person solely dedicated to such services thereafter.

Section 6.6    No Other Compensation.  Manager shall receive no compensation or reimbursement of any kind or nature for or during the Term for services performed under this Agreement, except as expressly provided in this Agreement.

Section 6.7    Workmen's Compensation Insurance.  Manager shall carry any and all workmen's compensation insurance required by applicable laws on employees of Manager who are assigned to the Center.

## SECTION VII

## TERMINATION

Section 7.1    Termination by Owner.  Owner may terminate this Agreement effective upon the expiration of the stated Term or any extension thereof upon not less than sixty (60) days prior written notice to Manager.  In addition, Owner may terminate this Agreement (by written notice to Manager) at any time upon the occurrence of any of the following occurrences:

7.1.1    Default.  In the event of a failure by the Manager to observe or perform any material obligation to be observed or performed by Manager under this Agreement, which failure shall continue uncured for a period of thirty (30) days after written notice thereof to Manager, provided that Manager's time period to cure such failure shall be extended for a period reasonably required to complete the cure thereof, if the cure of such failure within such thirty (30) day period is not capable of performance with reasonable efforts, provided  (i) the Manager shall have commenced actions to cure such failure within such thirty (30) day period and shall diligently pursue the curing of such failure until fully remedied and (ii) the cure period shall not in any event exceed ninety (90) days;

16

7.1.2   Bankruptcy.  The occurrence of any of the following by, against or with respect to Manager:

(a)   The commencement of a case under Title 11 of the U.S. Code, as now constituted or hereafter amended, or under any other applicable federal or state bankruptcy law or other similar law (which, in the case of an involuntary proceeding, is not dismissed within 60 days after such commencement);

(b).   An assignment for the benefit of creditors;

(c)   The appointment pursuant to any judicial proceeding of a trustee or receiver to take possession of all or a major portion of Manager's property, which possession is not restored to Manager within 60 days after such appointment;

(d)   An attachment, execution or other judicial seizure of all or a major portion of the property of Manager (where such seizure is not discharged within 60 days after the date the same is effected); or

(e)   In any legal proceeding, the adjudication or stipulation of insolvency or inability to pay debts as and when they come due.

7.1.3   Casualty or Condemnation.   Owner permanently discontinues the operation of the Center on account of damage to or destruction of, or a taking by (or sale under threat of) eminent domain of a substantial part of the Center.

7.1.4   Occupancy.   (a) If at any time after the Grand Opening Date less than seventy-five (75%) percent of the rentable square footage of the Center (excluding spaces for Belks, Bass Pro Shop and any premises for which Owner has provided notice pursuant to Section 4.9.2.1 hereof regarding a Related Party) (the "Applicable Space") is leased (an "Occupancy Event"), then Owner may terminate this Agreement, but only if (i) Owner gives written notice to Manager that an Occupancy Event has occurred, and (ii) such Occupancy Event has been in effect for (A) not less than two hundred forty (240) days during the preceding three hundred and sixty five (365) day period or (B) one hundred and eighty (180) consecutive days.

(b)   If on the Grand Opening Date, Manager has failed to secure executed Leases for not less than eighty five percent (85%) of the Applicable Space. Owner shall have the right to terminate this Agreement pursuant to this Section 7.1.4(b) only so long

as such termination notice is received by Manager within thirty (30) days after the Grand Opening Date. If Manager does not receive such termination notice provided in this Section 7.1.4(b) within thirty (30) day period, Owner's right to terminate this Agreement pursuant to this Section 7.1.4(b) shall thereafter be void and of no further force or effect.

7.1.5    Sale of the Center.  Upon the sale of all or substantially all of the Center.

7.1.6.    Financing Termination.  This Agreement shall be subject to termination in the event that Manager fails to execute any agreement required by the Financing Documents in connection with the financing of the Center.

7.1.7.    Termination of Development Agreement.  Upon the termination of that certain Development, Consulting and Leasing Agreement dated as of May 15, 2003, as amended from time to time (the "Development Agreement") by and between the Owner and Manager as a result of a default thereunder by Manager.

Section 7.2    Termination by Manager.  In the event of a failure by Owner to observe or perform any material obligation to be observed or performed by Owner under this Agreement, which failure shall continue uncured for a period of ten (10) days after written notice for any required funding obligation of Owner hereunder, and for thirty (30) days after written notice thereof to Owner for any other material obligation, provided that the Owner's time period to cure such failure within such thirty (30) day period is not capable of performance with reasonable efforts, provided (i) the Owner shall have commenced actions to cure such failure within such thirty (30) day period and shall thereafter diligently pursue the curing of such failure until fully remedied and (ii) the cure period shall not in any event be permitted to exceed ninety (90) days.

Section 7.3    Effect of Termination.  Termination of this Agreement shall terminate all rights and obligations of the parties hereunder (but such termination shall not affect the rights and obligations of the parties arising during or relating to the period prior to the date of such termination, or otherwise expressly provided to survive such termination under this Agreement, and shall not prejudice the rights of either party against the other for any prior breach of this Agreement, except as expressly provided to the contrary herein).  Without limitation on the generality of the foregoing, termination of this Agreement shall terminate any and all rights of Manager to act in such capacity on

18

behalf of or with respect to the Center (and Manager shall, if Owner so requests, execute a notice to third parties that such rights of Manager have been so terminated). Except as otherwise provided herein, in the event of the termination of this Agreement, Manager shall be paid all compensation theretofore earned under the terms of this Agreement.

Section 7.4  Final Accounting.  Upon the termination of this Agreement for any reason whatsoever, Manager shall, without any further compensation, cooperate with Owner and do all things reasonably necessary to achieve an efficient transition of the management of the Center without detriment to the rights of the Owner or to the continued management of the Center (which obligation shall survive the termination of this Agreement). Manager, shall deliver to Owner, or to such person or persons as Owner may direct, all property documents, permits, books, records and accounts, rent rolls, insurance policies, files and other materials relating to the Center, including documentation required to transfer sole control over the Center Accounts to Owner or its designee as well as appropriate assignments to Owner or Owner's designee of any service or supply contracts. Within thirty (30) days after termination of the Agreement, Manager shall deliver a final accounting to Owner reflecting all income and expenses of the Center as of the date of such termination.

## SECTION VIII

### MISCELLANEOUS

Section 8.1  No Joint Venture.  This Agreement shall not be construed as effecting a partnership or joint venture between Owner and Manager.  Subject to the express provisions set forth herein, each of the parties shall have the right to engage in other businesses and business transactions and the other party shall have no right or interest therein.

Section 8.2  Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that Manager shall not be entitled to assign this Agreement without the prior written consent of Owner except to Manager's Affiliate, but no such assignment shall release the Manager from its obligations under this Agreement. Owner shall have the

19

absolute right to assign its rights and obligations under this Agreement without the need for any consent whatsoever by Manager.

Section 8.3    Insurance and Waiver of Subrogation.

8.3.1    Insurance.    Owner shall maintain, and upon the written request of Owner, Manager shall assist Owner to effect and maintain such insurance as Owner designates (which must include at least all insurance required by Owner's mortgagee to be effected and maintained and which coverage shall be primary for all claims with respect to the Center) and in no event shall such commercial general liability insurance, combined single limit per occurrence be less than Twenty Five Million Dollars ($25,000,000.00). Owner agrees to look solely to such insurance coverage for any covered claims at the Center; provided, however, that the foregoing provision shall in no event limit Manager's obligations under Section 8.5 hereof. Owner shall cause copies of all insurance policies or certificates thereof to be delivered to Manager promptly upon issuance or renewal of each policy. Manager, at Owner's request, will work in consultation with Owner's insurance broker or consultant to identify coverage carried by other first class shopping centers. Owner acknowledges that Manager is not engaged in the business of procuring or advising on insurance matters and earns no fee or income of any kind with respect to the placement of insurance. All decisions with respect to such insurance are at the sole discretion of Owner and Manager makes no representation and is not liable with respect to the adequacy, or the limits of such coverage. All such policies of insurance shall include as named insureds, Owner, Manager and any mortgagee, as their respective interests may appear and shall contain a lender's loss payable endorsement as required by any deed of trust on the Center. No such insurance which names Manager as a named insured shall be cancelled non-renewed or reduced without providing thirty (30) days prior written notice of the same to Manager.

Manager shall maintain, as an expense of the Center or otherwise at Owner's expense, workers' compensation and unemployment insurance in amounts required or permitted by statute and employers' liability insurance in the amount of at least $500,000 per occurrence (if on-site workers will be on Manager's or its Affiliate's payroll), and

20

such other insurance, if any, as Manager deems reasonable and appropriate so long as such expenses are included within the Approved Annual Budget.

8.3.2    Waiver of Subrogation and Right of Recovery.    Owner and Manager waive any right to recover against each other for claims covered by their respective policies of insurance.  This provision is intended to waive fully, and for the benefit of Owner and Manager, any rights and/or claims which might give rise to a right of subrogation in favor of any insurance carrier. Without limiting the foregoing, neither Owner or Manager shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage even though such loss or damage may have been caused in whole or in part by the negligence of such party, its agents or employees.

Section 8.4    Owner Indemnity. Owner shall defend (through counsel selected or approved by Manager), indemnify and hold Manager and its Affiliates harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, back-pay awards, costs and expenses (including, without limitation, court costs and experts' and attorneys' fees) relating to the Center or otherwise arising out of or in connection with this Agreement or the performance by Manager of its obligations and duties hereunder, and Owner hereby waives all claims against Manager in connection therewith, except to the extent that a court of competent jurisdiction rules that any of the foregoing were caused solely by Manager's gross negligence, willful misconduct, intentional misrepresentation, or acts outside the scope of Manager's authority as provided herein .

Section 8.5    Manager Indemnity.  Manager shall defend, indemnify and hold Owner harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, back-pay awards, costs and expenses (including, without limitation, court costs and experts' and attorneys' fees) arising, as determined by a court of competent jurisdiction, solely by reason of Manager's gross negligence, willful misconduct, intentional misrepresentation, or acts outside the scope of Manager's authority as provided herein.

Section 8.6    Violations of Laws; Environmental Liabilities.  If either Owner or Manager becomes aware of any "Violations of Laws" or of any "Environmental Liabilities" (as such terms are defined below) relating to the Center, each shall promptly advise the other party.  Owner represents and warrants that, to the best of its knowledge after reasonable investigation, the Center is not subject to any Violations of Laws, and to the best of its knowledge after reasonable investigation, the Center is not subject to any Environmental Liabilities, except those which Owner has disclosed in writing to Manager.  "Laws" herein shall mean all federal, state, county and local governmental or municipal laws, ordinances, regulations, judgments, orders, rules and other such requirements, decisions by courts in cases where such decisions are binding precedents in the state in which the Center is located, and decisions of federal courts applying the Laws of such state, at the time in question, including but not limited to all "Environmental Laws" (as defined below) and those pertaining to fair employment, fair credit reporting, health, safety, building code, rent control, taxes, equal access or fair housing, including, but not limited to, any law prohibiting, or making illegal, discrimination on the basis of race, sex, creed, color, religion, national origin, economic or governmentally subsidized status, or physical, mental or other disability or condition, and any labor laws. "Environmental Laws" herein shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601, et seq., Hazardous Materials Transportation Act, 49 U.S.C. 1801, et seq., Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901 et seq., Clean Air Act, 42 U.S.C. 7401 et seq., Clean Water Act, 33 U.S.C. 1251, et seq., Safe Drinking Water Act, 14 U.S.C. 300f, et seq., Toxic Substances Control Act, 15 U.S.C. 2601, et seq., Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136 et seq., Atomic Energy Act of 1954, 42 U.S.C. 2014 et seq., and any similar federal, state or local Laws, and all regulations, guidelines, directives and other requirements thereunder, all as may be amended or supplemented from time to time.  "Environmental Liabilities" herein shall mean conditions that involve the presence (whether actual or alleged) of any Hazardous Substance, conditions that are subject to any Environmental Laws, and all claims relating thereto.  The term "Hazardous Substance" for purposes hereof shall mean any flammable,

explosive, toxic, radioactive, biological, corrosive or otherwise hazardous chemical, substance, liquid, gas, device, form of energy, material or waste or component thereof including, without limitation, all items now or hereafter listed, defined or regulated as a hazardous or toxic chemical, substance, liquid, gas, device, form of energy, pathogen, material or waste or component thereof by any federal, state or local governing body or agency having jurisdiction. "Violations of Laws" herein shall mean all actual and alleged violations of any Laws.

8.6.1 Notwithstanding any other provision of this Agreement to the contrary, Manager shall have no liability for conducting any environmental response activity, including without limitation, emergency response, investigation and cleanup, unless Manager specifically agrees in writing to conduct such response activity and Manager's additional compensation for conducting such activity is set forth as part of such agreement. (Any emergency response taken by Manager shall not be deemed to be an agreement to conduct any response activity.) Owner shall attend all meetings with regulatory agencies concerning Environmental Liabilities affecting the Center, and Owner shall be responsible for consulting with Manager in making all decisions concerning responses to such regulatory agency activities.

Section 8.7    Software. Any software provided by either party in connection with this Agreement shall: (a) remain the property of such party, (b) be used only in the manner authorized by such party from time to time, and (c) be returned upon termination of this Agreement, or earlier as requested by such party.

Section 8.8    Limitation of Liability. Neither parties' shareholders, officers, directors, employees, affiliates or agents shall have any liability under or in connection with this Agreement or relating to the Center. For purposes of all provisions of this Agreement requiring that Owner insure, defend or indemnify Manager, the term "Manager" shall include Manager's Affiliates (as defined in Section 4.9.4). The liability of Owner under this Agreement shall be limited to Owner's interest in the Center.

Section 8.9    Attorneys' Fees. If any party obtains a judgment against any other party by reason of breach of this Agreement, the prevailing party shall be entitled to recover its enforcement costs, including, without limitation, reasonable attorney's fees,

23

Section 8.10  No Waiver.  Time is of the essence of this Agreement.  No waiver by either party of any default by the other party or of any event, circumstance or condition permitting a party to terminate this Agreement shall constitute a waiver of any other default by such other party or of any other event, circumstance or condition permitting such termination, whether of the same or of any other nature or type and whether preceding, concurrent or succeeding; and no failure on the part of either party to exercise any right it may have by the terms hereof or by law upon a default by the other party and no delay in the exercise of such right shall prevent the exercise thereof by the non-defaulting party at any time when the other party may continue to be so in default, and no such failure or delay and no waiver of default shall operate as a waiver of any other default, or as a modification in any respect of the provisions of this Agreement. The subsequent acceptance of any payment or performance pursuant to this Agreement shall not constitute a waiver of any preceding default by a defaulting party or of any preceding event, circumstance or condition permitting termination hereunder, other than default in the payment of the particular payment or the performance of the particular matter so accepted, regardless of the non-defaulting party's knowledge of the preceding default or the preceding event, circumstance or condition, at the time of accepting such payment or performance, nor shall the non-defaulting party's acceptance of such payment or performance after termination constitute a reinstatement, extension or renewal of this Agreement or revocation of any notice or other act by the non-defaulting party.  No waiver of any provision of this Agreement shall be effective unless signed by the party against whom the waiver is asserted.

Section 8.11  Integration; Amendment.  This Agreement, including the exhibits attached hereto, constitutes the entire agreement between the parties hereto relative to the subject matter hereof.  Any prior negotiations, correspondence or understandings relative to the subject matter hereof shall be deemed to be merged in this Agreement.  This Agreement may not be amended or modified except in writing, executed by each of the parties hereto.

Section 8.12  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state in which the Center is located.

24

Section 8.13  Notices.  All notices and other communications provided for in this Agreement shall be in writing and may be personally delivered or mailed by certified or registered United States mail, return receipt requested, or by recognized overnight mail service postage prepaid and addressed as follows:

(a)    If to Owner, to:

HCW Development Company, L.L.C.

3027 W. Country Music Boulevard

Branson, MO 65616

Attention: Richard E. Huffman

(b)    If to Manager, to:

Urban Retail Properties Co.

900 North Michigan Avenue

Chicago, Illinois 60611

Attention:  General Counsel

or to such other address as any party shall hereafter designate by notice to the others as herein provided.  Any notice, demand or request shall be effective upon receipt.

Section 8.14  Captions.  The Section headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

Section 8.15  Inspection by Owner.  Neither this Agreement nor anything contained herein shall be deemed to limit Owner's right to enter upon or inspect the Center or to perform any repair or maintenance or to do or perform any matter or thing required of Manager hereunder in the event of Manager's failure to do so, and, without limitation of Owner's other rights as owner of the Center, Owner shall have the right to do any or all of the foregoing in the event of such failure.

Section 8.16  Counterparts.  This Agreement may be executed in any number of counterparts and each shall be considered an original and together they shall constitute one and the same instrument.

Section 8.17  Licenses.  Manager hereby represents and warrants to Owner that Manager is a duly licensed broker under the laws of the State where the Center is located

25

and has provided Owner the disclosure set forth in Exhibit B attached hereto and made a part hereof.

[SIGNATURE PAGE TO FOLLOW}

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

Owner: HCW Development Company

By: _____

Title: _____

Manager: Urban Retail Properties Co.

By: _____

Michael Law, Designated Broker and

Authorized Party

08CV4330
JUDGE NORGLE
MAG. JUDGE VALDEZ
J. N.

URBAN RETAIL PROPERTIES, LLC,     )
fka URBAN RETAIL PROPERTIES CO.,  )
                    Plaintiff,    )     Civil Action No. _____
v.                                )
                                  )     (Removed from Circuit Court
HCW DEVELOPMENT COMPANY, LLC,)          of Cook County, Illinois)
                    Defendant.    )

# Exhibit "A"

## Part 2 (pp. 36-80)

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

Owner: HCW Development Company

By: _____

Title: _____

Manager: Urban Retail Properties Co.

By: _____

Michael Law, Designated Broker and Authorized Party

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205IV-clean.doc

<u>**EXHIBIT A**</u>

<u>**MANAGEMENT FEES AND LEASING COMMISSIONS**</u>

1.    <u>Management Fee.</u>  Manager shall receive a monthly management fee equal to the greater of (a) Twelve Thousand Dollars ($12,000.00) (the "Minimum Monthly Payment") or (b) three and one half percent (3.5%) of Receipts (as hereinafter defined) per calendar month (the "Management Fee").  Any Management Fee for any partial calendar months shall be prorated on a per diem basis. The term "Receipts" as used herein shall mean the (x) gross amount of payments received as base, fixed or minimum rent, percentage or overage rent from tenants at the Center; provided, however, for purposes of this clause (x), only, an amount equal to the minimum rental payable by Westgate Resorts, Ltd. under its lease (the "Westgate Tours Lease") with Owner shall be included for such tenant, with minimum rent being $40 per square foot,  (y) rental loss insurance proceeds received by Owner in lieu of the rent payable to Owner as set forth in clause (x) above for the Center and (z) the Marina Base Payment.  "Receipts" shall not include (i) all fees, charges and payments by tenants and other parties for real estate taxes, insurance, common area or other expenses, heating, ventilating, air-conditioning or other utilities, (ii) any parking revenue from the Parking Garage, (iii) any receipts from  Sponsor Payments, (iv) any proceeds received and collected from (A) the financing or sale of all or any portion of the Center; (B) the condemnation or taking of all or any portion of the Center by eminent domain; (C) insurance polices (except for rental loss insurance proceeds as set forth above), (D) any extraordinary or non-recurring event, (other than Termination Fees as provided below) including but not limited to proceeds from any litigation other than rent collections and interest collected thereon, (E) security deposits (unless applied upon rent), (F) interest on invested funds and (G) amounts paid to Owner by tenants in reimbursement for costs of materials and  labor for improvements made by Owner in tenants' premises and not included in minimum rents.  The Manager shall be entitled to receive the Minimum Monthly Payment commencing on the first day of the month 120 days prior to the Grand Opening Date determined by the Owner and on the first day of each month thereafter during the Term. Any portion of the Management Fee in excess of the Minimum Monthly Payment shall be payable twenty (20) days after the end of the applicable calendar month and based upon the monthly report delivered and received by Owner for such applicable month. In the event that Owner receives an early termination fee (a "Termination Fee") for any termination of a lease, the Termination Fee included within Receipts shall be equal to the lesser of (a) the Termination Fee actually received by the Owner or (b) an amount equal to twelve (12) months of minimum rent due from such tenant from and after the date of such termination.

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205IV-clean.doc

2.  Commission Rates.  For leases (other than those for the Belk's Lease, Bass Pro Lease, the Westgate Tours Lease or a Temporary Lease (as defined herein), commissions shall be as follows:

a.    New Leases:  $5.00 per rentable square foot.

b.    Renewals:    One-half (1/2) of the amount payable for a New Lease. No renewal commission fee shall be payable for any existing option to renew exercised by a tenant for such premises under its Lease.

c.    Expansions:    New lease rate for new area to be occupied by such tenant and renewal rate for original space of such tenant for any extended term

Notwithstanding any provision herein to the contrary, except as otherwise expressly set forth in the last sentence of Section 3 below, in the event any tenant procured by Manager defaults under its lease for such space, other than Belk's or Temporary Lease tenants (the "Default Space") and such lease is terminated within the first eighteen (18) months of the commencement date thereof, Manager shall receive 50% of the commissions listed above for procuring the next replacement tenant for the Default Space and shall be entitled to the applicable New Lease rate for any additional space leased in excess of the Default Space.

2A.  Belk's Lease.   Manager shall be paid a commission of $150,000.00 for the lease (the "Belk's Lease") entered into by Owner and Belk's. Manager acknowledges that Manager has received a commission of $75,000 with respect to the Belk's Lease as of the date hereof. The remaining portion of the commission for the Belk's Lease shall be due and payable upon the opening of Belk's with the general public and the payment of the first minimum rent payment by Belk's under the Belk's Lease. Upon any request from Owner to Manager to provide consulting services post opening with respect to the Belk's Lease, Manager shall be paid the hourly fees for such services based on the schedule set forth in Exhibit D attached hereto and made a part hereof.

3.    Payment of Commissions.   For new leases (a "New Lease") (other than the Belk's Lease, Bass Pro Shop Lease, Westgate Tour Lease or any Temporary Lease), (a) one-half of the commission shall be paid on execution of the New Lease by Owner and such tenant (the "Execution Date") and (b) one-half of such commission on the date such tenant under the New Lease opens for business at the Center with the general public and pays its first monthly payment of minimum rent (the "Commencement Date"). For renewal leases with existing tenants and for leases dealing with expansion space for existing tenants, the full commission shall be payable upon execution of the lease for such existing tenants. In the event that the Owner agrees to the abatement of rent for any tenant (an "Abatement Tenant"), the remaining installment of such commission with respect

to such Abatement Tenant shall be due and payable on the date that such Abatement Tenant opens for business with the general public. In the event that Manager fails to receive any second installment of the lease commission because the Commencement Date does not occur and such lease of such tenant is terminated within the first eighteen (18) months of the commencement thereof, the Manager shall be entitled to a full commission with respect to the re-leasing of such Default Space and not limited to fifty per cent (50%) of such commission as otherwise provided in paragraph 2 hereof.

4.     Temporary Leases.  A commission shall be payable with respect to any kiosk tenancies, license agreements, retail merchandising unit tenancies, month-to-month tenancies and any leases with a term of one year or less (collectively referred to as "Temporary Leases") in the amount of ten percent (10%) of the monthly gross receipts payable with respect to such Temporary Leases and such amounts shall be due and payable within twenty (20) days after the end of such month such receipts are received by Owner from such sources and based on the monthly reports received by Owner from Manager with respect to the same. In the event this Agreement expires or is terminated for any reason, any portion of such commission which is based on gross receipts which have not yet been collected, shall be due and payable within thirty (30) days of the date of such expiration or termination. Any employee of Manager dedicated solely for such purpose shall be at the sole cost and expense of Owner.

5.     Documents Entered After Termination.  (a) Within thirty (30) days after termination of this Agreement for any reason other than as described in clause (b) of this Paragraph 5, Manager shall submit to Owner a written list of parties: (a) to whom Manager has presented a written proposal prior to termination of the Agreement, and (b) who have responded to such proposal in writing prior to termination of this Agreement. If Owner or its representative, or any successor to Owner, shall execute a lease with any such party respecting the Center within ninety (90) days after this Agreement has been terminated, Manager shall be entitled to a commission on the terms described above when the lease is executed by Owner and such tenant. The obligation to pay such commission to Manager shall survive the termination of this Agreement.

(b)     In the event the Development Agreement is terminated pursuant to the terms of Section 1.7 (b) thereof, and as a result of such termination this Agreement is terminated pursuant to Section 7.1.1 hereof, then:

(i)     Manager shall be entitled to receive a commission (on the terms described above) for any lease respecting the Center executed within three (3) years of the date of termination of this Agreement by Owner or its representative, or any successor to Owner, and tenant, which was an Approved Deal as of or prior to the effective date of such termination. An "Approved Deal" is a proposed lease transaction where

30

both (A) the basic economic terms of such lease have been approved by Owner in writing; and (B) tenant and Owner or Manager are negotiating the remainder of the terms of such lease. Manager shall submit a written list of such Approved Deals to Owner within thirty days after termination of this Agreement.

      (ii)     In addition to a list of Approved Deals, within thirty (30) days after termination of this Agreement, Manager shall submit to Owner a written list of parties: (A) to whom Manager has presented a written proposal prior to termination of the Agreement, and (B) who have responded to such proposal in writing prior to termination of this Agreement. If Owner or its representative, or any successor to Owner, shall execute a lease with any such party respecting the Center within one hundred eighty (180) days after this Agreement has been terminated, Manager shall be entitled to a commission on the terms described above when the lease is fully executed.

The obligation to pay to Manager the commissions described in this Paragraph 5(b) shall survive the termination of this Agreement.

    6.     <u>Tenant Coordination Fees</u>. Manager shall perform the tenant coordination services for Owner described on Schedule II attached hereto and made a part hereof. Manager shall prepare a proposed budget (such budget and any revision thereto approved in advance by the Owner is referred to herein as "PGO Budget"), and the PGO Budget which has been approved as of the date hereof is attached hereto as Schedule III, for the cost of providing such services during the period from October 1, 2004 through May 30, 2006 (such period referred to herein as the "Grand Opening Period"). As compensation for performing such tenant coordination services during the Grand Opening Period, Manager shall receive the lesser of (a) the amount set forth in the PGO Budget for staff time costs for the Grand Opening Period (the "Budgeted Amount") and (b) the actual staff time costs incurred by Manager for such period based on the rates set forth in Schedule IV attached hereto and made a part hereof. Such fees shall be paid monthly within thirty (30) days after receipt by Owner of an invoice from Manager for such services. After the Grand Opening Period, except for Excluded Tenants (as herein defined), Manager shall receive for tenant coordination services a flat fee (the "Tenant Coordination Fee") of (a) $1,500 for each lease with square footage of 2500 rentable square feet of less and (b) $3,000 for each lease with square footage of in excess of 2500 rentable square feet and up to 15,000 rentable square feet, for staff time for tenant coordination services provided by Manager at the request of Owner. Any tenant coordination fees for leases in excess of 15,000 square feet shall be negotiated by the parties on a deal by deal basis. Excluded Tenants shall mean any restaurant tenants and those tenants set forth on Exhibit E attached hereto and made a part hereof. For each Excluded Tenant, the Tenant Coordination Fee shall be $5,000. Such services shall specifically include the

31

review and approval of any tenant allowance payments payable to any tenant under a lease. After the Grand Opening Period, Owner shall pay the Tenant Coordination Fee within thirty (30) days of the date such tenant opens for business at the Center; provided, however, that such fee shall be payable within thirty (30) days after invoice for any tenant which fails to open for business at the Center after such services have been performed by Manager.

The Owner shall be responsible for any third party expenses incurred by Manager up to the amount set forth in the PGO Budget. Manager shall not incur any third party expenses in excess of the amount set forth in the PGO Budget without the prior approval of Owner, which approval shall be in the sole and absolute discretion of Owner. After the Grand Opening Period, no third party expenses shall be incurred in excess of amounts provided in the Approved Annual Budget without the prior written consent of the Owner.

The parties presently contemplate that the Grand Opening Date for the Center will be May 1, 2006 (the "Scheduled Date") and the PGO Budget is based on such date. In the event that the grand opening of the Center does not occur on or before the Scheduled Date, the Budgeted Amount for purposes of clause (a) of the third sentence of this paragraph 6 shall be increased based on the budgeted amount for such services set forth in the PGO Budget for the month of April, 2006. By way of example, and not by way of limitation, if the PGO Budget sets forth a Budgeted Amount of $500,000 and a monthly budget of $50,000 for the month of April in 2006, and the Center does not open on the Scheduled Date, if the Center opens on June 1, 2006, the Budgeted Amount would be increased to $550,000.

7.    Landlord Work Supervision Fee.    If requested to provide such service by Owner, Manager shall receive a supervision fee (the "Supervision Fee") in connection with supervising the construction work required to be performed by Owner under a lease at the Center (other than the Belk's Lease). Such Supervision Fee shall be negotiated on a deal by deal basis with Manager if Owner desires Manager to provide such services. Any Supervision Fee shall be payable as agreed upon by Owner and Manager.

8.    Marketing Fee.    For services described in Section 4.2 of the Agreement, Manager shall receive an annual fee (the "Marketing Fee") of five percent (5%) of all contributions by tenants at the Center to any marketing fund (the "Marketing Fund") in place at the Center from time to time. Manager shall not be entitled to receive any Marketing Fee with respect to any sums contributed by Owner to the Marketing Fund. The Marketing Fee will be paid on a monthly basis no later than the twentieth (20th) day of each calendar month with respect to such contributions made in the preceding month and based upon the monthly report provided by Manager to Owner for such applicable month.

Prior to the Grand Opening Date, Owner shall reimburse Manager for marketing services performed by a personnel employed at Manager's home office at the rate of $150 per hour, subject to a maximum amount, to be agreed upon in a marketing budget to be agreed upon by Owner and Manager. It is agreed and acknowledged that such services are in addition to the services to be provided by the marketing director based at the Center (and who prior to completion of the Center may be based elsewhere and all compensation payable to such person is to be included as part of the Approved Annual Budget).

9.    Lease Documentation Fees. In the event that Owner requests Manager to prepare the Leases for the Center and Manager has sufficient staff time available to do so, Manager's staff shall prepare such Leases. As compensation therefor, Owner shall pay Manager a fee (the "Lease Documentation Fee") of $3,500 for each Lease (a) of ten thousand square feet (10,000) or less of rentable space and (b) not a Lease for a restaurant (any such Lease described as a "Standard Lease"). For any lease other than a Standard Lease to be prepared by the Manager's in-house legal staff, the parties agree that the fee shall be based on Manager's in house staff hourly rate set forth below. No such fee shall be payable with respect to the Belk's Lease. Except as set forth herein, the Lease Documentation Fee for a Standard Lease shall be due and payable upon execution of the lease by the tenant and Owner; provided, however, that if lease negotiations are terminated prior to lease execution, Manager shall be paid within thirty (30) days of presentation of an invoice to Owner the lesser of (a) $3500 or (b) time spent on such lease negotiation multiplied by the hourly fee set forth below. The Lease Documentation Fee for all Leases which are not Standard Leases shall be payable monthly within thirty (30) days of presentation of an invoice therefor. The Manager agrees to cause its in-house staff to keep time records in connection with the negotiation of any lease and the agreed rate for such work shall be $185.00 per hour. Such fees are subject to an annual increase of the lesser of (a) four percent (4%) per annum or (b) the increase in the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics, for All Urban Consumers, U.S. City Average, All Items (1982-84=100) (the "CPI") for the last month in such immediately preceding year..

No outside legal counsel shall be utilized without the prior written consent of the Owner. The Owner shall be responsible for the payment of any outside legal counsel.

For services of Manager's lease administrators for coordination of the preparation of lease documentation prepared by outside counsel, Owner shall pay Manager a fee of $125.00 per hour for time spent on such services. Such fees are subject to an annual increase of the lesser of (a) four per cent (4%) per annum or (b) the increase in the CPI for the last month in such immediately preceding year. Such fees shall be due and payable monthly within thirty (30) days after receipt of the invoice by Owner from Manager.

33

10.    Outside Brokers:    Manager will not work with any outside broker (an "Outside Broker") on any lease transactions unless Owner has given its consent in advance.    Any such commission payable to an Outside Broker so approved by Owner is herein called an "Approved Outside Broker Commission".    If Owner does so consent, Owner will pay the Approved Outside Broker Commission and Manager's commission with respect to any lease transaction shall not be reduced. The Outside Broker shall be paid at the same time that Manager is paid its commission.

The Owner hereby agrees to pay the Manager its standard leasing commission of $5.00 per rentable square foot for the leases   set forth on Exhibit C attached hereto and made a part hereof and the amounts set forth as the Approved Outside Broker Commission to the Outside Broker listed in Exhibit C.

11.    Sponsorship Payment.    For obtaining corporate sponsorship payments (a "Sponsor Payment") from sponsors, Manager shall receive a sponsorship fee of ten percent (10%) of the gross revenue payable to Owner in connection with such Sponsor Payment (the "Sponsor Fee").  No agreement with any sponsor shall be entered into without the prior written approval of Owner, which approval may be withheld in the sole and absolute discretion of Owner. A "Sponsor" is any person or entity entering into one or more agreements (a "Sponsor Agreement") with Owner, the primary purpose of which  is  to increase brand name or product exposure by means of advertising, product sales or providing services or other consideration to Owner in connection with the Center. The Sponsor Fee shall be payable within twenty (20) days of the date the Owner receives the Sponsor Payment. In the event that any Sponsor Payment is received after the termination of this Agreement, the obligation of Owner to pay the Sponsor Fee shall survive the termination of the Agreement. No Sponsor Payment shall be due in the event a Sponsor obtained by Manager enters into an agreement with Owner to obtain naming rights for any physical feature at the Center. Any such fee for such naming rights shall be determined by the parties on a deal by deal basis.

12.    Marina Payment.  Manager acknowledges that Owner will be entering into an agreement (the "Marina Agreement") with a third party operator for operation of the marina.  For purposes of determining Receipts, only the base minimum rent payable under the Marina Agreement (the "Marina Base Payment") shall be included. Manager shall not be entitled to receive any additional fee with respect to the services it performs with respect to the marina.

13.    Parking Garage.  Manager acknowledges that Owner will be entering into a parking agreement with a third party operator with respect to the operation of a parking garage located at the Center (the "Parking Garage"). Owner agrees that Manager shall have the right to bid to provide such services with respect to the Parking Garage. The term Receipts shall not include any revenue received by Owner from the Parking Garage.

34

14.    Incentive Fees.  (a)  In the event that as of the Grand Opening Date, at least 90%, but less than 95%, of the Applicable Space at the Center is subject to executed Leases, then Owner shall pay to Manager, an amount equal to $1.00 per rentable square foot for such Leases in addition to the amounts provided in paragraph 2 of this Exhibit A.

(b)    In the event as of the Grand Opening Date, 95% or more of the Applicable Space at the Center is subject to executed Leases, then Owner shall pay to Manager, an amount equal to $1.25 per rentable square foot for such Leases in addition to the amounts provided in paragraph 2 of this Exhibit A.

(c)   Such incentive fees for any Lease shall be due and payable by Owner to Manager within thirty (30) days after the Grand Opening Date if such tenants shall be open within thirty (30) days after the Grand Opening Date, and on the Commencement Date of such Lease, if such tenant shall not be open for business within thirty (30) days after the Grand Opening Date.

**EXHIBIT B**

**MISSOURI DISCLOSURE FORM**

EXHIBIT B

| Other Agency Relationships |
| --- |

Missouri law does not prohibit written agency agreements which provide for duties exceeding that of a limited agent described in this pamphlet.

**This brokerage authorizes the following relationships:**

- ☐ Seller's Limited Agent
- ☒ Landlord's Limited Agent
- ☐ Buyer's Limited Agent
- ☐ Tenant's Limited Agent
- ☐ Sub-Agent
- ☐ Disclosed Dual Agent
- ☐ Designated Agent
- ☐ Transaction Broker
- ☐ Other Agency Relationship

**Broker or Entity Name and Address**

Urban Retail Properties Co.
900 N. Michigan Avenue
Chicago, IL 60611

## MISSOURI BROKER DISCLOSURE FORM



This disclosure is to enable you, a prospective buyer, seller, tenant or landlord of real estate, to make an informed choice BEFORE working with a real estate licensee.

Missouri law allows licensees to work for the interest of one or both of the parties to the transaction. The law also allows the licensee to work in a neutral position. How the licensee works depends on the type of brokerage service agreements involved. Since the sale or lease of real estate can involve several licensees, it is important that you understand what options are available to you regarding representation and to understand the relationships among the parties to any transaction in which you are involved.

Missouri laws require that if you want representation, you must enter into a written agreement. This may or may not require you to pay a commission. You do not need to enter into a written agreement with a transaction broker unless you intend to compensate this licensee. These agreements vary and you may also want to consider an exclusive or nonexclusive type of relationship.

If you choose not to be represented by an agent, the licensee working with you may be working for the other party to the transaction.

Provided by the Missouri Real Estate Commission as of January, 1996

Page 1 of 2

EXHIBIT B

## CHOICES AVAILABLE TO YOU IN MISSOURI

### Seller's or Landlord's Limited Agent

Duty to perform the terms of the written agreement made with the seller or landlord, to exercise reasonable skill and care for the seller or landlord, and to promote the interests of the seller or landlord with the utmost good faith, loyalty and fidelity in the sale, lease, or management of property.

Information given by the buyer/tenant to a licensee acting as a Seller's or Landlord's Limited Agent will be disclosed to the seller/landlord.

### Buyer's or Tenant's Limited Agent

Duty to perform the terms of the written agreement made with the buyer or tenant, to exercise reasonable skill and care for the buyer or tenant and to promote the interests of the buyer or tenant with the utmost good faith, loyalty and fidelity in the purchase or lease of property.

Information given by the seller/landlord to a licensee acting as a Buyer's or Tenant's Limited Agent will be disclosed to the buyer/tenant.

### Sub-Agent (Agent of the Agent)

Owes the same obligations and responsibilities as the Seller's or Landlord's Limited Agent, or Buyer's or Tenant's Limited Agent.

### Disclosed Dual Agent

With the written consent of all parties, represents both the seller and the buyer or the landlord and the tenant.

A Disclosed Dual Agent may disclose any information to either party that the licensee knows that is material to the transaction.

A dual agent may not disclose to customer/client information that is considered confidential, such as:
- Buyer/Tenant will pay more than the purchase price or lease rate
- Seller/Landlord will accept less than the asking price or lease rate
- Either party will agree to financing terms other than those offered
- Motivating factors for any person buying, selling or leasing the property
- Terms of any prior offers or counter offers made by any party.

### Designated Agent

Acts as your specific agent, whether you are a buyer or seller, or seller or landlord. When the broker making this appointment, the other real estate licensees in the company do not represent you.

There are two exceptions with both working in dual agency:
1. The agent representing you as a buyer or tenant is also the agent who listed the property you may want to buy or lease.
2. The supervising broker of two designated agents becomes involved in the transaction.

### Transaction Broker

Does not represent either party, therefore, does not advocate the interest of either party.

A transaction broker is responsible for performing the following:
- Protect the confidence of both parties
- Exercise reasonable skill and care
- Present all written offers in a timely manner
- Keep the parties fully informed
- Account for all money and property received
- Assist the parties in complying with the terms and conditions of the contract
- Disclose to each party of the transaction any adverse material facts known by the licensee
- Suggest that the parties obtain expert advice.

A transaction broker shall not disclose:
- Buyer/Tenant will pay more than the purchase or lease price
- Seller/Landlord will accept less than the asking or lease price
- Motivating factors of the parties
- Seller/Buyer will accept financing terms other than those offered.

A transaction broker has no duty to:
- conduct an independent inspection of, or discover any defects in, the property for the benefit of either party
- conduct an independent investigation of the buyer's financial condition.

Page 2 of 2

**EXHIBIT C**

Outside Broker

| New Lease | Approved Outside Broker Commission |
|-----------|-----------------------------------|
| Dress Barn | $13,467.00 |
| Jason's Deli | $15,000.00 |
| J. Jill | $40,000.00 |
| Chico's | $17,300.00 |
| White House | $13,315.00 |
| 3 Dog Bakery | $ 5,000.00 |

Exhibit D
Anchor Store Consulting Fees

President---$360.00 per hour
Vice President---$225.00 per hour

Such fees are subject to a an increase equal to the lesser of (a) 4% per annum or (b) the increase in the CPI for the last month in such immediately preceding year..

38

Exhibit E

Excluded Tenants

Perform Shops

Popcorn Shops

Cooked Pretzel Shops

Nail Salons

Hair Salons

SCHEDULE II

1/04/05

# TENANT COORDINATION SERVICES FOR BRANSON LANDINGS

### SET-UP SERVICES to be done in Chicago

- Work closely with leasing to provide design feasibility and preliminary budgeting for any work above Landlord standard
- Study the feasibility of all reconfigurations
- Review Base Building Documents as they relate to Tenant Construction and the creation of a criteria manual
- Establish a format for the Lease Outline Drawings
- Create the architectural and engineering criteria manual
- Customize Urban Retail Properties Co.'s Access Database for this project
- Meet with the city building official and establish procedures for tenants to obtain permits
- Create a code manual for Tenants
- Review standard lease and all relevant exhibits (already completed)
- Work with Website designer to put the design criteria and tenant construction bulletins on a website

### SET-UP SERVICES to be done after May 1, 2005 in Branson

- Set-up project office and hire project assistant
- Distribute permit procedures to Tenants
- Create a fire alarm manual
- Schedule meetings with each trade to establish a list of qualified regional sub-contractors

### DEAL PROCESS

- Send out customized Tenant Packages, including the LOD on disk – these will be sent as soon as they are completed either from Chicago or from Branson
- Closely monitor the progress of each tenant deal, their drawings, etc.
- Make follow-up phone calls
- Establish contact with all tenant architects and designers
- In-house architectural review of Tenant working drawings
- Sensitively resolve Tenant design issues during drawing review phase
- Provide a detailed summary of the architectural and engineering comments to the tenant and tenant's architect

Page 1 of 2

SCHEDULE II

### ON - SITE SERVICES

- Field verify each LOD for dimensions and utility stubs
- Issue Work Orders for changes to the Base Building Contractor for utility and demising wall modification due to leasing changes.
- Conduct a comprehensive Pre-construction Meeting with each Tenant's site superintendent
- Observe Tenant's construction on a daily basis and troubleshoot all problems
- Using Urban's sophisticated tracking system monitor daily all phases of the Tenant construction process
- Notify Tenant of any build-out behind schedule and recommend a solution.
- Resolve design/construction issues in the field
- Perform detailed punch lists for each tenant as work nears completion.
- Process Tenant Allowances.
- Issue bulletins weekly or as needed to keep contractors informed of code and mall issues

### COMMUNICATION

- Hold weekly (or more often as needed) status meetings with leasing, legal, and the development teams
- Maintain and create reports from the Access Database
- Advise legal regarding construction related lease issues
- Conduct regular meetings with city building officials regarding tenant permitting issues
- Meet weekly during the last 3 months with Management, Marketing and Security to coordinate activities.
- Meet weekly with the Base Building General Contractor and major sub-contractors to resolve discrepancies.
- Coordinate inspections for the city and the fire marshal
- Format and continuously update and publish Lease Plan

### SPECIAL SERVICES

- Design, price, hire architects, contractors, and write contracts for Landlord work for "Vanilla Boxes" and other types of Landlord Work
- Design, price and contract for barricade designs needed for Grand Opening
- Color CAD
- Kiosk and Cart coordination

SCHEDULE III

January 6, 2005

Rick Huffman
HCW Development Company LLC
3027 West Hwy 76, Suite B
Branson, MO 65616

Re:   Branson Landing

Rick:

As discussed in your telephone conversation with Charles Porter on Monday, I have revised the Tenant Coordination budget for the project to reflect the actual costs through the end of 2004 and the costs of Jason Westrope starting full time on this project on January 17th.  If you review page two, entitled Staff Timeline and Staff Costs, you will see that the costs are slightly lower than the original budget that we gave you in September. I have also revised the Travel, Office and Miscellaneous Expenses to reflect our discussion that HCW would provide office space free of charge for the Tenant Coordination staff. This revision along with some other revisions that always occur with more knowledge of the project has reduced these numbers. The Summary Sheet, page one, reflects all of these changes and a slightly reduced total estimate for the project.

It is important that the Tenant Coordination team get into full gear now. We all understand the importance of getting 50% of the leases fully executed by March. In order to accomplish this goal many of the tenants will demand answers on their construction issues prior to signing the lease. To date, I have been able to handle these questions myself, but with the increased number of deals in the system and the number of deals projected to come in the next few weeks it is critical that one person devote 100% of their time to this project. In addition, as soon as the construction documents are complete we need to start the architectural and engineering criteria manuals, as well as the code manual. Many of the tenants will want to see these manuals prior to lease execution. So that you can more clearly see which tasks will be accomplished by Jason prior to him moving to the Branson area, I have revised the statement of Tenant Coordination Services to reflect what we hope to accomplish prior to May 1st.

It is important that you know that Jason Westrope is an outstanding candidate to fill both the on-site Development responsibilities as well as head up the Tenant Coordination team. He has worked on four Grand Opening projects since 1999; three for Urban and one for another company.  He handled both the development and tenant coordination responsibilities of Mainstreet at Southpoint, the outdoor retail area.  In 2002 and 2003 he had both development and tenant coordination responsibilities on the Glen, a mixed use development northwest of Chicago, that includes retail and residential. He has an undergraduate degree in Mechanical Engineering

Page 1

SCHEDULE III.

Rick Huffman
January 6, 2005
Page 2

and a Masters in Architecture. He is extremely well organized and self-disciplined as well as being a very good designer.

As I have stated previously, I will stay involved with the Branson Landings project through the Grand Opening. I will not only participate in status calls, but I will be traveling to Branson frequently to assess the progress of the project from a tenant coordination perspective.

In order to accomplish all of above and to meet the timeframe of the project, we will need to bill increased time for tenant coordination beginning on January 17th. As stated above, these amounts are reflected in the attached budget.

Please approve the attached budget by signing this letter and returning it to me either via e-mail or fax.

Hope you and your family had a great holiday.

Sincerely,

Urban Retail Properties Co.

Martha J. Spatz
Senior Vice President
(312) 915-3821 Telephone
(312) 915-3784 Fax
mspatzm@urbanretail.com

Attachments

Cc:    Ross Glickman
       Mike Levin
       Charles Porter

HCW DEVELOPMENT COMPANY, L.L.C.,
a Missouri limited liability company

by: _____
       Richard E. Huffman, Manager

SCHEDULE XII

1/8/05

**Urban Retail Properties Co.**
**Branson Landing Grand Opening Tenant Coordination Budget**

**Summary of Costs**

| | |
|---|---|
| Staff Costs | $486,931 |
| Travel / Expenses | $50,910 |
| Miscellaneous Costs | $114,250 |
| Office Expenses* | $25,800 |
| Overall Total | $677,891 |

* some of these could be eliminated if provided by owner

Page 3

SCHEDULE III

Urban Retail Properties Co. Tenant Coordination Budget for Reasons Meeting

Revised January 8, 2005

Based on May 1, 2005 Opening

SCHEDULE III

Urban Retail Properties Co. Tenant Coordination Budget for Branson Landing
Based on May 1, 2006 Opening



SCHEDULE III

**Branson Grand Opening Proposal**
**Travel / Office / Miscellaneous Expenses**

4/8/05

**Housing, Airfare, Meals**

| | | | | TOTALS |
|---|---|---|---|---|
| **Housing** | | | | |
| Staff Architect 1 | 10 nights in hotel* | $100/night | $1,000 | |
| Staff Architect 1 | 35 nights in htl/aprp, incldng - Chgo | $100/night | $3,500 | |
| Staff Architect 1 | 13 months in furnished apartment | ^^^ | | |
| Staff Architect 2 | 7 months in furnished apartment | ^^^ | | |
| Project Executive | 12 nights in hotel | $100/night | $1,200 | |
| | | | | |
| **Airfare** | | | | |
| Staff Architect 1 | 8 roundtrips* | $225/roundtrip | $3,150 | |
| Staff Architect 2 | 14 roundtrips | $525/roundtrip | $7,350 | |
| Project Executive | 12 roundtrips | $525/roundtrip | $6,300 | |
| | | | | |
| **Meals** | | | | |
| Staff Architect 1 | 30 meals* | $10/meal | $300 | |
| Project Executive | 38 meals | $10/meal | $380 | |
| Team meals | 52 meals | $70/meal | $3,640 | |
| | | | | |
| **Car Rental** | | | | |
| Staff Architect 1 | 6 trips* | $100/trip | $600 | |
| Staff Architect 1 | 13 months | $900/month | $11,700 | |
| Staff Architect 2 | 7 months | $750/month | $5,250 | |
| Project Executive | 12 trips | $55/trip | $660 | |
| | | | | |
| Total Travel Expenses | | | $50,910 | $50,910 |

* prior to move to Branson Area
^^^ furnished apartment assumed to be provided or paid for by owner of the project

one per week

**Office Expenses** (based on a conversation with Rick Huffman. Urban's TC office in Branson will be provided by NCW at no cost to Urban. It is also possible that some of these expenses can be deleted if they are shared with NCW).

| | | | |
|---|---|---|---|
| Fax machine - purchase | 1 | $200 | $200 |
| Copy machine ( monthly rental) | 13 months | $250/month | $3,250 |
| Dedicated phone lines | 5 lines | $250/line | $1,250 |
| New telephones | 5 phones | 150/each | $750 |
| Telephone bills - months | 13 months | $400/month | $5,200 |
| Construction drawing plan holder | 1 | $350 | $350 |
| Office supplies (files, folders | 13 months | $300/month | $3,900 |
| Paper, pens, tape, staplers, etc.) | | | |
| Letter postage | 13 months | $50/month | $650 |
| Office for trailer | 13 months | provided by owner | $0 |
| Security for trailer | 13 months | provided by owner | $0 |
| Office utilities | 13 months | provided by owner | $0 |
| Office furniture | 5 people | provided by owner | $0 |
| Cell phones/radios | 5 people | | $6,000 |
| Broadband internet connections | 5 people | | $3,200 |
| Broadband internet connection installation | | $1,000 | $1,000 |
| **Office Expense Total** | | | **$25,800** |

Page 2

SCHEDULE III

**Miscellaneous Costs**

| | | | |
|---|---|---|---|
| Building Department Incentives | | $1,000 | $1,000 |
| Contractor Incentives | | $5,000 | $5,000 |
| Engineering Develop Reviews | | $20,000 | $20,000 |
| Printing Costs (100 tenants x 20 sheets x 2 sets) | 4,000 sheets | $980/sheet | $12,000 |
| Computers | 5 | $250 | $1,250 |
| Computer Printers | 100 | $500 | $50,000 |
| Lease Outline Drawings | 300 | $15/pkg | $4,500 |
| Signage Package (Budgeted x 100) | 900 | $20/manual | $6,000 |
| Criteria Printing and Binding | | $2,500 | $2,500 |
| Computer Technician to network and create hook-ups | | $7,500 | $7,500 |
| Website for criteria and bulletins | | | |
| | | | |
| Miscellaneous Costs Total | | $114,250 | $114,250 |

Page 3.

### SCHEDULE IV

| | |
|---|---|
| Mike Levin | $370.00 |
| Charles Porter | $260.00 |
| Martha Spatz (project executive) | $230.00 |
| Jason Westrope | $ 75.00 |
| Administrative Assistant - Chicago | $ 50.00 |
| Administrative Assistant - Branson | $ 35.00 |
| Cad Person | $ 45.00 |
| Staff Architect 2 | $ 75.00 |

# Exhibit B



**HCW**
HCW DEVELOPMENT COMPANY

VIA OVERNIGHT DELIVERY AND CERTIFIED MAIL RETURN RECEIPT REQUESTED

Urban Retail Properties Co.
900 North Michigan Avenue
Chicago, Illinois 60611
Attention: General Counsel

Re:    Property Management and Leasing Agreement dated February 22, 2005
       (the "Agreement") between HCW Development Company, L.L.C ("Owner")
       and Urban Retail Properties Co. ("Manager")

Dear Sirs:

This termination notice is being delivered to you pursuant to Section 7.1.1 of the Agreement as a result of Manager's failure to observe or perform a material obligation to be observed or performed by Manager under the Agreement.

As part of Manager's duties and obligations under the Agreement, Manager is required to respond to complaints and requests of tenants. The tenants of the Center have met with the Owner and advised owner that Manager has repeatedly failed to respond to the complaints and requests of such tenants. Such actions have caused substantial harm to the Center and are not curable in nature. As a result of the failure of Manager to observe or perform its duties under the Agreement, the management of Owner has been forced to become actively involved in the operations of the Center.

Please be advised that pursuant to Section 4.6 of the Agreement, the Manager has no further authority as signatories of the Operating Account or Security Account as of this date. Notwithstanding the foregoing, Owner will authorize Manager to continue to be able to disburse sums from the Operating Account until the Turn Over Date so long as such amounts are within the Approved Annual Budget.

Owner hereby requests that Manager continue to provide services until August 1, 2008 (the "Turn Over Date") in order to achieve an efficient transition of the management of the Center.

                              Very truly yours,

                              H.C.W. Development Company, L.L.C.

                              By: _____
                                  Richard E. Huffman, C.E.O.

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

URBAN RETAIL PROPERTIES, LLC, f/k/a )
URBAN RETAIL PROPERTIES Co. a )
Delaware corporation, )
)
        Plaintiff, )
)     Case No. 08 L 7023
     vs. )
)     Judge Ronald F. Bartkowicz
HCW DEVELOPMENT CO., LLC, a )
Missouri limited liability company, )     JURY TRIAL DEMANDED
)
        Defendant. )

**NOTICE OF MOTION**

TO:   Attached Service List

    **PLEASE TAKE NOTICE** that on the *18* th day of July, 2008, at *9:30* or as soon thereafter as counsel may be heard, counsel shall appear before the Honorable Ronald F. Bartkowicz or any judge sitting in his stead, in the courtroom usually occupied by him in Room 2101, at the Circuit Court of Cook County, Chancery Division, in Chicago, Illinois, and then and there shall present **Urban Retail Properties, LLC's Motion For Leave to File Amended Complaint**, a copy of which is attached and hereby served upon you.

               Respectfully submitted,

               URBAN RETAIL PROPERTIES, LLC f/k/a
               URBAN RETAIL PROPERTIES CO.

               By: _____
                    One of its attorneys

Gregory J. Scandaglia
SCANDAGLIA & RYAN (FIRM NO. 43575)
55 E. Monroe, Suite 3930
Chicago IL 60603
Telephone: (312) 580-2020
Facsimile: (312) 782-3806

OF COUNSEL:

## CERTIFICATE OF SERVICE

I, Eric J. Muñoz, an attorney, hereby certify that I served a copy of the foregoing **Urban Retail Properties, LLC's Motion For Leave to File Amended Complaint**, to the below party *via* facsimile and Federal Express, on the 11th of July, 2008:

HCW Development Co., LLC
3027 West Highway 76, Ste. B
Branson, MO 65616
Fax: 417-332-3447

_____
Eric J. Muñoz

James L. Goldman(CA No. 57127) (*Pro Hac Vice* to be
filed)
PIRCHER NICHOLS & MEEKS
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 201-8900
Facsimile: (310) 201-8922

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

URBAN RETAIL PROPERTIES, LLC, f/k/a
URBAN RETAIL PROPERTIES Co. a
Delaware corporation,

    Plaintiff,

vs.

HCW DEVELOPMENT CO., LLC, a
Missouri limited liability company,

    Defendant.

Case No. 08 L 7023

FILED-4

2008 JUL 11 AM 11:19

DOROTHY BROWN
CLERK OF CIRCUIT COURT
LAW DIVISION

## URBAN RETAIL PROPERTIES, LLC'S MOTION
## FOR LEAVE TO FILE AMENDED COMPLAINT

Plaintiff, Urban Retail Properties, LLC f/k/a Urban Retail Properties Co. ("Urban"), by and through its attorneys, Scandaglia & Ryan, respectfully moves for leave to file an Amended Complaint (attached hereto as Exhibit A), to correct a clerical error in the name of the defendant. In further support of its motion, Urban states:

    1.    On June 26, 2008, Urban filed its one-count Complaint for breach of contract. Urban effected service of process on the defendant on July 3, 2008.

    2.    In its original Complaint, Urban named "HCW Development *Properties* Co., a Missouri limited liability company" as defendant.  The word "Properties" is *not* part of defendant's name. The correct name of defendant is "HCW Development Co., LLC."

    3.    The proposed amendment corrects this clerical error, and contains the correct spelling of defendant HCW.

**WHEREFORE**, Urban respectfully requests that the Court grant the instant motion, and permit Urban to file the attached Amended Complaint.

July 11, 2008

Respectfully submitted,

URBAN RETAIL PROPERTIES, LLC f/k/a
URBAN RETAIL PROPERTIES CO.

By: _____
One of its attorneys

Gregory J. Scandaglia
SCANDAGLIA & RYAN (FIRM NO. 43575)
55 E. Monroe, Suite 3930
Chicago IL 60603
Telephone: (312) 580-2020
Facsimile: (312) 782-3806

OF COUNSEL:

James L. Goldman (CA No. 57127) (*Pro Hac Vice* to be filed)
PIRCHER NICHOLS & MEEKS
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 201-8900
Facsimile: (310) 201-8922

2

# Exhibit A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

URBAN RETAIL PROPERTIES, LLC, f/k/a )
URBAN RETAIL PROPERTIES Co. a )
Delaware corporation, )
)
Plaintiff, )        Case No. 08 L 7023
)
vs. )        JURY TRIAL DEMANDED
)
HCW DEVELOPMENT CO., LLC, a )
Missouri limited liability company, )
)
Defendant. )

## AMENDED COMPLAINT

Plaintiff, Urban Retail Properties, LLC f/k/a Urban Retail Properties Co. ("Urban"), by
and through its attorneys, Scandaglia & Ryan, alleges for its Amended Complaint as follows:

1.    Urban is a corporation duly organized and existing under the laws of the State of
Delaware. Urban formerly conducted business under the name Urban Retail Properties Co.
Urban's principal place of business is in Chicago, Illinois. Urban is duly authorized to do
business in this County and State. Urban was founded over 35 years ago, and has become one
of the most preeminent managers and developers of commercial real estate (office properties,
mixed use properties, and primarily shopping malls) in the United States. As the manager of
such properties, Urban is responsible for, among other things, leasing, marketing and tenant
coordination.

2.    Defendant HCW Development Company, LLC ("HCW") is a limited liability
company organized and existing under the laws of the State of Missouri and is the owner of the
property that is the subject of this action, as more fully alleged below.

3.    On or about February 22, 2005, Urban and HCW executed and entered into a
written contract entitled "Property Management and Leasing Agreement" (hereinafter, the
"Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**, pursuant to
which HCW engaged Urban to manage certain property owned by HCW in Branson, Missouri

known as "Branson Landing" (referred to in the Agreement and hereinafter as "the Center").

4.    Venue is proper in this Court under 735 ILCS 5/2-101 because although the Center is located in Branson, Missouri, the negotiations that led up to the execution of the Agreement took place in significant part in Chicago, Illinois. In addition, the Agreement was executed, by Urban, in Chicago, Illinois. Furthermore, some of the obligations that Urban is required to perform under the Agreement have been performed in Chicago, Illinois.

5.    The Agreement provides, in Section I, that its term would, subject to Section 7.1, commence on the date of the Agreement and terminate on the 5th anniversary of the date of the grand opening date of the Center, anticipated to be May 1, 2006, unless the Agreement is terminated as provided in Section VII. Section VII provides that the Owner may terminate the Agreement upon certain occurrences, one of which is that the Manager, i.e., Urban, fails "to observe or perform any material obligation to be observed or performed by Manager under [the] Agreement, which failure shall continue uncured for a period of thirty (30) days after written notice thereof to Manager...."

6.    At all times relevant to this action, Urban was in compliance with its obligations under the Agreement.

7.    On or about June 17, 2008, Urban received an undated letter from HCW ("Termination Notice"), a copy of which is attached hereto as **Exhibit B**, in which HCW stated that it was terminating the Agreement, purportedly because Urban had "failed to observe or perform a material obligation" under the Agreement by "repeatedly" failing to respond to tenant complaints.

8.    The Termination Notice did not comply with the provisions in the Agreement relating to the circumstances and manner in which HCW is allowed to terminate the Agreement, and HCW has not otherwise complied with such provisions. In particular:.

a.    Urban has not failed to observe or perform any material obligations under the Agreement, and certainly has not "repeatedly" failed to observe or perform such obligations.

2

b.    The Termination Notice does not sufficiently identify the manner or respects in which Urban supposedly failed to observe or perform any material obligation under the Agreement, nor does it identify any such obligation.  For example, the Termination Notice does not identify the tenants who supposedly had complaints, how the complaints were made, when the complaints were made, or the nature of such complaints.  As a result, Urban was deprived of its right to cure or attempt to cure any alleged failure or non-performance.

c.    The Termination Notice alleges that the purported breaches were not curable.  Although Urban contends that no such breaches have occurred, Urban alleges, on information and belief, any such breaches were curable and, therefore, that the allegation in the Termination Notice is false.

d.    If there were any tenant complaints relating to or resulting from any conduct on Urban's part, such conduct was the direct result of management decisions made by HCW that HCW directed Urban to implement.  Therefore, HCW was and is estopped or otherwise barred from terminating the Agreement on the basis of such conduct or complaints about it.

9.    Urban is informed and believes, and on that basis alleges, that HCW is using the allegation relating to tenant complaints as a pretext to terminate the Agreement, and that any such complaints have nothing to do with the real reason for terminating the Agreement.  Urban is informed and believes, and on that basis alleges, that HCW terminated the Agreement because it did not like the economic terms in the Agreement and wanted to enter into a management agreement with one of Urban's competitors.

10.    On information and belief, Urban asserts that certain persons, whose names and identities are as yet unknown, were aware of the Agreement and, and for the purpose of obtaining an advantage for themselves, deliberately induced or caused HCW to breach its contractual obligations to Urban, proximately causing damages to Urban.  Urban will amend its complaint, if necessary, once the identity of these individuals has been ascertained.

3

## Count I – Breach of Contract
### (Against HCW Development Co., LLC)

11.     Urban restates and incorporates paragraphs 1 through 10 as if fully set forth herein.

12.     HCW has breached its obligations to Urban by terminating the Agreement prior to the end of the term without complying with the termination provisions in Section VII and in the absence of any condition or circumstance justifying early termination.  In addition, HCW has breached the covenants of good faith and fair dealing implicit in the Agreement by terminating the Agreement in bad faith and without any factual or legal basis to do so, thus depriving Urban of its substantial rights under the Agreement.

13.     As a result of the foregoing, Urban has suffered substantial damages, the amount of which will be established at trial.  Urban's damages include, but are not limited to, all of the fees that it would have received during the remaining portion of the term of the Agreement, prejudgment interest thereon, and all costs and expenses incurred by Urban in connection with the transfer and termination of its management functions.  In addition, pursuant to Section 8.9 of the Agreement, Urban is entitled to recover its attorneys' fees in this action.

4

WHEREFORE, Urban prays for judgment in its favor and against HCW as follows:

    a.    For all of its actual and consequential damages, according to proof;

    b.    For prejudgment interest;

    c.    For its attorneys' fees and costs incurred herein; and

    d.    For such other and further relief as to the Court deems just and proper.

Respectfully submitted,
URBAN RETAIL PROPERTIES, LLC f/k/a
URBAN RETAIL PROPERTIES CO.

By: _____
One of its attorneys

Gregory J. Scandaglia
SCANDAGLIA & RYAN (FIRM NO. 43575)
55 E. Monroe, Suite 3930
Chicago IL 60603
Telephone: (312) 580-2020
Facsimile: (312) 782-3806

OF COUNSEL:

James L. Goldman(CA No. 57127) (*Pro Hac Vice* to be filed)
PIRCHER NICHOLS & MEEKS
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 201-8900
Facsimile: (310) 201-8922

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, LAW DIVISION

Urban Retail Properties, LLC **Plaintiff(s),**

v.

HCW Development Co., LLC

**Defendant(s).**

No. 08 L 7023

### ORDER

THIS MATTER COMING FOR HEARING/STATUS ON THE MOTION OF Plaintiff/Defendant for _Leave to File Amended Cmplt_, DUE NOTICE HAVING BEEN GIVEN, AND THE COURT BEING OTHERWISE FULLY ADVISED IN THE PREMISES:

**IT IS HEREBY ORDERED:** _The motion is GRANTED._

4231 1) Movant is give leave to file a Motion and Memorandum in Support thereof instanter/within____ days or by_____;

4231 2) Respondent shall Respond by_____;

4231 3) Movant shall Reply by_____;

4217 4) The Movant must provide the Court at **CLERK'S STATUS** on (Mon.-Fri.)_____, 200__, at 8:45 a.m. with a **COMPLETE** set of ALL documents including the **MOTION, RESPONSE, REPLY**, etc., deposition transcripts if applicable, Complaint, if dismissal is sought; and all exhibits. No brief in excess of 15 pages shall be submitted without leave of court.

4304 5) The previous Clerk's Status Date of _____, 200__ is stricken and reset to _____, 200__ at _____ a.m./p.m.

6) No continuance of any of the above dates will be granted without leave of the Court;

7) Lack of compliance with any of the above may result in either a striking or ruling on the Motion without a hearing as applicable.

8) Hearing/Disposition date is set for _____, 200__, at _____a.m./ p.m.

9) The previous hearing date of _____, 200__, at _____, a.m./p.m. is stricken and reset to _____, 200__, at _____, a.m./p.m.

10) Other _____
_Defendant to answer or plead by August 8, 2008._
_Status hearing is set for August 27, 2008 at 9:00 am._

Attorney No. 43575

Attorney Name/For Scandaglia · Ryan / TT

Attorney Address 55 E. Monroe St. 3930

City, State Chicago, IL 60603

Attorney Phone No. 312 - 580 - 2020

Enter: _____
Ronald. F. Bartkowicz- Circuit Court Judge 893

Judge Ronald F. Bartkowicz
**ENTERED**
JUL 30 2008
**Circuit Court - 193**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

URBAN RETAIL PROPERTIES, LLC, f/k/a )
URBAN RETAIL PROPERTIES Co. a )
Delaware corporation, )
                 )
        Plaintiff, )     Case No. 08 L 7023
                 )
    vs. )     JURY TRIAL DEMANDED
                 )
HCW DEVELOPMENT CO., LLC, a )
Missouri limited liability company, )
                 )
        Defendant. )
                 )

**F I L E D**
Law Div.-2101
JUL 18 2008
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

## AMENDED COMPLAINT

     Plaintiff, Urban Retail Properties, LLC f/k/a Urban Retail Properties Co. ("Urban"), by

and through its attorneys, Scandaglia & Ryan, alleges for its Amended Complaint as follows:

     1.    Urban is a corporation duly organized and existing under the laws of the State of

Delaware.  Urban formerly conducted business under the name Urban Retail Properties Co.

Urban's principal place of business is in Chicago, Illinois.  Urban is duly authorized to do

business in this County and State.  Urban was founded over 35 years ago, and has become one

of the most preeminent managers and developers of commercial real estate (office properties,

mixed use properties, and primarily shopping malls) in the United States.  As the manager of

such properties, Urban is responsible for, among other things, leasing, marketing and tenant

coordination.

     2.    Defendant HCW Development Company, LLC ("HCW") is a limited liability

company organized and existing under the laws of the State of Missouri and is the owner of the

property that is the subject of this action, as more fully alleged below.

     3.    On or about February 22, 2005, Urban and HCW executed and entered into a

written contract entitled "Property Management and Leasing Agreement" (hereinafter, the

"Agreement"), a true and correct copy of which is attached hereto as **Exhibit A**, pursuant to

which HCW engaged Urban to manage certain property owned by HCW in Branson, Missouri

known as "Branson Landing" (referred to in the Agreement and hereinafter as "the Center").

4.    Venue is proper in this Court under 735 ILCS 5/2-101 because although the Center is located in Branson, Missouri, the negotiations that led up to the execution of the Agreement took place in significant part in Chicago, Illinois. In addition, the Agreement was executed, by Urban, in Chicago, Illinois. Furthermore, some of the obligations that Urban is required to perform under the Agreement have been performed in Chicago, Illinois.

5.    The Agreement provides, in Section I, that its term would, subject to Section 7.1, commence on the date of the Agreement and terminate on the 5th anniversary of the date of the grand opening date of the Center, anticipated to be May 1, 2006, unless the Agreement is terminated as provided in Section VII. Section VII provides that the Owner may terminate the Agreement upon certain occurrences, one of which is that the Manager, i.e., Urban, fails "to observe or perform any material obligation to be observed or performed by Manager under [the] Agreement, which failure shall continue uncured for a period of thirty (30) days after written notice thereof to Manager...."

6.    At all times relevant to this action, Urban was in compliance with its obligations under the Agreement.

7.    On or about June 17, 2008, Urban received an undated letter from HCW ("Termination Notice"), a copy of which is attached hereto as **Exhibit B**, in which HCW stated that it was terminating the Agreement, purportedly because Urban had "failed to observe or perform a material obligation" under the Agreement by "repeatedly" failing to respond to tenant complaints.

8.    The Termination Notice did not comply with the provisions in the Agreement relating to the circumstances and manner in which HCW is allowed to terminate the Agreement, and HCW has not otherwise complied with such provisions. In particular: .....

a.    Urban has not failed to observe or perform any material obligations under the Agreement, and certainly has not "repeatedly" failed to observe or perform such obligations.

2

b.    The Termination Notice does not sufficiently identify the manner or respects in which Urban supposedly failed to observe or perform any material obligation under the Agreement, nor does it identify any such obligation.  For example, the Termination Notice does not identify the tenants who supposedly had complaints, how the complaints were made, when the complaints were made, or the nature of such complaints.  As a result, Urban was deprived of its right to cure or attempt to cure any alleged failure or non-performance.

c.    The Termination Notice alleges that the purported breaches were not curable.  Although Urban contends that no such breaches have occurred, Urban alleges, on information and belief, any such breaches were curable and, therefore, that the allegation in the Termination Notice is false.

d.    If there were any tenant complaints relating to or resulting from any conduct on Urban's part, such conduct was the direct result of management decisions made by HCW that HCW directed Urban to implement.  Therefore, HCW was and is estopped or otherwise barred from terminating the Agreement on the basis of such conduct or complaints about it.

9.    Urban is informed and believes, and on that basis alleges, that HCW is using the allegation relating to tenant complaints as a pretext to terminate the Agreement, and that any such complaints have nothing to do with the real reason for terminating the Agreement.  Urban is informed and believes, and on that basis alleges, that HCW terminated the Agreement because it did not like the economic terms in the Agreement and wanted to enter into a management agreement with one of Urban's competitors.

10.    On information and belief, Urban asserts that certain persons, whose names and identities are as yet unknown, were aware of the Agreement and, and for the purpose of obtaining an advantage for themselves, deliberately induced or caused HCW to breach its contractual obligations to Urban, proximately causing damages to Urban.   Urban will amend its complaint, if necessary, once the identity of these individuals has been ascertained.

3

**Count I – Breach of Contract**
**(Against HCW Development Co., LLC)**

11.     Urban restates and incorporates paragraphs 1 through 10 as if fully set forth herein.

12.     HCW has breached its obligations to Urban by terminating the Agreement prior to the end of the term without complying with the termination provisions in Section VII and in the absence of any condition or circumstance justifying early termination.  In addition, HCW has breached the covenants of good faith and fair dealing implicit in the Agreement by terminating the Agreement in bad faith and without any factual or legal basis to do so, thus depriving Urban of its substantial rights under the Agreement.

13.     As a result of the foregoing, Urban has suffered substantial damages, the amount of which will be established at trial.  Urban's damages include, but are not limited to, all of the fees that it would have received during the remaining portion of the term of the Agreement, prejudgment interest thereon, and all costs and expenses incurred by Urban in connection with the transfer and termination of its management functions.  In addition, pursuant to Section 8.9 of the Agreement, Urban is entitled to recover its attorneys' fees in this action.

WHEREFORE, Urban prays for judgment in its favor and against HCW as follows:

    a.    For all of its actual and consequential damages, according to proof;

    b.    For prejudgment interest;

    c.    For its attorneys' fees and costs incurred herein; and

    d.    For such other and further relief as to the Court deems just and proper.

Respectfully submitted,
URBAN   RETAIL   PROPERTIES,   LLC   f/k/a
URBAN RETAIL PROPERTIES CO.

By: _____
One of its attorneys

Gregory J. Scandaglia
SCANDAGLIA & RYAN (FIRM NO. 43575)
55 E. Monroe, Suite 3930
Chicago IL 60603
Telephone: (312) 580-2020
Facsimile: (312) 782-3806

OF COUNSEL:

James L. Goldman(CA No. 57127) (*Pro Hac Vice* to be filed)
PIRCHER NICHOLS & MEEKS
1925 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 201-8900
Facsimile: (310) 201-8922

URBAN RETAIL PROPERTIES, LLC, )
fka URBAN RETAIL PROPERTIES CO., )
      Plaintiff, )  Civil Action No. _____
v.         )
          )  (Removed from Circuit Court
HCW DEVELOPMENT COMPANY, LLC,)  of Cook County, Illinois)
      Defendant. )

# Exhibit "A"

## Part 3 (pp. 81-100)

# Exhibit A

<u>PROPERTY MANAGEMENT AND LEASING AGREEMENT</u>

THIS PROPERTY MANAGEMENT AND LEASING AGREEMENT (the "Agreement") made as of the 22nd day of February, 2005, by and between HCW Development Company, L.L.C., a Missouri limited liability company ("Owner"), and Urban Retail Properties Co., a Delaware corporation ("Manager").

<u>WITNESSETH, THAT:</u>

WHEREAS, Owner is to operate and lease the shopping center to be known as known as Branson Landing ("Center"), located in Branson, Missouri;

WHEREAS, Manager possesses the personnel, skills and experience necessary for the professional management and leasing of the Center.

WHEREAS, Owner wishes to appoint Manager for the purpose of managing and leasing the Center, and Manager wishes to accept such appointment, all on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

<u>SECTION I</u>
<u>TERM</u>

Section 1.1     <u>Duration</u>. Subject to the provisions of Section 7.1 hereof, the term (the "Term") of this Agreement shall be for a period commencing on the date hereof and terminating on the fifth (5th) anniversary of the date of the grand opening date of the Center (the "Grand Opening Date") (which date shall be determined solely by the Owner and communicated to the Manager) unless earlier terminated as provided in Section VII below. It is anticipated that the Grand Opening Date will be May 1, 2006. Unless

1

terminated as provided in Section VII below, the Term shall automatically renew on a year to year basis.

**SECTION II**

**APPOINTMENT AND AUTHORITY OF MANAGER**

Section 2.1    Appointment and Authority of Manager.  On and subject to the terms and conditions herein set forth, Owner hereby appoints Manager as an independent contractor to be the exclusive leasing agent (except as otherwise specifically provided herein) and managing agent for the Center and hereby authorizes Manager, subject to the limitations herein set forth, to exercise such powers in an efficient and satisfactory manner to the best of its abilities and to have such authority with respect to the Center as are customary for a manager and leasing agent of premium waterfront destinations in a major tourist area in accordance with first class shopping center standards and, in addition, such powers and authority as may be reasonably necessary for the performance of Manager's duties set forth herein and as more specifically described in Section IV below. Manager hereby accepts such appointment and agrees to make available to Owner the advice, expertise and judgment of its organization relating to the management, operation, leasing, maintenance and repair of the Center.

Section 2.2    Certain Limitations on Authority; Emergencies.  Owner expressly withholds from Manager any power or authority to: (a) convey or otherwise transfer, pledge or encumber the Center, pledge the credit of Owner (except for purchases or transactions otherwise expressly authorized under this Agreement), or borrow money or execute any promissory note, mortgage, deed of trust, or security agreement in the name of or on behalf of Owner, or (b) make any structural changes in any building or make any other major alterations or additions in or to any such building or equipment therein, or incur any expense chargeable to Owner other than expenses arising from (i) Manager's exercise of the express powers vested herein in Manager, (ii) matters included in the Approved Annual Budget under Section III, or (iii) such emergency repairs or actions as may be required because of danger to persons or property or which are immediately necessary for compliance with Laws (as defined in Section 8.6 hereof) or are required to

2

avoid the suspension of any necessary service to the Center; provided, however, that with respect to such emergency repairs or actions, Manager will notify Owner as soon as reasonably possible as to the nature of and cost of such repair or action.

Section 2.3    Compliance with Underlying Documents. Manager acknowledges that (i) the Center is subject to a Redevelopment Contract dated February 1, 2003 (the "Redevelopment Contract") between Owner and the City of Branson, Missouri (the "City"), and a Ground Lease (the "Ground Lease") executed by the Owner and the City; (ii) the Center may be subject to additional agreements such as mortgage or other loan documents (the "Financing Documents"); (the Redevelopment Agreement, Ground Lease, and the Financing Documents are herein collectively called the "Underlying Documents"). Manager agrees to amend this Agreement to the extent it is in conflict with, or as is necessary to affect the purpose and duties of Owner in accordance with the Financing Documents, but only if such amendment does not materially alter Manager's rights and obligations hereunder.

Section 2.4    Confidentiality. Manager shall keep confidential (and will require any of its employees, officers and directors to keep confidential), and shall not disclose to any third party without Owner's direction or approval, any information regarding the Center to which Manager gained access as a result of Manager's performance of the services and not otherwise available to the public, unless required to do so by a court or governmental agency of competent authority.

## SECTION III
## ANNUAL BUDGET

Section 3.1    Preparation of Budget; Contents. Within thirty (30) days after the commencement of the Term, and on or before October 1 of each year with respect to the calendar year thereafter, Manager shall prepare and submit to Owner a budget (the "Annual Budget") substantially in the form then being used by Manager as a standard for similar properties managed by Manager, provided, however, that Manager shall produce a final budget for submission to public authorities in the form and manner directed by Owner. The Annual Budget shall include, among other matters:

3

3.1.1    Operating Budget.  An operating budget which shall set forth, among other matters, anticipated operating income, expenses, working capital and reserve requirements for such year.

3.1.2    Capital Budget.  A capital budget which shall set forth, among other matters, anticipated and proposed capital expenditures for such year and the source of funds in respect thereto.

3.1.3    Leasing Plan.  A statement of: (a) the space Manager expects to be leased or renewed during such year, (b) the rent it expects to obtain for such space, and (c) the other material economic provisions of the leases, including, as appropriate for commercial property, free rent, rebates and other concessions, any improvement allowances, brokerage commissions (including any payable to Manager hereunder), and payments by tenants toward operating expenses and taxes.

Section 3.2    Approval of Budget.  The term "Approved Annual Budget" shall mean the Annual Budget (as modified by revisions thereof) approved by Owner in accordance with the provisions hereof.  An Annual Budget or a revision thereof shall be deemed approved by Owner only if it is approved in writing by Owner (and Manager acknowledges and agrees that Owner may be required to obtain approval of governmental entities prior to Owner giving approval to an Annual Budget).  Any disapproval by Owner shall be specific with respect to particular items objected to in the Annual Budget submitted by Manager.

If Owner has not approved the proposed Annual Budget for any year prior to the commencement of such year, Manager shall continue to manage the Center during the year in accordance with the Approved Annual Budget in effect for the immediately preceding fiscal year (except as it relates to capital expenditures and leasing expenditures, which shall not be incurred until Owner approves the same) until the time that an Annual Budget for such fiscal year is approved, with the right, until such approval, to incur (i) the expenses specified in clauses (b), (c), (d) and (e) of Section 3.3 and, (ii) except to the extent, if any, that the same would duplicate the coverage of clause (i) above, the expenses (other than capital expenditures or leasing expenditures) allowed in the Approved Annual Budget for the immediately preceding year.

4

Section 3.3    Permitted Expenses.  The Manager shall not incur any expenses other than:  (a) expenses projected in the Approved Annual Budget (or supplements or revisions thereto); or  (b) expenses which are required in connection with an emergency which, if in the reasonable judgment of Manager, are necessary to protect persons from death or injury or to preserve property, provided that the Manager shall notify Owner within five (5) business days after incurring such expenses ("Emergency Expenses") and with respect to which it is either impractical to seek prior approval of Owner, or if such approval is being sought, is not received in a timely manner: or (c) expenses which do not exceed five  percent (5%) in excess of the amount projected for (i) the respective item of expense in the Approved Annual Budget, or (ii) with respect to a line item which has not yet been approved, for the immediately preceding calendar year (the amounts set forth in clauses (i) and (ii) of clause (c) referred to herein as "Non-Projected Expenses"), provided, however, that the sum of all Non-Projected Expenses of all types shall not exceed $100,000 in any fiscal year without the prior written consent of Owner; or (d) expenses which, regardless of amount, result from increases in property taxes or other assessments or levies, insurance premiums, per capita labor costs, ground rent, debt service and utility charges, which are not within the reasonable control of Owner or Manager; but which are necessary for the operation of the Center; or (e) expenses which are specifically authorized by the terms of this Agreement.

## SECTION IV
## MANAGER'S SERVICES

Section 4.1    Services in General.  Manager agrees, in performing its duties hereunder, to use that level of the premium standard of skill for waterfront destinations in a major tourist area in accordance with the standards required of a first class shopping center.  Manager shall, with respect to the Center, perform such duties as are customarily performed with respect to similar properties by such management firms and, without limitation on the foregoing, shall perform those duties set forth in this Section IV, subject to all express limitations on Manager's authority contained in other provisions of this Agreement.  Without limiting the generality of the foregoing, Owner hereby grants

5

Manager the authority and power (all or any of which may be exercised by Manager as agent on behalf of Owner) to perform the services more specifically described hereinafter in this Section IV (at Owner's expense).

Section 4.2    Advertising and Promotion.    Manager shall be authorized to advertise and conduct promotional activities relating to the Center and to display signs thereon as limited by the Approved Annual Budget. Such advertising and promotion shall include: developing a property-specific marketing plan, including advertising, tourism, special events, public relations, websites, and customer service; developing a customized marketing budget; and directing cost-savings programs, including holiday décor purchases, advertising agency fees, and creative and media placement costs.

Section 4.3.    Books and Records. Manager shall maintain the books, records and accounts of Owner with respect to the management and operation of the Center and shall retain those records during the Term and, shall deliver the same to Owner upon termination of the Term (provided Manager may retain photocopies thereof for Manager's files).

Said records and accounts shall be the property of Owner and shall be available to Owner, or its duly designated representative, for examination and inspection at any reasonable time during usual business hours at Manager's office at the Center and for audit as provided in Section 4.3.1 hereof.

At all times during the Term, Manager shall maintain, on an accrual and on a cash basis (with cash basis records and accounts to be computed with reserves for such items as real estate taxes and insurance), and in accordance with generally accepted accounting principles, consistently applied, records and accounts that accurately reflect all revenues earned, funds received, expenses incurred and disbursements made in connection with Manager's duties hereunder.

Within twenty (20) days after the end of each and every month during the Term, the Manager shall furnish Owner with an operating statement containing a statement of cash receipts and disbursements for the month then ended and a description of all other pertinent information reasonably requested. Each such statement shall:

6

(a)    Accurately reflect all revenues received, funds received and expenses and disbursements made, by relevant category of the Approved Annual Budget, or in the case of unbudgeted revenues, receipts, expenses and disbursements on an itemized basis;

(b)    Compare the amounts received and expended with the estimated receipts and expenses set forth in the Approved Annual Budget, for the preceding calendar month, calendar quarter and calendar year to date ;

(c)    Show the balance in any Account (as defined herein) and other information reasonably requested by Owner;

(d)    Contain such information as may be necessary to permit Owner to prepare its financial statements and tax returns;

(e)    Be accompanied by an aged statement of all delinquent rentals and other charges for the use and occupancy of the Center;

(f)    Be accompanied by copies of current bank statements of the Accounts; .

(g)    Be accompanied by a lease status report; and

(h)    Be accompanied by a statement showing detailed calculations of percentage rent payable in such month under the Leases; and

with respect to the operating statement related to each December during the Term, such statement shall be accompanied by (x) a summary in reasonable detail of the operations of the Center on a cash basis for the preceding twelve (12) month period and (y) a statement indicating the estimated portion of income attributable to the operation of escalation provisions for taxes and operating expenses provided in the leases for the Center for such twelve (12) month period.

4.3.1   Owner shall be entitled to examine or audit the books and records maintained by Manager with respect to the Center during normal business hours, after two (2) days written notice to Manager (unless Manager is the defaulting party hereunder or Owner has the right terminate this Agreement, in which event no notice shall be required).  In the event that any audit permitted hereunder discloses an overpayment or underpayment of management fees or other compensation or reimbursement payable to Manager hereunder, Owner or Manager shall promptly pay to the other party the amount of such overpayment or underpayment, as the case may be. If such audit discloses (x) an

7

overpayment of such fees through incorrect billing by Manager of more than five percent (5%) of the correct management fee due or (y) any other material failure of Manager to comply with this Agreement, then Manager shall pay all costs and expenses of such audit without any right whatsoever to be reimbursed by Owner. If such result occurs more than two (2) times during the Term, Owner shall have the right to terminate this Agreement.

Section 4.4    Employment of On-Site Personnel. Manager shall be authorized to hire, discharge and pay all on-site personnel, including without limitation (but subject to the Approved Annual Budget); (a) a property manager, one or more assistant property managers and/or operations managers, marketing personnel, specialty leasing personnel (on or off-site prior to the Grand Opening Date of the Center and on-site thereafter), bookkeepers and accountants, clerical and secretarial personnel, all of whom shall be on Manager's payroll with reimbursement by Owner, and (b) engineers, janitors, maintenance, landscaping, custodial, parking, and security personnel (subject to the provision of Section 4.5 hereof, all or any of whom shall at Manager's option, be on Manager's payroll with reimbursement by Owner, or on the payroll of an independent contractor whose costs and fees will be paid by Owner). All employees placed on Manager's payroll shall be bonded in amounts and with a company reasonably determined by Manager and Owner. Owner shall have the right to approve the property manager and leasing representatives assigned to the Center, which approval shall not be unreasonably withheld or delayed.

Section 4.5    Maintenance and Repairs. Manager shall, on behalf of Owner, maintain the Center in a good, clean, sanitary and sightly condition and perform all ordinary repairs, maintenance and decorating, and purchase all supplies necessary for the proper operation of the Center. Manager, in its capacity as such, shall not be required (without additional compensation satisfactory to Manager) to undertake the making or supervision of extensive construction or reconstruction of the Center or any part thereof. All such work shall be provided by independent contractors or employees of the Manager at a cost not in excess of the prevailing market rate in the area of which the Center is located. Manager hereby agrees to give an affiliate of the Owner the first opportunity to perform any landscaping or normal maintenance work at the Center so long as such

services are performed at a cost not in excess of the prevailing market rate and subject to customary terms in the area where the Center is located. Owner may notify Manager at any time during the Term that it requires such affiliate to perform such services.

Section 4.6    Collection and Disbursement of Revenue.  Manager shall collect rent and all other revenue from the Center and deposit the same promptly in a bank account (the "Operating Account") established in the name of and for the benefit of Owner.  All receipts collected by Manager shall be received, held and disbursed by Manager through the Operating Account for the account of Owner. Either Owner or Manager shall be entitled to draw upon such Operating Account, but all such money shall be deemed to be the property of Owner.  Such monies of Owner shall not be commingled with the funds of Manager.  Manager may withdraw from the Operating Account (subject to the limitations set forth in this Agreement) disbursements required or permitted to be made under this Agreement; provided, however, that except as otherwise agreed in writing by Owner, disbursements by Manager out of the Operating Account shall be limited (subject to the provisions of this Agreement) to the purposes set forth in the Approved Annual Budget and to the amounts for such purposes which do not exceed the corresponding sums allocated to the same in the Approved Annual Budget or as otherwise allowed hereunder.  Manager shall render monthly reports to Owner showing the fees and other compensation and reimbursement to which Manager is entitled under this Agreement.  In addition, upon Owner's request, Manager shall provide to Owner such other periodic reports as may be required to satisfy the requirements of any loan or other agreement affecting the Center. If Manager is a defaulting party or Owner otherwise has the right to terminate this Agreement under Article VII hereof, the representatives of Manager shall have no further authority as signatories of the Operating Account or Security Account (as hereinafter defined) until such default is cured and the right to terminate is no longer applicable. The Operating Account and Security Account (collectively referred to herein as the "Accounts") shall be segregated and in no event commingled with other funds of Manager, Owner or any other person. Such Accounts shall be, if available, interest bearing at the highest available rates payable where deposited, consistent the primary objective of preservation of principal, and in all events

9

shall be insured by the Federal Deposit Insurance Corporation. Income realized from the investment of the Accounts shall be for the benefit of and payable to Owner.

Section 4.7    Security Deposits. Manager shall deposit all security deposits for the Center in a separate project account (the "Security Account") in the name of Owner on which either Owner or Manager may draw. Manager shall be authorized to withdraw monies from the Security Account at such time as the security deposits are returnable to tenants or in the event of a tenant default. It is expressly understood and agreed that all disbursements, transfers and refunds made by Manager from the security deposits shall be made by a check drawn on the appropriate account or appropriate journal or bookkeeping entries and shall be substantiated by appropriate records and accounting procedures.

Section 4.8    Payments. Except as otherwise directed from time to time by Owner, Manager shall make or cause to be made (but only to the extent cash receipts from the Center are available therefor or to the extent Owner provides the funds therefor) the payment when due of all obligations, the existence of which was approved by Owner as part of the Approved Annual Budget or otherwise or which were incurred in accordance with the provisions hereof, including, without limitation, Section 3.3 hereof

Section 4.9    Contracts and Leases.

4.9.1    Service and Purchase Contracts. Manager may, without the prior written consent of Owner, to the extent the obligations of Owner thereunder do not exceed the amounts provided for in the Approved Annual Budget or the other amounts set forth in Section 3.3 hereof, negotiate and enter into on behalf of Owner contracts for terms no longer than one (1) year for electricity, gas, fuel, water, telephone, window cleaning, vermin extermination, janitorial services, landscape maintenance and such other supplies, materials, services and other matters for the Center, and so long as such contracts are terminable without cause by Owner upon no more than 30 days notice. Any contracts with a term of more than one (1) year must be approved by Owner. Manager shall not enter into any single contract on behalf of the Owner requiring payment, in the aggregate, of more than $50,000 per fiscal year without the prior written consent of Owner unless the same (x) is already in the Approved Annual Budget or (y) constitutes an Emergency Expense. All work for maintenance and repair of the Center shall be performed by

-10-

independent contractors or employees of Manager, at Manager's discretion, subject to Section 4.5 hereof. Any cash and trade discounts, refunds, credits concessions or other incentives obtained by Manager in connection with any such contracts shall belong to Owner.

4.9.2. <u>Leases</u>. Subject to the subsequent provisions of this Section 4.9.2, Manager shall use reasonable efforts to rent and keep the Center rented by procuring tenants for the Center pursuant to leases in accordance with the Approved Annual Budget. Without limitation on the foregoing, Manager shall negotiate, on behalf of Owner, in accordance with the Approved Annual Budget, the business terms of new leases, expansions, amendments, cancellations, or extensions thereof (all such new leases, expansions, amendments, cancellations, or extensions now existing or hereafter entered into being herein individually and collectively referred to as a "Lease" or "Leases"). All Leases shall be subject to Owner's direction and approval and shall be executed by Owner. Manager will assist Owner in the negotiation of Leases, but Owner may engage outside legal counsel (or use Owner's in-house counsel) to negotiate and prepare Leases on behalf of the Owner, and Owner shall be responsible for all outside legal fees and expenses incurred in connection therewith. If any Lease, operating agreement or other document or instrument affecting the Center requires the consent of a third party, upon request of Owner, Manager will assist Owner in obtaining such consent. Owner's approval or execution of a Lease shall serve as authorization for Manager to expend such amounts as are required to comply with the Lease on Owner's behalf (whether or not contained in the Approved Annual Budget). Manager shall provide reports of leasing activity to Owner on a monthly basis unless Owner otherwise directs. Manager shall deliver at least three (3) original tenant-executed copies of each Lease hereafter made and any and all amendments or modifications to Owner so that the same may be approved and executed by Owner.

4.9.2.1 <u>Excluded Leases</u>. Notwithstanding the foregoing, in the event Owner elects to negotiate any Lease with, or market any space in the Center to, a Related Party (as hereinafter defined), (a) Owner shall notify Manager thereof, identifying the tenant and premises in question, and (b) Manager shall not receive any commissions

11

provided herein with respect to such Lease with a Related Party. A "Related Party" shall mean Owner; BLR Development Company, L.L.C. ("BLR"); the members and subsidiaries of Owner and BLR; and any entity in which the members or subsidiaries of Owner and BLR hold a 25% or more ownership interest. Manager will not be entitled to any commission for the Lease entered into with Bass Pro Shop or Westgate Resorts, Ltd.

4.9.3    Other Contracts. Manager, in its capacity as such, shall not enter into any other contract or agreement on behalf of Owner, unless the same is consented to in writing in advance by Owner.

4.9.4    Manager's Affiliates. For purposes of this Agreement, the term "Affiliate" means any corporation, partnership, venture or other entity which controls, is controlled by, or is under common control with Manager, and the officers, employees, partners and venturers of such entity.

Section 4.10    Legal Action. Manager shall, on behalf of, and at the cost of Owner, institute through competent counsel approved in writing by Owner, all necessary legal action or proceedings for the collection of rent or other income from the Center, or for the ousting or dispossessing of tenants or other persons therefrom, and shall promptly notify Owner of the institution of all such actions. In addition, Manager shall promptly notify Owner of any lawsuit or threat thereof involving or affecting the Center of which Manager receives actual knowledge.    Manager shall not be authorized to settle, compromise and release such actions or suits or reinstate tenancies without the prior written consent of the Owner. The retention or use of any attorneys or legal assistants approved by Owner shall be at Owner's sole cost and expense. Any use of Manager's in-house legal staff for such services shall be subject to the advance approval of Owner and Manager. This Agreement shall not be construed to require that Manager or its Affiliates provide legal services, and the provision of such services shall not be construed as the practice of law by such parties.

Section 4.11    Tenant Requests. Manager shall receive and respond to complaints and requests of tenants. Records shall be maintained showing the action taken with respect to each complaint or request. Complaints or requests of a material nature shall, after investigation of such complaints by Manager, be promptly reported in writing by

12

Manager to Owner. Manager shall include in such written report to Owner all relevant details and appropriate recommendations.

Section 4.12   Impounds and Capital Reserves. In the event that under the terms or provisions of any mortgage or deed of trust to which the Center is subject, the mortgagor or trustor is required to deposit in installments an amount against or based upon taxes, insurance premiums or other sums, then Manager shall make such deposits to the extent of available funds from receipts from the Center collected by Manager or if Owner provides the funds therefore and notice of such requirements.

Section 4.13   Payments to Owner. Within twenty (20) days after the end of each calendar month or partial calendar month during the term of this Agreement, Manager shall pay to Owner, but only to the extent out of Receipts remaining in the Operating Account after the payment of all expenses and other and other amounts required or provided to be paid by Manager pursuant to this Agreement and after (a) setting aside the amount of any reserves required under an Approved Annual Budget in effect from time to time, and (b) retaining a reasonable minimum balance in the Operating Account, the balance of such Receipts.

Section 4.14   Fidelity Bonds. Manager shall maintain throughout the Term hereof, at Owner's expense, such fidelity bonds as Owner shall from time to time require for the full protection of the interests of Owner and Manager and such other parties as may be required by the provisions of any Underlying Document. Any such bond or bonds shall be in such reasonable amount as required by Owner from time to time and obtained from such companies as may be required by the Underlying Documents, or as Owner shall approve. Manager shall furnish certificates to Owner showing such bonds to be in effect, together with an agreement that the company will endeavor to notify Owner not less than ten (10) days prior to the expiration, modification or cancellation of such bonds.

## SECTION V
## BEARING OF EXPENSES

To the extent available, Manager shall use the cash receipts from the Center to pay the cost and expense of discharging its obligations and duties hereunder which are attributable to or arise during or with respect to the Term. Any excess of such costs and expenses over such cash receipts (whether or not contained or accurately reflected in the Annual Budget submitted by Manager or the Approved Annual Budget as approved by Owner), shall be borne solely by Owner and Manager shall not be obligated to advance its own funds therefor.

## SECTION VI
## COMPENSATION

Section 6.1    Management Fees. Manager shall be entitled to receive a monthly management fee in accordance with the schedule attached as Exhibit A hereto and as further described therein.

Section 6.2    Leasing Commissions and Other Compensation.

6.2.1    Leasing Commissions. Manager shall be entitled to receive commissions for all leases executed with tenants for the Center, and other compensation, in accordance with the schedule attached as Exhibit A hereto and as further described therein.

6.2.2    Other Compensation. Manager shall be entitled to receive such additional fees and commissions as specified in Exhibit A hereto.

Section 6.3    Renovation Fees. If Owner desires to perform a renovation, expansion, base building improvement or redevelopment at the Center, and Owner requests Manager to provide such services and Manager is willing to provide additional services in connection therewith, Owner shall pay additional fees on such terms as the parties shall mutually agree in writing. If this Agreement is terminated while any such project is pending, the fees for such project shall be equitably prorated.

Section 6.4    Manager's Office. Owner shall provide a reasonable and appropriate space within the Center, rent-free, to serve as Manager's on-site office, shall fully furnish and equip the same, and shall pay all direct costs of operating said on-site office, including, without limitation, utilities, telephone and office supplies. All of such personal property furnished by Owner shall remain the property of Owner and shall remain at the Center upon termination of this Agreement.

14

Section 6.5    Payments and Reimbursements.  Manager may pay directly out of the Operating Account, or Manager shall be entitled to receive reimbursement (which it may withdraw from the Operating Account) for the fees and commissions earned pursuant to this Section VI, on the dates provided in Exhibit A attached hereto, and for the following costs to the extent such costs are directly allocable to the Center and if such costs are included within an Approved Annual Budget:  (a) the cost of long-distance telephone and data communication between the Center and Manager's regional and home offices, and Manager's on-site costs, including software and hardware, associated with financial reporting and property accounting for the Center;  (b) Manager's travel (including transportation, lodging and meals) and entertainment costs;  (c) amounts paid to third parties in connection with architectural and engineering design, plan review, lease outline drawing preparation, printing and copying costs, messenger and courier charges and review, supervision and inspection, both on and off-site, relating to construction in the Center; (d) amounts paid to third parties in connection with real estate or property tax consulting (including preparation of documents related thereto), and efforts to maintain or reduce taxes applicable to or against the Center; (e) the costs of marketing brochures and the expenses, both direct and indirect, incurred relative to on- and off-site marketing and promotional services rendered or contracted for by Manager for the Center; (f) any sales tax, gross receipts tax, license fee or other tax, fee or charge imposed on the payment or receipt of fees, commissions or other amounts hereunder (other than any income or franchise tax payable by Manager); (g) costs and expenses referred to in Section 6.4 hereof;  and (h) color or other non-routine photocopying charges and courier charges incurred at Manager's home or regional office.

Except as expressly provided otherwise herein or as expressly set forth in an Approved Annual Budget, in no event shall Owner be required to pay, or shall Manager be entitled to any reimbursement for (i) Manager's home or regional office overhead, office or administrative expenses or (ii) the cost of gross salary and wages and other compensation, payroll taxes, insurance, workers' compensation, pension benefits and any other benefits of Manager's home or regional office personnel; or (c)  any travel and lodging costs of  employees of Manager above the level of regional manager located at

15.

the Manager's home office, except for travel of such employees done at the request of Owner to provide services for the Center. No reimbursement to the Manager shall be allowed for the compensation of the leasing staff of the Manager, other than the temporary leasing person assigned to the Center through the Grand Opening Period (as defined in Paragraph 6 of Exhibit A hereto) and any on-site temporary leasing person solely dedicated to such services thereafter.

Section 6.6    No Other Compensation.  Manager shall receive no compensation or reimbursement of any kind or nature for or during the Term for services performed under this Agreement, except as expressly provided in this Agreement.

Section 6.7    Workmen's Compensation Insurance:  Manager shall carry any and all workmen's compensation insurance required by applicable laws on employees of Manager who are assigned to the Center.

### SECTION VII
### TERMINATION

Section 7.1    Termination by Owner.  Owner may terminate this Agreement effective upon the expiration of the stated Term or any extension thereof upon not less than sixty (60) days prior written notice to Manager.  In addition, Owner may terminate this Agreement (by written notice to Manager) at any time upon the occurrence of any of the following occurrences:

7.1.1    Default.  In the event of a failure by the Manager to observe or perform any material obligation to be observed or performed by Manager under this Agreement, which failure shall continue uncured for a period of thirty (30) days after written notice thereof to Manager, provided that Manager's time period to cure such failure shall be extended for a period reasonably required to complete the cure thereof, if the cure of such failure within such thirty (30) day period is not capable of performance with reasonable efforts, provided   (i) the Manager shall have commenced actions to cure such failure within such thirty (30) day period and shall diligently pursue the curing of such failure until fully remedied and (ii) the cure period shall not in any event exceed ninety (90) days;

L:\WORKING\KRIS\MARY\MAN-AGRM\Bransonownerdraft022205TV-clean.doc

7.1.2   Bankruptcy. The occurrence of any of the following by, against or with respect to Manager:

(a)   The commencement of a case under Title 11 of the U.S. Code, as now constituted or hereafter amended, or under any other applicable federal or state bankruptcy law or other similar law (which, in the case of an involuntary proceeding, is not dismissed within 60 days after such commencement);

(b)   An assignment for the benefit of creditors;

(c)   The appointment pursuant to any judicial proceeding of a trustee or receiver to take possession of all or a major portion of Manager's property, which possession is not restored to Manager within 60 days after such appointment;

(d)   An attachment, execution or other judicial seizure of all or a major portion of the property of Manager (where such seizure is not discharged within 60 days after the date the same is effected); or

(e)   In any legal proceeding, the adjudication or stipulation of insolvency or inability to pay debts as and when they come due.

7.1.3   Casualty or Condemnation.   Owner permanently discontinues the operation of the Center on account of damage to or destruction of, or a taking by (or sale under threat of) eminent domain of a substantial part of the Center.

7.1.4   Occupancy.  (a) If at any time after the Grand Opening Date less than seventy-five (75%) percent of the rentable square footage of the Center (excluding spaces for Belks, Bass Pro Shop and any premises for which Owner has provided notice pursuant to Section 4.9.2.1 hereof regarding a Related Party) (the "Applicable Space") is leased (an "Occupancy Event"), then Owner may terminate this Agreement, but only if (i) Owner gives written notice to Manager that an Occupancy Event has occurred, and (ii) such Occupancy Event has been in effect for (A) not less than two hundred forty (240) days during the preceding three hundred and sixty five (365) day period or (B) one hundred and eighty (180) consecutive days.

(b)   If on the Grand Opening Date, Manager has failed to secure executed Leases for not less than eighty five percent (85%) of the Applicable Space. Owner shall have the right to terminate this Agreement pursuant to this Section 7.1.4(b) only so long

17

as such termination notice is received by Manager within thirty (30) days after the Grand Opening Date. If Manager does not receive such termination notice provided in this Section 7.1.4(b) within thirty (30) day period, Owner's right to terminate this Agreement pursuant to this Section 7.1.4(b) shall thereafter be void and of no further force or effect.

7.1.5   Sale of the Center.  Upon the sale of all or substantially all of the Center.

7.1.6.   Financing Termination.  This Agreement shall be subject to termination in the event that Manager fails to execute any agreement required by the Financing Documents in connection with the financing of the Center.

7.1.7:   Termination of Development Agreement.  Upon the termination of that certain Development, Consulting and Leasing Agreement dated as of May 15, 2003, as amended from time to time (the "Development Agreement") by and between the Owner and Manager as a result of a default thereunder by Manager.

Section 7.2   Termination by Manager.  In the event of a failure by Owner to observe or perform any material obligation to be observed or performed by Owner under this Agreement, which failure shall continue uncured for a period of ten (10) days after written notice for any required funding obligation of Owner hereunder, and for thirty (30) days after written notice thereof to Owner for any other material obligation, provided that the Owner's time period to cure such failure within such thirty (30) day period is not capable of performance with reasonable efforts, provided (i) the Owner shall have commenced actions to cure such failure within such thirty (30) day period and shall thereafter diligently pursue the curing of such failure until fully remedied and (ii) the cure period shall not in any event be permitted to exceed ninety (90) days.

Section 7.3   Effect of Termination.  Termination of this Agreement shall terminate all rights and obligations of the parties hereunder (but such termination shall not affect the rights and obligations of the parties arising during or relating to the period prior to the date of such termination, or otherwise expressly provided to survive such termination under this Agreement, and shall not prejudice the rights of either party against the other for any prior breach of this Agreement, except as expressly provided to the contrary herein).  Without limitation on the generality of the foregoing, termination of this Agreement shall terminate any and all rights of Manager to act in such capacity on

18

behalf of or with respect to the Center (and Manager shall, if Owner so requests, execute a notice to third parties that such rights of Manager have been so terminated). Except as otherwise provided herein, in the event of the termination of this Agreement, Manager shall be paid all compensation theretofore earned under the terms of this Agreement.

Section 7.4  Final Accounting.  Upon the termination of this Agreement for any reason whatsoever, Manager shall, without any further compensation, cooperate with Owner and do all things reasonably necessary to achieve an efficient transition of the management of the Center without detriment to the rights of the Owner or to the continued management of the Center (which obligation shall survive the termination of this Agreement). Manager, shall deliver to Owner, or to such person or persons as Owner may direct, all property documents, permits, books, records and accounts, rent rolls, insurance policies, files and other materials relating to the Center, including documentation required to transfer sole control over the Center Accounts to Owner or its designee as well as appropriate assignments to Owner or Owner's designee of any service or supply contracts. Within thirty (30) days after termination of the Agreement, Manager shall deliver a final accounting to Owner reflecting all income and expenses of the Center as of the date of such termination.

## SECTION VIII
## MISCELLANEOUS

Section 8.1    No Joint Venture.  This Agreement shall not be construed as effecting a partnership or joint venture between Owner and Manager.    Subject to the express provisions set forth herein, each of the parties shall have the right to engage in other businesses and business transactions and the other party shall have no right or interest therein.

Section 8.2    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that Manager shall not be entitled to assign this Agreement without the prior written consent of Owner except to Manager's Affiliate, but no such assignment shall release the Manager from its obligations under this Agreement. Owner shall have the

19

08CV4330
JUDGE NORGLE
MAG. JUDGE VALDEZ
J. N.

URBAN RETAIL PROPERTIES, LLC,              )
fka URBAN RETAIL PROPERTIES CO.,           )
                          Plaintiff,       )       Civil Action No. _____
v.                                          )
                                            )       (Removed from Circuit Court
HCW DEVELOPMENT COMPANY, LLC, )             of Cook County, Illinois)
                          Defendant.        )

# Exhibit "A"

## Part 4 (pp. 101-136)

absolute right to assign its rights and obligations under this Agreement without the need for any consent whatsoever by Manager.

Section 8.3    Insurance and Waiver of Subrogation.

8.3.1 Insurance. Owner shall maintain, and upon the written request of Owner, Manager shall assist Owner to effect and maintain such insurance as Owner designates (which must include at least all insurance required by Owner's mortgagee to be effected and maintained and which coverage shall be primary for all claims with respect to the Center) and in no event shall such commercial general liability insurance, combined single limit per occurrence be less than Twenty Five Million Dollars ($25,000,000.00). Owner agrees to look solely to such insurance coverage for any covered claims at the Center; provided, however, that the foregoing provision shall in no event limit Manager's obligations under Section 8.5 hereof. Owner shall cause copies of all insurance policies or certificates thereof to be delivered to Manager promptly upon issuance or renewal of each policy. Manager, at Owner's request, will work in consultation with Owner's insurance broker or consultant to identify coverage carried by other first class shopping centers. Owner acknowledges that Manager is not engaged in the business of procuring or advising on insurance matters and earns no fee or income of any kind with respect to the placement of insurance. All decisions with respect to such insurance are at the sole discretion of Owner and Manager makes no representation and is not liable with respect to the adequacy, or the limits of such coverage. All such policies of insurance shall include as named insureds, Owner, Manager and any mortgagee, as their respective interests may appear and shall contain a lender's loss payable endorsement as required by any deed of trust on the Center. No such insurance which names Manager as a named insured shall be cancelled non-renewed or reduced without providing thirty (30) days prior written notice of the same to Manager.

Manager shall maintain, as an expense of the Center or otherwise at Owner's expense, workers' compensation and unemployment insurance in amounts required or permitted by statute and employers' liability insurance in the amount of at least $500,000 per occurrence (if on-site workers will be on Manager's or its Affiliate's payroll), and

such other insurance, if any, as Manager deems reasonable and appropriate so long as such expenses are included within the Approved Annual Budget.

8.3.2   Waiver of Subrogation and Right of Recovery.   Owner and Manager waive any right to recover against each other for claims covered by their respective policies of insurance. This provision is intended to waive fully, and for the benefit of Owner and Manager, any rights and/or claims which might give rise to a right of subrogation in favor of any insurance carrier. Without limiting the foregoing, neither Owner or Manager shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage even though such loss or damage may have been caused in whole or in part by the negligence of such party, its agents or employees.

Section 8.4   Owner Indemnity. Owner shall defend (through counsel selected or approved by Manager), indemnify and hold Manager and its Affiliates harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, back-pay awards, costs and expenses (including, without limitation, court costs and experts' and attorneys' fees) relating to the Center or otherwise arising out of or in connection with this Agreement or the performance by Manager of its obligations and duties hereunder, and Owner hereby waives all claims against Manager in connection therewith, except to the extent that a court of competent jurisdiction rules that any of the foregoing were caused solely by Manager's gross negligence, willful misconduct, intentional misrepresentation, or acts outside the scope of Manager's authority as provided herein.

Section 8.5   Manager Indemnity.   Manager shall defend, indemnify and hold Owner harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, back-pay awards, costs and expenses (including, without limitation, court costs and experts' and attorneys' fees) arising, as determined by a court of competent jurisdiction, solely by reason of Manager's gross negligence, willful misconduct, intentional misrepresentation, or acts outside the scope of Manager's authority as provided herein.

Section 8.6    Violations of Laws; Environmental Liabilities.  If either Owner or Manager becomes aware of any "Violations of Laws" or of any "Environmental Liabilities" (as such terms are defined below) relating to the Center, each shall promptly advise the other party.  Owner represents and warrants that, to the best of its knowledge after reasonable investigation, the Center is not subject to any Violations of Laws, and to the best of its knowledge after reasonable investigation, the Center is not subject to any Environmental Liabilities, except those which Owner has disclosed in writing to Manager.  "Laws" herein shall mean all federal, state, county and local governmental or municipal laws, ordinances, regulations, judgments, orders, rules and other such requirements, decisions by courts in cases where such decisions are binding precedents in the state in which the Center is located, and decisions of federal courts applying the Laws of such state, at the time in question, including but not limited to all "Environmental Laws" (as defined below) and those pertaining to fair employment, fair credit reporting, health, safety, building code, rent control, taxes, equal access or fair housing, including, but not limited to, any law prohibiting, or making illegal, discrimination on the basis of race, sex, creed, color, religion, national origin, economic or governmentally subsidized status, or physical, mental or other disability or condition, and any labor laws. "Environmental Laws" herein shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601, et seq., Hazardous Materials Transportation Act, 49 U.S.C. 1801, et seq., Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901 et seq., Clean Air Act, 42 U.S.C. 7401 et seq., Clean Water Act, 33 U.S.C. 1251, et seq., Safe Drinking Water Act, 14 U.S.C. 300f, et seq., Toxic Substances Control Act, 15 U.S.C. 2601, et seq., Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136 et seq., Atomic Energy Act of 1954, 42 U.S.C. 2014 et seq., and any similar federal, state or local Laws, and all regulations, guidelines, directives and other requirements thereunder, all as may be amended or supplemented from time to time.   "Environmental Liabilities" herein shall mean conditions that involve the presence (whether actual or alleged) of any Hazardous Substance, conditions that are subject to any Environmental Laws, and all claims relating thereto.  The term "Hazardous Substance" for purposes hereof shall mean any flammable,

explosive, toxic, radioactive, biological, corrosive or otherwise hazardous chemical, substance, liquid, gas, device, form of energy; material or waste or component thereof including, without limitation, all items now or hereafter listed, defined or regulated as a hazardous or toxic chemical, substance, liquid, gas, device, form of energy, pathogen, material or waste or component thereof by any federal, state or local governing body or agency having jurisdiction. "Violations of Laws" herein shall mean all actual and alleged violations of any Laws.

8.6.1 Notwithstanding any other provision of this Agreement to the contrary, Manager shall have no liability for conducting any environmental response activity, including without limitation, emergency response, investigation and cleanup, unless Manager specifically agrees in writing to conduct such response activity and Manager's additional compensation for conducting such activity is set forth as part of such agreement. (Any emergency response taken by Manager shall not be deemed to be an agreement to conduct any response activity.) Owner shall attend all meetings with regulatory agencies concerning Environmental Liabilities affecting the Center, and Owner shall be responsible for consulting with Manager in making all decisions concerning responses to such regulatory agency activities.

Section 8.7    Software. Any software provided by either party in connection with this Agreement shall: (a) remain the property of such party, (b) be used only in the manner authorized by such party from time to time, and (c) be returned upon termination of this Agreement, or earlier as requested by such party.

Section 8.8    Limitation of Liability. Neither parties' shareholders, officers, directors, employees, affiliates or agents shall have any liability under or in connection with this Agreement or relating to the Center. For purposes of all provisions of this Agreement requiring that Owner insure, defend or indemnify Manager, the term "Manager" shall include Manager's Affiliates (as defined in Section 4.9.4). The liability of Owner under this Agreement shall be limited to Owner's interest in the Center.

Section 8.9    Attorneys' Fees. If any party obtains a judgment against any other party by reason of breach of this Agreement, the prevailing party shall be entitled to recover its enforcement costs, including, without limitation, reasonable attorney's fees,

23

Section 8.10   <u>No Waiver</u>. Time is of the essence of this Agreement. No waiver by either party of any default by the other party or of any event, circumstance or condition permitting a party to terminate this Agreement shall constitute a waiver of any other default by such other party or of any other event, circumstance or condition permitting such termination, whether of the same or of any other nature or type and whether preceding, concurrent or succeeding; and no failure on the part of either party to exercise any right it may have by the terms hereof or by law upon a default by the other party and no delay in the exercise of such right shall prevent the exercise thereof by the non-defaulting party at any time when the other party may continue to be so in default, and no such failure or delay and no waiver of default shall operate as a waiver of any other default, or as a modification in any respect of the provisions of this Agreement. The subsequent acceptance of any payment or performance pursuant to this Agreement shall not constitute a waiver of any preceding default by a defaulting party or of any preceding event, circumstance or condition permitting termination hereunder, other than default in the payment of the particular payment or the performance of the particular matter so accepted, regardless of the non-defaulting party's knowledge of the preceding default or the preceding event, circumstance or condition, at the time of accepting such payment or performance, nor shall the non-defaulting party's acceptance of such payment or performance after termination constitute a reinstatement, extension or renewal of this Agreement or revocation of any notice or other act by the non-defaulting party. No waiver of any provision of this Agreement shall be effective unless signed by the party against whom the waiver is asserted.

Section 8.11   <u>Integration; Amendment</u>. This Agreement, including the exhibits attached hereto, constitutes the entire agreement between the parties hereto relative to the subject matter hereof. Any prior negotiations, correspondence or understandings relative to the subject matter hereof shall be deemed to be merged in this Agreement. This Agreement may not be amended or modified except in writing, executed by each of the parties hereto.

Section 8.12   <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the state in which the Center is located.

Section 8.13   Notices.  All notices and other communications provided for in this Agreement shall be in writing and may be personally delivered or mailed by certified or registered United States mail, return receipt requested, or by recognized overnight mail service postage prepaid and addressed as follows:

(a)      If to Owner, to:

HCW Development Company, L.L.C.

3027 W. Country Music Boulevard

Branson, MO 65616

Attention: Richard E. Huffman

(b)      If to Manager, to:

Urban Retail Properties Co.

900 North Michigan Avenue

Chicago, Illinois 60611

Attention:  General Counsel

or to such other address as any party shall hereafter designate by notice to the others as herein provided.  Any notice, demand or request shall be effective upon receipt.

Section 8.14   Captions.  The Section headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

Section 8.15   Inspection by Owner.   Neither this Agreement nor anything contained herein shall be deemed to limit Owner's right to enter upon or inspect the Center or to perform any repair or maintenance or to do or perform any matter or thing required of Manager hereunder in the event of Manager's failure to do so, and, without limitation of Owner's other rights as owner of the Center, Owner shall have the right to do any or all of the foregoing in the event of such failure.

Section 8.16   Counterparts.  This Agreement may be executed in any number of counterparts and each shall be considered an original and together they shall constitute one and the same instrument.

Section 8.17   Licenses.  Manager hereby represents and warrants to Owner that Manager is a duly licensed broker under the laws of the State where the Center is located

25

and has provided Owner the disclosure set forth in Exhibit B attached hereto and made a part hereof.

[SIGNATURE PAGE TO FOLLOW}

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205IV-clean.doc

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

Owner: HCW Development Company

By: _____

Title: _____

Manager: Urban Retail Properties Co.

By: _____

Michael Law, Designated Broker and

Authorized Party

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

Owner: HCW Development Company

By: _____

Title: _____

Manager: Urban Retail Properties Co.

By: _____

Michael Law, Designated Broker and Authorized Party

## EXHIBIT A

## MANAGEMENT FEES AND LEASING COMMISSIONS

1.    Management Fee. Manager shall receive a monthly management fee equal to the greater of (a) Twelve Thousand Dollars ($12,000.00) (the "Minimum Monthly Payment") or (b) three and one half percent (3.5%) of Receipts (as hereinafter defined) per calendar month (the "Management Fee"). Any Management Fee for any partial calendar months shall be prorated on a per diem basis. The term "Receipts" as used herein shall mean the (x) gross amount of payments received as base, fixed or minimum rent, percentage or overage rent from tenants at the Center; provided, however, for purposes of this clause (x), only an amount equal to the minimum rental payable by Westgate Resorts, Ltd. under its lease (the "Westgate Tours Lease") with Owner shall be included for such tenant, with minimum rent being $40 per square foot, (y) rental loss insurance proceeds received by Owner in lieu of the rent payable to Owner as set forth in clause (x) above for the Center and (z) the Marina Base Payment. "Receipts" shall not include (i) all fees, charges and payments by tenants and other parties for real estate taxes, insurance, common area or other expenses, heating, ventilating, air-conditioning or other utilities, (ii) any parking revenue from the Parking Garage, (iii) any receipts from Sponsor Payments, (iv) any proceeds received and collected from (A) the financing or sale of all or any portion of the Center, (B) the condemnation or taking of all or any portion of the Center by eminent domain; (C) insurance polices (except for rental loss insurance proceeds as set forth above), (D) any extraordinary or non-recurring event, (other than Termination Fees as provided below) including but not limited to proceeds from any litigation other than rent collections and interest collected thereon, (E) security deposits (unless applied upon rent), (F) interest on invested funds and (G) amounts paid to Owner by tenants in reimbursement for costs of materials and labor for improvements made by Owner in tenants' premises and not included in minimum rents. The Manager shall be entitled to receive the Minimum Monthly Payment commencing on the first day of the month 120 days prior to the Grand Opening Date determined by the Owner and on the first day of each month thereafter during the Term. Any portion of the Management Fee in excess of the Minimum Monthly Payment shall be payable twenty (20) days after the end of the applicable calendar month and based upon the monthly report delivered and received by Owner for such applicable month. In the event that Owner receives an early termination fee (a "Termination Fee") for any termination of a lease, the Termination Fee included within Receipts shall be equal to the lesser of (a) the Termination Fee actually received by the Owner or (b) an amount equal to twelve (12) months of minimum rent due from such tenant from and after the date of such termination.

2.    Commission Rates.  For leases (other than those for the Belk's Lease, Bass Pro Lease, the Westgate Tours Lease or a Temporary Lease (as defined herein), commissions shall be as follows:

a.    New Leases: $5.00 per rentable square foot.

b.    Renewals:    One-half (1/2) of the amount payable for a New Lease. No renewal commission fee shall be payable for any existing option to renew exercised by a tenant for such premises under its Lease.

c.    Expansions:  New lease rate for new area to be occupied by such tenant and renewal rate for original space of such tenant for any extended term

Notwithstanding any provision herein to the contrary, except as otherwise expressly set forth in the last sentence of Section 3 below, in the event any tenant procured by Manager defaults under its lease for such space, other than Belk's or Temporary Lease tenants (the "Default Space") and such lease is terminated within the first eighteen (18) months of the commencement date thereof, Manager shall receive 50% of the commissions listed above for procuring the next replacement tenant for the Default Space and shall be entitled to the applicable New Lease rate for any additional space leased in excess of the Default Space.

2A.   Belk's Lease.   Manager shall be paid a commission of $150,000.00 for the lease (the "Belk's Lease") entered into by Owner and Belk's. Manager acknowledges that Manager has received a commission of $75,000. with respect to the Belk's Lease as of the date hereof. The remaining portion of the commission for the Belk's Lease shall be due and payable upon the opening of Belk's with the general public and the payment of the first minimum rent payment by Belk's under the Belk's Lease. Upon any request from Owner to Manager to provide consulting services post opening with respect to the Belk's Lease, Manager shall be paid the hourly fees for such services based on the schedule set forth in Exhibit D attached hereto and made a part hereof.

3.    Payment of Commissions.  For new leases (a "New Lease") (other than the Belk's Lease, Bass Pro Shop Lease, Westgate Tour Lease or any Temporary Lease), (a) one-half of the commission shall be paid on execution of the New Lease by Owner and such tenant (the "Execution Date") and (b) one-half of such commission on the date such tenant under the New Lease opens for business at the Center with the general public and pays its first monthly payment of minimum rent (the "Commencement Date"). For renewal leases with existing tenants and for leases dealing with expansion space for existing tenants, the full commission shall be payable upon execution of the lease for such existing tenants. In the event that the Owner agrees to the abatement of rent for any tenant (an "Abatement Tenant"), the remaining installment of such commission with respect

29

to such Abatement Tenant shall be due and payable on the date that such Abatement Tenant opens for business with the general public. In the event that Manager fails to receive any second installment of the lease commission because the Commencement Date does not occur and such lease of such tenant is terminated within the first eighteen (18) months of the commencement thereof, the Manager shall be entitled to a full commission with respect to the re-leasing of such Default Space and not limited to fifty per cent (50%) of such commission as otherwise provided in paragraph 2 hereof.

4.    Temporary Leases.  A commission shall be payable with respect to any kiosk tenancies, license agreements, retail merchandising unit tenancies, month-to-month tenancies and any leases with a term of one year or less (collectively referred to as "Temporary Leases") in the amount of ten percent (10%) of the monthly gross receipts payable with respect to such Temporary Leases and such amounts shall be due and payable within twenty (20) days after the end of such month such receipts are received by Owner from such sources and based on the monthly reports received by Owner from Manager with respect to the same. In the event this Agreement expires or is terminated for any reason, any portion of such commission which is based on gross receipts which have not yet been collected, shall be due and payable within thirty (30) days of the date of such expiration or termination. Any employee of Manager dedicated solely for such purpose shall be at the sole cost and expense of Owner.

5.    Documents Entered After Termination.  (a) Within thirty (30) days after termination of this Agreement for any reason other than as described in clause (b) of this Paragraph 5, Manager shall submit to Owner a written list of parties: (a) to whom Manager has presented a written proposal prior to termination of the Agreement, and (b) who have responded to such proposal in writing prior to termination of this Agreement. If Owner or its representative, or any successor to Owner, shall execute a lease with any such party respecting the Center within ninety (90) days after this Agreement has been terminated, Manager shall be entitled to a commission on the terms described above when the lease is executed by Owner and such tenant. The obligation to pay such commission to Manager shall survive the termination of this Agreement.

    (b)    In the event the Development Agreement is terminated pursuant to the terms of Section 1.7 (b) thereof, and as a result of such termination this Agreement is terminated pursuant to Section 7.1.1 hereof, then:

        (i)    Manager shall be entitled to receive a commission (on the terms described above) for any lease respecting the Center executed within three (3) years of the date of termination of this Agreement by Owner or its representative, or any successor to Owner, and tenant, which was an Approved Deal as of or prior to the effective date of such termination. An "Approved Deal" is a proposed lease transaction where

30

both (A) the basic economic terms of such lease have been approved by Owner in writing; and (B) tenant and Owner or Manager are negotiating the remainder of the terms of such lease. Manager shall submit a written list of such Approved Deals to Owner within thirty days after termination of this Agreement.

(ii)    In addition to a list of Approved Deals, within thirty (30) days after termination of this Agreement, Manager shall submit to Owner a written list of parties: (A) to whom Manager has presented a written proposal prior to termination of the Agreement, and (B) who have responded to such proposal in writing prior to termination of this Agreement. If Owner or its representative, or any successor to Owner, shall execute a lease with any such party respecting the Center within one hundred eighty (180) days after this Agreement has been terminated, Manager shall be entitled to a commission on the terms described above when the lease is fully executed.

The obligation to pay to Manager the commissions described in this Paragraph 5(b) shall survive the termination of this Agreement.

6.    Tenant Coordination Fees. Manager shall perform the tenant coordination services for Owner described on Schedule II attached hereto and made a part hereof. Manager shall prepare a proposed budget (such budget and any revision thereto approved in advance by the Owner is referred to herein as "PGO Budget"), and the PGO Budget which has been approved as of the date hereof is attached hereto as Schedule III, for the cost of providing such services during the period from October 1, 2004 through May 30, 2006 (such period referred to herein as the "Grand Opening Period"). As compensation for performing such tenant coordination services during the Grand Opening Period, Manager shall receive the lesser of (a) the amount set forth in the PGO Budget for staff time costs for the Grand Opening Period (the "Budgeted Amount") and (b) the actual staff time costs incurred by Manager for such period based on the rates set forth in Schedule IV attached hereto and made a part hereof. Such fees shall be paid monthly within thirty (30) days after receipt by Owner of an invoice from Manager for such services. After the Grand Opening Period, except for Excluded Tenants (as herein defined), Manager shall receive for tenant coordination services a flat fee (the "Tenant Coordination Fee") of (a) $1,500 for each lease with square footage of 2500 rentable square feet of less and (b) $3,000 for each lease with square footage of in excess of 2500 rentable square feet and up to 15,000 rentable square feet, for staff time for tenant coordination services provided by Manager at the request of Owner. Any tenant coordination fees for leases in excess of 15,000 square feet shall be negotiated by the parties on a deal by deal basis. Excluded Tenants shall mean any restaurant tenants and those tenants set forth on Exhibit E attached hereto and made a part hereof. For each Excluded Tenant, the Tenant Coordination Fee shall be $5,000. Such services shall specifically include the

31

review and approval of any tenant allowance payments payable to any tenant under a lease. After the Grand Opening Period, Owner shall pay the Tenant Coordination Fee within thirty (30) days of the date such tenant opens for business at the Center; provided, however, that such fee shall be payable within thirty (30) days after invoice for any tenant which fails to open for business at the Center after such services have been performed by Manager.

The Owner shall be responsible for any third party expenses incurred by Manager up to the amount set forth in the PGO Budget. Manager shall not incur any third party expenses in excess of the amount set forth in the PGO Budget without the prior approval of Owner, which approval shall be in the sole and absolute discretion of Owner. After the Grand Opening Period, no third party expenses shall be incurred in excess of amounts provided in the Approved Annual Budget without the prior written consent of the Owner.

The parties presently contemplate that the Grand Opening Date for the Center will be May 1, 2006 (the "Scheduled Date") and the PGO Budget is based on such date. In the event that the grand opening of the Center does not occur on or before the Scheduled Date, the Budgeted Amount for purposes of clause (a) of the third sentence of this paragraph 6 shall be increased based on the budgeted amount for such services set forth in the PGO Budget for the month of April, 2006. By way of example, and not by way of limitation, if the PGO Budget sets forth a Budgeted Amount of $500,000 and a monthly budget of $50,000 for the month of April in 2006, and the Center does not open on the Scheduled Date, if the Center opens on June 1, 2006, the Budgeted Amount would be increased to $550,000.

7.   Landlord Work Supervision Fee.   If requested to provide such service by Owner, Manager shall receive a supervision fee (the "Supervision Fee") in connection with supervising the construction work required to be performed by Owner under a lease at the Center (other than the Belk's Lease). Such Supervision Fee shall be negotiated on a deal by deal basis with Manager if Owner desires Manager to provide such services. Any Supervision Fee shall be payable as agreed upon by Owner and Manager.

8.   Marketing Fee.   For services described in Section 4.2 of the Agreement, Manager shall receive an annual fee (the "Marketing Fee") of five percent (5%) of all contributions by tenants at the Center to any marketing fund (the "Marketing Fund") in place at the Center from time to time. Manager shall not be entitled to receive any Marketing Fee with respect to any sums contributed by Owner to the Marketing Fund. The Marketing Fee will be paid on a monthly basis no later than the twentieth (20th) day of each calendar month with respect to such contributions made in the preceding month and based upon the monthly report provided by Manager to Owner for such applicable month.

Prior to the Grand Opening Date, Owner shall reimburse Manager for marketing services performed by a personnel employed at Manager's home office at the rate of $150 per hour, subject to a maximum amount, to be agreed upon in a marketing budget to be agreed upon by Owner and Manager. It is agreed and acknowledged that such services are in addition to the services to be provided by the marketing director based at the Center (and who prior to completion of the Center may be based elsewhere and all compensation payable to such person is to be included as part of the Approved Annual Budget).

9.    Lease Documentation Fees.  In the event that Owner requests Manager to prepare the Leases for the Center and Manager has sufficient staff time available to do so, Manager's staff shall prepare such Leases. As compensation therefor, Owner shall pay Manager a fee (the "Lease Documentation Fee") of $3,500 for each Lease (a) of ten thousand square feet (10,000) or less of rentable space and (b) not a Lease for a restaurant (any such Lease described as a "Standard Lease"). For any lease other than a Standard Lease to be prepared by the Manager's in-house legal staff, the parties agree that the fee shall be based on Manager's in house staff hourly rate set forth below. No such fee shall be payable with respect to the Belk's Lease.  Except as set forth herein, the Lease Documentation Fee for a Standard Lease shall be due and payable upon execution of the lease by the tenant and Owner; provided, however, that if lease negotiations are terminated prior to lease execution, Manager shall be paid within thirty (30) days of presentation of an invoice to Owner the lesser of (a) $3500 or (b) time spent on such lease negotiation multiplied by the hourly fee set forth below. The Lease Documentation Fee for all Leases which are not Standard Leases shall be payable monthly within thirty (30) days of presentation of an invoice therefor. The Manager agrees to cause its in-house staff to keep time records in connection with the negotiation of any lease and the agreed rate for such work shall be $185.00 per hour. Such fees are subject to an annual increase of the lesser of (a) four percent (4%) per annum or (b) the increase in the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics, for All Urban Consumers, U.S. City Average, All Items (1982-84=100) (the "CPI") for the last month in such immediately preceding year..

No outside legal counsel shall be utilized without the prior written consent of the Owner. The Owner shall be responsible for the payment of any outside legal counsel.

For services of Manager's lease administrators for coordination of the preparation of lease documentation prepared by outside counsel, Owner shall pay Manager a fee of $125.00 per hour for time spent on such services. Such fees are subject to an annual increase of the lesser of (a) four cent (4%) per annum or (b) the increase in the CPI for the last month in such immediately preceding year. Such fees shall be due and payable monthly within thirty (30) days after receipt of the invoice by Owner from Manager.

10.  Outside Brokers:  Manager will not work with any outside broker (an "Outside Broker") on any lease transactions unless Owner has given its consent in advance. Any such commission payable to an Outside Broker so approved by Owner is herein called an "Approved Outside Broker Commission". If Owner does so consent, Owner will pay the Approved Outside Broker Commission and Manager's commission with respect to any lease transaction shall not be reduced. The Outside Broker shall be paid at the same time that Manager is paid its commission.

The Owner hereby agrees to pay the Manager its standard leasing commission of $5.00 per rentable square foot for the leases  set forth on Exhibit C attached hereto and made a part hereof and the amounts set forth as the Approved Outside Broker Commission to the Outside Broker listed in Exhibit C.

11.    Sponsorship Payment.  For obtaining corporate sponsorship payments (a "Sponsor Payment") from sponsors, Manager shall receive a sponsorship fee of ten percent (10%) of the gross revenue payable to Owner in connection with such Sponsor Payment (the "Sponsor Fee"). No agreement with any sponsor shall be entered into without the prior written approval of Owner, which approval may be withheld in the sole and absolute discretion of Owner. A "Sponsor" is any person or entity entering into one or more agreements (a "Sponsor Agreement") with Owner, the primary purpose of which is  to increase brand name or product exposure by means of advertising, product sales or providing services or other consideration to Owner in connection with the Center. The Sponsor Fee shall be payable within twenty (20) days of the date the Owner receives the Sponsor Payment. In the event that any Sponsor Payment is received after the termination of this Agreement, the obligation of Owner to pay the Sponsor Fee shall survive the termination of the Agreement. No Sponsor Payment shall be due in the event a Sponsor obtained by Manager enters into an agreement with Owner to obtain naming rights for any physical feature at the Center. Any such fee for such naming rights shall be determined by the parties on a deal by deal basis.

12.    Marina Payment.  Manager acknowledges that Owner will be entering into an agreement (the "Marina Agreement") with a third party operator for operation of the marina. For purposes of determining Receipts, only the base minimum rent payable under the Marina Agreement (the "Marina Base Payment") shall be included. Manager shall not be entitled to receive any additional fee with respect to the services it performs with respect to the marina.

13.    Parking Garage.  Manager acknowledges that Owner will be entering into a parking agreement with a third party operator with respect to the operation of a parking garage located at the Center (the "Parking Garage"). Owner agrees that Manager shall have the right to bid to provide such services with respect to the Parking Garage. The term Receipts shall not include any revenue received by Owner from the Parking Garage.

34

14. <u>Incentive Fees.</u> (a) In the event that as of the Grand Opening Date, at least 90%, but less than 95%, of the Applicable Space at the Center is subject to executed Leases, then Owner shall pay to Manager, an amount equal to $1.00 per rentable square foot for such Leases in addition to the amounts provided in paragraph 2 of this Exhibit A.

(b)　In the event as of the Grand Opening Date, 95% or more of the Applicable Space at the Center is subject to executed Leases, then Owner shall pay to Manager, an amount equal to $1.25 per rentable square foot for such Leases in addition to the amounts provided in paragraph 2 of this Exhibit A.

(c)　Such incentive fees for any Lease shall be due and payable by Owner to Manager within thirty (30) days after the Grand Opening Date if such tenants shall be open within thirty (30) days after the Grand Opening Date, and on the Commencement Date of such Lease, if such tenant shall not be open for business within thirty (30) days after the Grand Opening Date.

**EXHIBIT B**

**MISSOURI DISCLOSURE FORM**

EXHIBIT B

---

## Other Agency Relationships

Missouri law does not prohibit written agency agreements which provide for duties beyond that of a limited agent described in this pamphlet.

**This brokerage authorizes the following relationships:**

- ☐ Seller's Limited Agent
- ☒ Landlord's Limited Agent
- ☐ Buyer's Limited Agent
- ☐ Tenant's Limited Agent
- ☐ Sub-Agent
- ☐ Disclosed Dual Agent
- ☐ Designated Agent
- ☐ Transaction Broker
- ☐ Other Agency Relationship

---

Broker or Entity Name and Address

Urban Retail Properties Co.
900 N. Michigan Avenue
Chicago, IL 60611

---

## MISSOURI BROKER DISCLOSURE FORM



This disclosure is to enable you, a prospective buyer, seller, tenant or landlord of real estate, to make an informed choice BEFORE working with a real estate licensee.

Missouri law allows licensees to work for the interest of one or both of the parties to the transaction. The law also allows the licensee to work in a neutral position. How the licensee works depends on the type of brokerage service agreements involved. Since the sale or lease of real estate can involve several licensees, it is important that you understand what options are available to you regarding representation and to understand the relationships among the parties to any transaction in which you are involved.

Missouri laws require that if you want representation, you must enter into a written agreement. This may or may not require you to pay a commission. You do not need to enter into a written agreement with a transaction broker unless you intend to compensate this licensee. These agreements vary and you may also want to consider an exclusive or nonexclusive type of relationship.

If you choose not to be represented by an agent, the licensee working with you may be working for the other party to the transaction.

Provided by the Missouri Real Estate Commission as of January, 2008

---

Page 1 of 2

EXHIBIT B

# CHOICES AVAILABLE TO YOU IN MISSOURI

### Seller's or Landlord's Limited Agent

Duty to perform the terms of the written agreement made with the seller or landlord, to exercise reasonable skill and care for the seller or landlord, and to promote the interests of the seller or landlord with the utmost good faith, loyalty and fidelity in the sale, lease, or management of property.

Information given by the buyer/tenant to a licensee acting as a Seller's or Landlord's Limited Agent will be disclosed to the seller/landlord.

### Buyer's or Tenant's Limited Agent

Duty to perform the terms of the written agreement made with the buyer or tenant, to exercise reasonable skill and care for the buyer or tenant and to promote the interests of the buyer or tenant with the utmost good faith, loyalty and fidelity in the purchase or lease of property.

Information given by the seller/landlord to a licensee acting as a Buyer's or Tenant's Limited Agent will be disclosed to the buyer/tenant.

### Sub-Agent (Agent of the Agent)

Owes the same obligations and responsibilities as the Seller's or Landlord's Limited Agent, or Buyer's or Tenant's Limited Agent .

### Disclosed Dual Agent

With the written consent of all parties, represents both the seller and the buyer or the landlord and the tenant.

A Disclosed Dual Agent may disclose any information to either party that the licensee gains first is revealed to the transaction.

A dual agent may not disclose information that is considered confidential, such as:
- Buyer/Tenant will pay more than the purchase price or lease rent
- Seller/Landlord will accept less than the asking price or lease rent
- Either party will agree to financing terms other than those offered
- Motivating factors for any person buying, selling or leasing the property
- Terms of any prior offers or counter offers made by any party.

### Designated Agent

Acts as your specific agent, whether you are a buyer or tenant, or seller or landlord. When the broker makes this appointment, the other real estate licensees in the company do not represent you.

There are two exceptions with both resulting in dual agency
1. The agent representing you as a buyer or tenant to also the agent who listed the property you may want to buy or lease.
2. The supervising broker of two designated agents becomes involved in the transaction.

### Transaction Broker

Does not represent either party, therefore, does not advocate the interest of either party.

A transaction broker is responsible for performing the following:
- Protect the confidence of both parties
- Exercise reasonable skill and care
- Present all written offers in a timely manner
- Keep the parties fully informed
- Account for all money and property received
- Assist the parties in complying with the terms and conditions of the contract
- Disclose to each party of the transaction any adverse material facts known by the licensee
- Suggest that the parties obtain expert advice.

A transaction broker shall not disclose:
- Buyer/Tenant will pay more than the purchase or lease price
- Seller/Landlord will accept less than the asking or lease price
- Motivating factors of the parties
- Seller/Buyer will accept financing terms other than those offered.

A transaction broker has no duty to:
- conduct an independent inspection of, or discover any defects in, the property for the benefit of either party
- conduct an independent investigation of the buyer's financial condition.

Page 2 of 2

## EXHIBIT C

### Outside Broker

| New Lease | Approved Outside Broker Commission |
|---|---|
| Dress Barn | $13,467.00 |
| Jason's Deli | $15,000.00 |
| J. Jill | $40,000.00 |
| Chico's | $17,300.00 |
| White House | $13,315.00 |
| 3 Dog Bakery | $ 5,000.00 |

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205IV-clean.doc

Exhibit D
Anchor Store Consulting Fees

President---$360.00 per hour
Vice President---$225.00 per hour

Such fees are subject to a an increase equal to the lesser of (a) 4% per annum or (b) the increase in the CPI for the last month in such immediately preceding year.

38

Exhibit E

Excluded Tenants

Perform Shops

Popcorn Shops

Cooked Pretzel Shops

Nail Salons

Hair Salons

SCHEDULE II

1/04/05

# TENANT COORDINATION SERVICES FOR
# BRANSON LANDINGS

**SET-UP SERVICES to be done in Chicago**

- Work closely with leasing to provide design feasibility and preliminary budgeting for any work above Landlord standard
- Study the feasibility of all reconfigurations
- Review Base Building Documents as they relate to Tenant Construction and the creation of a criteria manual
- Establish a format for the Lease Outline Drawings
- Create the architectural and engineering criteria manual
- Customize Urban Retail Properties Co.'s Access Database for this project.
- Meet with the city building official and establish procedures for tenants to obtain permits
- Create a code manual for Tenants
- Review standard lease and all relevant exhibits (already completed)
- Work with Website designer to put the design criteria and tenant construction bulletins on a website

**SET-UP SERVICES to be done after May 1, 2005 in Branson**

- Set-up project office and hire project assistant
- Distribute permit procedures to Tenants
- Create a fire alarm manual
- Schedule meetings with each trade to establish a list of qualified regional sub-contractors

**DEAL PROCESS**

- Send out customized Tenant Packages, including the LOD on disk -- these will be sent as soon as they are completed either from Chicago or from Branson
- Closely monitor the progress of each tenant deal, their drawings, etc.
- Make follow-up phone calls
- Establish contact with all tenant architects and designers.
- In-house architectural review of Tenant working drawings
- Sensitively resolve Tenant design issues during drawing review phase.
- Provide a detailed summary of the architectural and engineering comments to the tenant and tenant's architect

Page 1 of 2

SCHEDULE II

**ON - SITE SERVICES**

- Field verify each LOD for dimensions and utility stubs
- Issue Work Orders for changes to the Base Building Contractor for utility and demising wall modification due to leasing changes.
- Conduct a comprehensive Pre-construction Meeting with each Tenant's site superintendent
- Observe Tenant's construction on a daily basis and troubleshoot all problems
- Using Urban's sophisticated tracking system monitor daily all phases of the Tenant construction process
- Notify Tenant of any build-out behind schedule and recommend a solution.
- Resolve design/construction issues in the field
- Perform detailed punch lists for each tenant as work nears completion.
- Process Tenant Allowances.
- Issue bulletins weekly or as needed to keep contractors informed of code and mall issues

**COMMUNICATION**

- Hold weekly (or more often as needed) status meetings with leasing, legal, and the development teams
- Maintain and create reports from the Access Database
- Advise legal regarding construction related lease issues
- Conduct regular meetings with city building officials regarding tenant permitting issues
- Meet weekly during the last 3 months with Management, Marketing and Security to coordinate activities.
- Meet weekly with the Base Building General Contractor and major sub-contractors to resolve discrepancies.
- Coordinate inspections for the city and the fire marshal
- Format and continuously update and publish Lease Plan

**SPECIAL SERVICES**

- Design, price, hire architects, contractors, and write contracts for Landlord work for "Vanilla Boxes" and other types of Landlord Work
- Design, price and contract for barricade designs needed for Grand Opening
- Color CAD
- Kiosk and Cart coordination

SCHEDULE III

January 6, 2005

Rick Huffman
HCW Development Company LLC
3027 West Hwy 76, Suite B
Branson, MO 65616

Re:   Branson Landing

Rick:

As discussed in your telephone conversation with Charles Porter on Monday, I have revised the Tenant Coordination budget for the project to reflect the actual costs through the end of 2004 and the costs of Jason Westrope starting full time on this project on January 17th. If you review page two, entitled Staff Timeline and Staff Costs, you will see that the costs are slightly lower than the original budget that we gave you in September. I have also revised the Travel, Office and Miscellaneous Expenses to reflect our discussion that HCW would provide office space free of charge for the Tenant Coordination staff. This revision along with some other revisions that always occur with more knowledge of the project has reduced these numbers. The Summary Sheet, page one, reflects all of these changes and a slightly reduced total estimate for the project.

It is important that the Tenant Coordination team get into full gear now. We all understand the importance of getting 50% of the leases fully executed by March. In order to accomplish this goal many of the tenants will demand answers on their construction issues prior to signing the lease. To date, I have been able to handle these questions myself, but with the increased number of deals in the system and the number of deals projected to come in the next few weeks it is critical that one person devote 100% of their time to this project. In addition, as soon as the construction documents are complete we need to start the architectural and engineering criteria manuals, as well as the code manual. Many of the tenants will want to see these manuals prior to lease execution. So that you can more clearly see which tasks will be accomplished by Jason prior to him moving to the Branson area, I have revised the statement of Tenant Coordination Services to reflect what we hope to accomplish prior to May 1st.

It is important that you know that Jason Westrope is an outstanding candidate to fill both the on-site Development responsibilities as well as head up the Tenant Coordination team. He has worked on four Grand Opening projects since 1999; three for Urban and one for another company. He handled both the development and tenant coordination responsibilities of Mainstreet at Southpoint, the outdoor retail area. In 2002 and 2003 he had both development and tenant coordination responsibilities on the Glen, a mixed use development northwest of Chicago, that includes retail and residential. He has an undergraduate degree in Mechanical Engineering

Page 1

SCHEDULE III

Rick Huffman
January 6, 2005
Page 2

and a Masters in Architecture. He is extremely well organized and self-disciplined as well as being a very good designer.

As I have stated previously, I will stay involved with the Branson Landings project through the Grand Opening. I will not only participate in status calls, but I will be traveling to Branson frequently to assess the progress of the project from a tenant coordination perspective.

In order to accomplish all of above and to meet the timeframe of the project, we will need to bill increased time for tenant coordination beginning on January 17th. As stated above, these amounts are reflected in the attached budget.

Please approve the attached budget by signing this letter and returning it to me either via e-mail or fax.

Hope you and your family had a great holiday.

Sincerely,

Urban Retail Properties Co.

Martha J. Spatz
Senior Vice President
(312) 915-3821 Telephone
(312) 915-3784 Fax
spatzm@urbanretail.com

Attachments

Cc:    Ross Glickman
       Mike Levin
       Charles Porter

HCW DEVELOPMENT COMPANY, L.L.C.,
a Missouri limited liability company

by: _____
       Richard B. Huffman, Manager

Page 2

SCHEDULE III

1/6/05

**Urban Retail Properties Co.**
**Branson Landing Grand Opening Tenant Coordination Budget**

Summary of Costs

| | |
|---|---|
| Staff Costs | $486,931 |
| Travel / Expenses | $50,910 |
| Miscellaneous Costs | $114,250 |
| Office Expenses* | $25,800 |
| **Overall Total** | **$677,891** |

* some of these could be eliminated if provided by owner



**SCHEDULE III**

Miami Road Properties Co. Tenant Construction Budget for Sizzano's Landing

Refback January 6, 2006

Based on May 1, 2006 Opening



SCHEDULE III

Urban Retail Properties Co. Tenant Coordination Budget for Branson Landing
Based on May 1, 2005 Opening

1/8/05

| Staff Timeline | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Staff Architect 1 | | | | 60% | | | | | | | | | | | | | | | | |
| Project Architect 1 | | | | | | | | | | | | | | | | | | | | |
| CCSD Operator | | | | | | | | 60% of Time | | | | | | | | | | | | |
| Staff Architect 2 | | | | | | | | | | | | | | | | | | | | |
| Construction Coordinator | | | | | | | | | | | | | | | | | | | | |
| Project Executive | | | | | | | | | | | | | | | | | | | | |

* This time in the Chicago office

Page 5

4/8/06

SCHEDULE III

# Branson Grand Opening Proposal
## Travel / Office / Miscellaneous Expenses

### Housing, Airfare, Meals

| | | | | TOTALS |
|---|---|---|---|---|
| **Housing** | | | | |
| Staff Architect 1 | 10 nights in hotel* | $100/night | $1,000 | |
| Staff Architect 1 | 8.5 months in temp. housing - Chgo. | $9,500 | | |
| Staff Architect 1 | 13 months in furnished apartment | ^^ | | |
| Staff Architect 2 | 7 months in furnished apartment | ^^ | | |
| Project Executive | 12 nights in hotel | $100/night | $1,200 | |
| | | | | |
| **Airfare** | | | | |
| Staff Architect 1 | 8 roundtrips | $225/roundtrip | $1,160 | |
| Staff Architect 2 | 14 roundtrips | $225/roundtrip | $7,280 | |
| Project Executive | 12 roundtrips | $225/roundtrip | $9,300 | |
| | | | | |
| **Meals** | | | | |
| Staff architect 1 | 90 meals* | $10/meal | $900 | |
| Project Executive | 38 meals | $10/meal | $380 | |
| Team meals    one per week | 52 meals | $70/meal | $3,640 | |
| | | | | |
| Car Rental | 5 trips* | $100/trip | $500 | |
| Staff Architect 1 | 13 months | $900/month | $11,700 | |
| Staff Architect 1 | 7 months | $750/month | $5,250 | |
| Staff Architect 2 | 12 trips | $55/trip | $660 | |
| Project Executive | | | | |
| | | | | |
| **Total Travel Expenses** | | | $50,910 | **$50,910** |

\* prior to move to Branson Area
^^ furnished apartment assumed to be provided or paid for by owner of the project

Page 1

Page 6

Office Expenses (based on a conversation with Rick Huffman, Urban's TC offices in Branson will be provided by HCW at no cost to Urban. It is also possible that some of these expenses can be deleted if they are shared with HCW).

| | | | |
|---|---|---|---|
| Fax machine - purchase | 1 | $200 | $200 |
| Copy machine ( monthly rental) | 13 months | $250/month | $3,250 |
| Dedicated phone lines | 5 lines | $250/line | $1,250 |
| New telephones | 5 phones | $150/each | $760 |
| Telephone bills - monthly | 13 months | $400/month | $5,200 |
| Construction drawing plan holder | 1 | $350 | $350 |
| Office supplies (files, folders | | | |
| Paper, pens, tape, staplers, etc.) | 13 months | $300/month | $3,800 |
| Letter postage | 13 months | $50/month | $850 |
| Office or trailer | 13 months | provided by owner | $0 |
| Security for trailer | 13 months | provided by owner | $0 |
| Office utilities | 13 months | provided by owner | $0 |
| Office furniture | | provided by owner | $0 |
| Cell phones/radios | 6 people | | $3,000 |
| Broadband internet connections | 6 people | | $3,250 |
| Broadband internet connection installation | | $1,000 | $1,000 |
| Office Expenses Total | | $25,500 | $25,500 |

EXHIBIT III

Page 7

Page 2



**SCHEDULE III**

**Miscellaneous Costs**

| Miscellaneous Costs | | | |
|---|---|---|---|
| Building Department Incentives | 100 | | $1,000 | $1,000 |
| Contractor Incentives | | | $5,000 | $5,000 |
| Engineering Drawing Reviews | | | $20/tenant | $20,000 |
| Printing Costs (100 tenants x 20 sheets x 2 sets) | 4,000 sheets | | $3/sheet | $12,000 |
| Computers | 5 | | $900 | $4,500 |
| Computer Printers | 5 | | $250 | $1,250 |
| Laser Outline Drawings | 100 | | $500 | $50,000 |
| Shipping Drawings (Fedex/dhl x 100) | 300 | | $15/pkg | $4,500 |
| Criteria Printing and Binding | 300 | | $20/manual | $6,000 |
| Computer Technician to network and create hook-ups | | | $2,500 | $2,500 |
| Website for criteria and bulletins | | | $7,500 | $7,500 |
| Miscellaneous Costs Total | | | | $114,250 |

$114,250

Page 3.

## SCHEDULE IV

| | |
|---|---|
| Mike Levin | $370.00 |
| Charles Porter | $260.00 |
| Martha Spatz (project executive) | $230.00 |
| Jason Westrope | $ 75.00 |
| Administrative Assistant – Chicago | $ 50.00 |
| Administrative Assistant – Branson | $ 35.00 |
| Cad Person | $ 45.00 |
| Staff Architect 2 | $ 75.00 |

# Exhibit B



### VIA OVERNIGHT DELIVERY AND CERTIFIED MAIL RETURN RECEIPT REQUESTED

Urban Retail Properties Co.
900 North Michigan Avenue
Chicago, Illinois 60611
Attention: General Counsel

Re:    Property Management and Leasing Agreement dated February 22, 2005
       (the "Agreement") between HCW Development Company, L.L.C ("Owner")
       and Urban Retail Properties Co. ("Manager")

Dear Sirs:

This termination notice is being delivered to you pursuant to Section 7.1.1 of the Agreement as a result of Manager's failure to observe or perform a material obligation to be observed or performed by Manager under the Agreement.

As part of Manager's duties and obligations under the Agreement, Manager is required to respond to complaints and requests of tenants. The tenants of the Center have met with the Owner and advised owner that Manager has repeatedly failed to respond to the complaints and requests of such tenants. Such actions have caused substantial harm to the Center and are not curable in nature. As a result of the failure of Manager to observe or perform its duties under the Agreement, the management of Owner has been forced to become actively involved in the operations of the Center.

Please be advised that pursuant to Section 4.6 of the Agreement, the Manager has no further authority as signatories of the Operating Account or Security Account as of this date. Notwithstanding the foregoing, Owner will authorize Manager to continue to be able to disburse sums from the Operating Account until the Turn Over Date so long as such amounts are within the Approved Annual Budget.

Owner hereby requests that Manager continue to provide services until August 1, 2008 (the "Turn Over Date") in order to achieve an efficient transition of the management of the Center.

Very truly yours,

H.C.W. Development Company, L.L.C.

By: _____
    Richard E. Huffman, C.E.O.

HCW, L.L.C. • HCW Development Company, L.L.C.
3027 West Highway 76 | Branson Missouri 65616 | P 417.332.3404 | F 417.332.3447 | www.hcwdev.com

08cv4330
JUDGE NORGLE
MAG. JUDGE VALDEZ
J. N.

URBAN RETAIL PROPERTIES, LLC,      )
fka URBAN RETAIL PROPERTIES CO.,   )
           Plaintiff,      )      Civil Action No. _____
v.                                 )
                               )      (Removed from Circuit Court
HCW DEVELOPMENT COMPANY, LLC, )       of Cook County, Illinois)
          Defendant.     )

# Exhibit "B"

## CIVIL COVER SHEET

The civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form isrequired for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**
Urban Retail Properties, LLC, fka
Urban Retail Properties Co.

**DEFENDANTS**
HCW Development Company, LLC

**(b)** County of Residence of First Listed Plaintiff    Cook County, IL
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Taney County, MO
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Gregory J. Scandaglia    (312) 580-2020
Scandaglia & Ryan                    60603
55 E. Monroe, Suite 3930, Chicago, IL

Attorneys (If Known)    (312) 655-1500
James White
Husch Blackwell Sanders LLP Welsh & Katz
120 S. Riverside Plz, 22d Flr, Chicago, IL 60606

### II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☐ 2  U.S. Government Defendant
☐ 3  Federal Question (U.S. Government Not a Party)
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT    (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane — **PERSONAL INJURY** | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | ☐ 362 Personal Injury— Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury— | of Property 21 USC 881 | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 480 Consumer Credit |
| Student Loans (excl. vet.) | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 490 Cable/Satellite TV |
| ☐ 153 Recovery of Overpayment | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| of Veteran's Benefits | Liability | ☐ 371 Truth in Lending | | | ☐ 850 Security/Commodity/Exch. |
| ☒ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | ☐ 360 Other Personal Inj. | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | | | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 ADA—Employment | ☐ 540 Mandamus & Other | Security Act | 26 USC 7609 | State Statutes |
| | ☐ 446 ADA — Other | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

### V. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION  (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

This is a breach of contract action involving residents of different states which is being removed pursuant to 28 U.S.C. 1332 and within the requirements of 28 U.S.C. 1441.

### VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary)

### VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

**IX. This case**  ☒ is not a refiling of a previously dismissed action.
☐ is a refiling of case number _____ previously dismissed by Judge _____

DATE  7-30-08

SIGNATURE OF ATTORNEY OF RECORD