# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED STAMP: JULY 30, 2008

08CV4330

JUDGE NORGLE

MAG. JUDGE VALDEZ

| | | |
|---|---|---|
| URBAN RETAIL PROPERTIES, LLC, | ) | |
| fka URBAN RETAIL PROPERTIES CO., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. ~~J. N.~~ |
| | ) | |
| v. | ) | |
| | ) | (Removed from Circuit Court |
| HCW DEVELOPMENT COMPANY, LLC, | ) | of Cook County, Illinois) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR ALTERNATIVELY TO TRANSFER VENUE TO THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI**

HCW DEVELOPMENT COMPANY, LLC

James P. White (ARDC No. 3001032)
J. Aron Carnahan (ARDC No. 6242642)
HUSCH BLACKWELL SANDERS LLP
120 South Riverside Plaza
22nd Floor
Chicago, IL 60606
Phone: (312) 655-1500
Fax: (312) 655-1501

# TABLE OF CONTENTS

I. Introduction ........................................................................................................ 1

II. Relevant Factual Background ........................................................................... 1

   A. The Basis for this Lawsuit. ........................................................................... 1

   B. HCW's Lack of Contacts With the State of Illinois. ..................................... 2

   C. This Lawsuit's Lack of Contacts with the Northern District of Illinois. .............................. 3

   D. Overwhelming Contacts With the Western District of Missouri. ....................................... 3

      1. The Parties and Their Employees/Witnesses. ............................................... 3

      2. Relevant Third Party Witnesses. ................................................................. 4

      3. Relevant Documents and the Premises. ....................................................... 4

      4. Governing Law. .......................................................................................... 5

   E. Practical Considerations. ............................................................................. 5

III. Legal Argument and Citations to Authorities ................................................... 5

   A. This Action Should Be Dismissed Because The Court Lacks Personal Jurisdiction Over
HCW. ................................................................................................................ 5

      1. Plaintiff Cannot Meet Its Burden of Establishing Personal Jurisdiction. ......................... 5

         a. HCW does not have "minimum contacts" ............................................. 6

         b. Even if HCW had sufficient "minimum contacts," the exercise of jurisdiction over
HCW in Illinois would violate traditional notions of fair play and substantial justice. ...... 8

   B. Alternatively, the Court Should Transfer This Action to the United States District Court for
the Western District of Missouri Pursuant to 28 U.S.C. § 1404(a). ........................................ 8

      1. Venue is Proper in the Western District of Missouri. ........................................ 9

      2. Transfer of Venue to the Western District of Missouri Will Serve the Convenience of the
Parties and Witnesses and the Interests of Justice ............................................... 9

         a. Plaintiff's choice of forum. ............................................................ 10

         b. The situs of the material events lies in the Western District of Missouri. .................. 10

         c. Convenience of parties heavily favors transfer. .......................................... 11

         d. Convenience of witnesses heavily favors transfer. ....................................... 12

         e. Relative ease of access to sources of proof favors transfer. ............................... 13

         f. Transfer would allow this case to proceed to trial sooner. ............................... 13

         g. Governing law heavily favors transfer. .................................................. 13

         h. Practical considerations indicating where the case can be tried more expeditiously and
inexpensively favor  transfer. ......................................................... 14

         i. Weighing of all factors. ................................................................. 14

IV. Conclusion ...................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Amoco Oil Co. v. Mobil Oil Corp.*, 90 F.Supp.2d 958 (N.D.Ill. 2000)............................10

*Anchor Wall Sys., Inc. v. R&D Concrete Products, Inc.*, 55 F.Supp.2d 871
    (N.D.Ill. 1999)....................................................................................................10, 12

*Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102 (1987)..................6

*Aviles v. Kunkle*, 978 F.2d 201 (5th Cir. 1992)...................................................................7

*Burger King v. Rudzewicz*, 471 U.S. 472 (1985) ...............................................................6

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986) .................................8, 9, 13

*Cote v. Wadel*, 796 F.2d 981 (7th Cir. 1986)......................................................................7

*First Nat'l Bank v. El Camino Res., Ltd.*, 447 F.Supp.2d 902 (N.D.Ill. 2006)........9, 10, 13

*Glass v. Kemper Corp.*, 930 F.Supp. 332 (N.D.Ill. 1996) ...............................................6, 7

*Household Fin. Servs., Inc. v. Prestige Fin. Servs. Corp.*, 1999 WL 608705
    (N.D.Ill. Aug. 6, 1999)...................................................................................................12

*Hyatt Corp. v. Pers. Comm. Indus. Ass'n*, 2004 WL 2931288
    (N.D.Ill. Dec. 15, 2004) ................................................................................................10

*International Shoe Co. v. Washington,* 326 U.S. 310 (1945) ..............................................6

*Jamik, Inc. v. Days Inn of Mount Laurel*, 74 F.Supp.2d 818 (N.D.Ill. 1999)................5, 7

*Jennings v. AC Hydraulic A/S*, 383 F.3d 546 (7th Cir. 2004)............................................5

*Karrels v. Adolph Coors Co.*, 699 F.Supp. 172 (N.D.Ill. 1988) ......................................12

*Kingsley v. Dixon Old People's Home Fund, Inc.*, 1996 WL 417548
    (N.D.Ill. July 22, 1996)................................................................................................12

*Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651 (8th Cir. 1982).........................7

*Paul v. Lands' End, Inc.*, 742 F. Supp. 512 (N.D. Ill. 1990) ...........................................10

*Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773 (7th Cir. 2003)...........5

*RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272 (7th Cir. 1997) .......................................7

*Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)........................................8

*Tensor Group, Inc. v. All Press Parts & Equip., Inc.*, 966 F. Supp. 727 (N.D. Ill. 1997).10

*Tingstol Co. v. Rainbow Sales, Inc.*, 8 F.Supp.2d 1113 (N.D.Ill. 1998)............................6

*Van Dusen v. Barrack*, 376 U.S. 612 (1964) ....................................................................13

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)....................................6

## FEDERAL RULES AND STATUTES

Federal Rule of Civil Procedure 12(b)(2) ...................................................................8, 15

28 U.S.C. § 1404(a) ...................................................................................................1, 8, 9

28 U.S.C. § 1391(a) ...........................................................................................................9

28 U.S.C. § 1391(c) ...........................................................................................................9

## MISCELLANEOUS

Judicial Case Profile, *available at* http://www.uscourts.gov/cgi-bin/cmsd2007.pl.............5

17 Moore's Federal Practice § 111.13[1][c] ....................................................................14

## I.  INTRODUCTION

This case arises out of a Property Management and Leasing Agreement between the parties that was to be carried out in all parts in Branson, Missouri and is subject to Missouri law. When HCW terminated the Agreement for Plaintiff's failure to meet its contractual obligations, Plaintiff filed this one-count breach of contract lawsuit against HCW in Cook County, Illinois despite HCW having little, if any, contact with the state of Illinois.  HCW is a Missouri entity with its principal place of business in Branson, Missouri.  It has no employees, agents, offices, business premises, bank accounts, financial holdings, or property in Illinois.  HCW never traveled to Illinois to meet with Plaintiff while negotiating the Agreement, and HCW executed the Agreement in Missouri.  Because of HCW's very minimal contacts with Illinois, subjecting it to this Court's jurisdiction violates its due process rights, and this case should be dismissed.

Alternatively, the Court should transfer this case to the Western District of Missouri pursuant to 28 U.S.C. § 1404(a).  Of the eight factors relevant to the § 1404(a) analysis, <u>seven</u> weigh heavily in favor of transfer.  The property at issue is located in Branson, Missouri.  The vast majority, if not all, of the factual events giving rise to this lawsuit took place in Branson, Missouri.  The majority of the party witnesses and some 21 non-party witnesses reside in or near Branson, Missouri.  Missouri law applies.  The center of gravity of this case is unquestionably Branson, Missouri.   Transfer to the Western District of Missouri is warranted for the convenience of the parties and witnesses and in the interests of justice.

## II.  RELEVANT FACTUAL BACKGROUND

### A.  The Basis for this Lawsuit.

1.      Plaintiff filed this lawsuit against HCW seeking damages from HCW arising out of HCW's alleged breach of a written "Property Management and Leasing Agreement" between the parties (the "Agreement").  *See* Complaint filed in Cook County, Illinois Circuit Court on or about June 26, 2008, as amended on or about July 18, 2008, attached to Notice of Removal filed in this Court.

2.      The Agreement provided for Plaintiff to manage and lease the Branson Landing shopping center owned and operated by HCW in Branson, Missouri (the "Branson Landing") for an initial term of five years. *See generally* the Agreement, attached hereto as Exhibit "A." Plaintiff's responsibilities under the Agreement included, among other things, supervising the

maintenance of the Branson Landing, procuring and collecting rent from its tenants, and responding to tenant requests and complaints. *See* Exhibit "A."

3.     Plaintiff alleges that HCW breached the Agreement by attempting to terminate its relationship with Plaintiff without first complying with the terms of the Agreement. *See* Complaint at ¶¶ 7, 8. The sole count of Plaintiff's Complaint requests damages for HCW's alleged "Breach of Contract." *See* Complaint at ¶¶ 11-13.

4.     HCW's termination letter, attached to Plaintiff's Complaint, states that HCW is terminating the Agreement because Plaintiff "repeatedly failed to respond to the complaints and requests of (the Branson Landing's) tenants." Attached hereto as Exhibit "B" is a letter dated May 23, 2008 sent to HCW by 16 Branson Landing tenants complaining that they had "repeatedly expressed (their) concerns to…Urban Retail Properties and (had) been met with completely unsatisfactory and unacceptable results," and that "from day one," Plaintiff's general manager had managed the Branson Landing in "an egotistical, narcissistic fashion."

### B.  HCW's Lack of Contacts With the State of Illinois.

5.     HCW is a Missouri limited liability company with its headquarters and principal place of business in Branson, Missouri. *See* Affidavit of Richard Huffman, attached hereto as Exhibit "C," at ¶ 4.   None of HCW's officers, members, or employees resides in Illinois. *See* Exhibit "C" at ¶ 4.

6.     HCW has no offices or other business premises in Illinois. HCW is not registered to do business in Illinois and does not maintain a registered agent or officer for service of process in Illinois. *See* Exhibit "C" at ¶ 5.

7.     HCW has no telephone listing or business listing in Illinois. Likewise, HCW has no bank accounts, financial holdings or property, real or personal, in Illinois. *See* Exhibit "C" at ¶ 6.

8.     Although HCW did have written and telephonic discussions with Plaintiff while Plaintiff was located in Illinois, HCW never traveled to Illinois to meet with Plaintiff while negotiating the Agreement, and HCW executed the Agreement in Missouri. *See* Exhibit "C" at ¶¶ 7, 8.

**C.  This Lawsuit's Lack of Contacts with the Northern District of Illinois.**

9.      The Northern District of Illinois is connected to this dispute only because Plaintiff lists the District as its principal place of business, and conspicuously alleges that "***some*** of the obligations that (it) is required to perform under the Agreement have been performed in Chicago, Illinois."  *See* Complaint at ¶¶ 1, 4 (emphasis added).

10.     Although Plaintiff may be headquartered in Illinois, it conducts business across the United States, and bills itself as "the nations' (sic) leading third-party real-estate manager." *See* Printout from Plaintiff's website attached hereto as Exhibit "D."  Further, Plaintiff is a Delaware company, and boasts of offices in "Connecticut, Florida, Georgia, Iowa, Massachusetts, New Jersey, Texas, and Washington, DC."  *See* Exhibit "D."

11.     The Agreement was negotiated by HCW in the state of Missouri.  *See* Exhibit "C" at ¶ 7.  HCW never traveled to Illinois to meet with Plaintiff during the negotiation process.  *See* Exhibit "C" at ¶ 7.

12.     The Agreement provides for its execution in counterparts.  *See* Exhibit "A" at § 8.16.  HCW executed the Agreement in Missouri.  *See* Exhibit "C" at ¶ 8.

13.     The terms of the Agreement were to be carried out in Branson, Missouri, not in Chicago, Illinois.  *See generally* Exhibit "A."  The Agreement did not provide for Plaintiff's employees to perform their obligations from Illinois.  Neither the Branson Landing project nor the vast majority of the witnesses and documents relevant to this dispute are located in the Northern District of Illinois.  *See* Exhibit "C" at ¶¶ 12-16.


**D.  Overwhelming Contacts With the Western District of Missouri.**

1. The Parties and Their Employees/Witnesses.

14.     HCW is a Missouri limited liability company with its headquarters and principal place of business in Branson, Missouri. *See* Exhibit "C" at ¶ 5.  Each of HCW's officers and employees with knowledge of the events giving rise to this lawsuit resides in or near Branson, Missouri.  *See* Exhibit "C" at ¶ 12.

15.     Plaintiff is a licensed Landlord's Agent in Missouri, registered with the Missouri Division of Professional Registration.  *See* Plaintiff's registration materials, attached to Exhibit "A."

16.     Plaintiff is also registered to do business in the state of Missouri, and maintains a registered agent for service of process in Missouri.  *See* documents filed by Plaintiff with the Missouri Secretary of State, attached hereto as Exhibit "E."

17.     The Agreement contemplated Plaintiff employing full-time on-site personnel in Branson, Missouri to carry out its management and leasing responsibilities.  *See* Exhibit "A" at §§ 4.1-4.14.   Throughout the duration of the Agreement prior to its termination, Plaintiff employed several employees on-site in Branson, Missouri.  *See* Exhibit "C" at ¶ 9.  At the time of the Agreement's termination, Plaintiff employed six employees on-site in Branson, Missouri. See Exhibit "C" at ¶ 9.  Of those six individuals, the following five still work at the Branson Landing in some capacity and live in or near Branson, Missouri:  Melissa Hudson, Maria Smith, Tammy Scholten, Allison White, and Kathy Kruger.  *See* Exhibit "C" at ¶ 15.

        2.  Relevant Third Party Witnesses.

18.     As noted above, this dispute arises out of HCW's termination of the Agreement due to Plaintiff's failure to respond to the requests and complaints of Branson Landing tenants.

19.     Each of these tenants and their relevant representatives is located and does business in Branson, Missouri.  *See* Exhibit "C" at ¶ 16.   These individuals include representatives of the following 16 tenants that signed Exhibit "B":  Turtle Bay Clothing Company, Peace Frogs, Charlie's Grilled Subs, Stone Smith Jewelry, Bath Junkie, Auntie Anne's Soft Pretzels, Branson Quilts, Integrity Designs and Embroidery, Waxy O'Shea's Irish Pub, Grand Glitz, Haagen-Dasz, Gloria Jean's I, Gloria Jean's II, Temporary Airbrush Tattoos, Famous Dave's, and Rocky Mountain Chocolate Factors.  None of the individuals signing the May 23, 2008 letter resides in the Northern District of Illinois.  *See* Exhibit "C" at ¶ 16.

        3.  Relevant Documents and the Premises.

20.     The Branson Landing is located in Branson, Missouri.  *See* Exhibit "C" at ¶ 14.

21.     All of the documents in HCW's possession relevant to Plaintiff's Complaint are located in Branson, Missouri.  *See* Exhibit "C" at ¶ 13.

22.     Further, because the tenant complaints were made to Plaintiff's employees in Missouri, and because Plaintiff's employees managed the Branson Landing in Missouri, all of the documents in Plaintiff and any third party's possession relevant to Plaintiff's Complaint are presumably also located in Branson, Missouri.  To HCW's knowledge, no relevant documents are located in the Northern District of Illinois.  *See* Exhibit "C" at ¶ 13.

4.  Governing Law.

23.    Federal law does not apply to this action.  Because the parties' responsibilities were to be carried out in Missouri, the Agreement is to be governed by and construed in accordance with Missouri law.  *See* Exhibit "A" at § 8.12.

**E. Practical Considerations.**

24.    The United States District Court for the Northern District of Illinois, Eastern Division, is located approximately 550 miles from Branson, Missouri, the location of the Branson Landing and the majority of the relevant witnesses and documents in this case.  The United States District Court for the Western District of Missouri, Southern Division, is located approximately 45 miles from Branson, Missouri.

25.    Civil cases proceed to trial in the United States District Court for the Northern District of Illinois, on average, in 29.7 months.  Civil cases proceed to trial in the United States District Court for the Western District of Missouri in an average of 22.0 months.  *See* Judicial Case Profile, http://www.uscourts.gov/cgi-bin/cmsd2007.pl, attached hereto as Exhibit "F."

### III.  LEGAL ARGUMENT AND CITATION TO AUTHORITIES

**A.     This Action Should Be Dismissed Because The Court Lacks Personal Jurisdiction Over HCW.**

This Court lacks personal jurisdiction over HCW because subjecting HCW to jurisdiction in the state of Illinois would violate HCW's due process rights under the United States Constitution.  Accordingly, Rule 12(b)(2) of the Federal Rules of Civil Procedure mandates that the suit against HCW be dismissed for lack of personal jurisdiction.

1.  Plaintiff Cannot Meet Its Burden of Establishing Personal Jurisdiction.

Personal jurisdiction determines, in part, where a plaintiff may hale a defendant into court.  *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 548 (7th Cir. 2004).  Once a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003).  In determining whether the plaintiff has met its burden, the court should take as true facts contained in a defendant's affidavits that are not refuted by the plaintiff.  *Jamik, Inc. v. Days Inn of Mount Laurel*, 74 F.Supp.2d 818, 821 (N.D.Ill. 1999).

Because the Illinois long-arm statute extends personal jurisdiction to due process limits, federal courts sitting in Illinois need only consider whether the exercise of jurisdiction in

diversity cases is consistent with federal due process requirements.   *E.g., Tingstol Co. v. Rainbow Sales, Inc.*, 8 F.Supp.2d 1113, 1115 (N.D.Ill. 1998); *Glass v. Kemper Corp.*, 930 F.Supp. 332, 337 (N.D.Ill. 1996).   Due process limits when a state may exercise personal jurisdiction over nonresident defendants.   *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 108 (1987); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980).  This limitation allows potential defendants to structure their contacts with different forums so as to plan where their business activities will and will not render them liable to suit. *Burger King v. Rudzewicz*, 471 U.S. 472,73 (1985).

The due process test for assertions of personal jurisdiction has been settled for more than sixty years, since the Supreme Court decided *International Shoe Co. v. Washington,* 326 U.S. 310 (1945). This test requires that a defendant must have "minimum contacts" with the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Id.* at 316.   The generalized foreseeability of the defendant's action causing harm in the forum is not sufficient for the exercise of jurisdiction. *Burger King*, 471 U.S. at 474. Instead, whether the defendant's conduct and connection with the forum are such that it should reasonably anticipate being haled into court there is the crucial inquiry.   *Id.*  To establish such a reasonable anticipation, the defendant must have purposefully availed itself of the privilege of conducting activities in the forum, invoking the benefits and protections of its laws.   *Id.*  Once minimum contacts have been shown to exist, a court still must examine other factors, such as the forum's interest in adjudicating the dispute and the burden on the defendant, to determine whether the exercise of personal jurisdiction satisfies traditional notions of fair play and substantial justice.  *Id.* at 476-77.

> **a.    HCW does not have "minimum contacts" such that it could have reasonably anticipated being haled into court in Illinois.**

HCW could not reasonably have anticipated being haled into court in Illinois.  Plaintiff seemingly acknowledges as much in that it fails to allege a single direct contact between HCW and the state of Illinois.  There are no such contacts.  HCW is not registered to do business in Illinois, and has no business premises, inventory, bank accounts, real estate, personal property, employees or agents in Illinois.  *See* Exhibit "C" at ¶¶ 4-6.  Further, HCW did not travel to Illinois during the negotiation of the Agreement, HCW executed the Agreement in Missouri, and

the Agreement provides for the application of Missouri law. *See* Exhibit "A" at § 8.12; Exhibit "C" at ¶¶ 7, 8.

Notably, Plaintiff does not allege that Illinois courts have jurisdiction over HCW. However, Plaintiff does claim that "venue" is appropriate in Illinois because "the negotiations that led up to the execution of the Agreement took place in significant part in Chicago, Illinois." *See* Complaint at ¶ 4. HCW interprets this allegation to mean that Plaintiff claims that jurisdiction is appropriate over HCW because HCW negotiated with Plaintiff while Plaintiff was located in Illinois, and because HCW ultimately contracted with Plaintiff, a company headquartered in Illinois. Neither is a basis for personal jurisdiction over HCW.

It is well-settled that simply contracting with a resident of a forum state is not sufficient in and of itself to establish personal jurisdiction. *See RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1277 (7th Cir. 1997); *Jamik,* 74 F.Supp.2d at 823. Thus, the fact that HCW contracted with Plaintiff, a company headquartered in Illinois, does not subject HCW to the jurisdiction of the Illinois courts. This is particularly true given that the Agreement provided for its execution in counterparts, and HCW executed the Agreement in Branson, Missouri. *See* Exhibit "A" at § 8.16; Exhibit "C" at ¶ 8.

Further, although HCW did have some written and telephonic discussions with Plaintiff while Plaintiff was located in Illinois, these contacts are not sufficient to confer personal jurisdiction, because mere communications or negotiations with a resident of a forum state are typically not sufficient to subject non-resident defendants to the forum state's jurisdiction. *See Aviles v. Kunkle*, 978 F.2d 201, 205 (5th Cir. 1992). This is true whether the communications are through letter, by telephone, or via facsimile or email. *See, e.g., Cote v. Wadel*, 796 F.2d 981, 984 (7th Cir. 1986) (handful of letters and phone calls insufficient to support exercise of personal jurisdiction); *Glass v. Kemper Corp.*, 930 F.Supp. 332 (N.D.Ill. 1996) (occasional telephone call and letter to Illinois employer is insufficient contact to warrant exercise of jurisdiction) *Mountaire Feeds, Inc. v. Agro Impex, S.A.*, 677 F.2d 651, 652 (8th Cir. 1982) (letters and faxes do not establish personal jurisdiction).

Given its very minimal contacts with the state, HCW could not have reasonably anticipated being haled into court in Illinois. The exercise of personal jurisdiction in this case would therefore violate HCW's due process rights. Plaintiff's Complaint should be dismissed.

**b.     Even if HCW had sufficient "minimum contacts," the exercise of jurisdiction over HCW in Illinois would violate traditional notions of fair play and substantial justice.**

Notwithstanding HCW's contacts with Illinois, fair play and substantial justice also require dismissal of Plaintiff's Complaint.  All of the events giving rise to this lawsuit occurred in Branson, Missouri.  The property at issue is located in Branson, Missouri.  Nearly all of the witnesses – party and non-party – reside in or near Branson, Missouri.  *See* Exhibit "C" at ¶¶ 12, 15, 16.  The Agreement is to be construed in accordance with Missouri law.  *See* Exhibit "A" at § 8.12.  Illinois therefore has little interest in adjudicating this dispute.

Further, allowing this litigation to proceed in Illinois would impose a significant burden on HCW.  HCW is headquartered in Branson, Missouri.  All of HCW's officers and employees with knowledge of the allegations of the Complaint and the events giving rise to this lawsuit reside in or near Branson, Missouri.  HCW's other likely witnesses – the 16 individuals who signed the May 23, 2008 letter to HCW and Plaintiff's five former employees still working at the Branson Landing – also reside in or near Branson, Missouri.  Forcing HCW to litigate in Chicago, Illinois some 550 miles away from all of its witnesses and the property in question simply does not comport with any notion of justice.  This is particularly true given HCW's very minimal contacts with Illinois, and the Illinois courts' relatively minor interest in this dispute.  HCW simply has not purposefully availed itself of the privilege of doing business in Illinois.  Due process therefore requires that the Court dismiss Plaintiff's Complaint under Rule 12(b)(2).

**B.     Alternatively, the Court Should Transfer This Action to the United States District Court for the Western District of Missouri Pursuant to 28 U.S.C. § 1404(a).**

Pursuant to 28 U.S.C. § 1404(a), this Court has authority to transfer any civil action "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought."  28 U.S.C. § 1404(a); *Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986).  A party seeking transfer under § 1404(a) must show that (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice.  *Id.* at 219.  In enacting this statute, Congress "intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  The transfer

requirements are fully satisfied here, and this case should be transferred to United States District Court for the Western District of Missouri.

### 1.  Venue is Proper in the Western District of Missouri.

Venue is governed by 28 U.S.C. § 1391(a) in cases, as here, where subject matter jurisdiction is based on diversity.  Section 1391(a) provides that venue may be proper in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no other district in which the action may otherwise be brought.

Pursuant to 28 U.S.C. § 1391(c), "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced."

Venue is proper in the Western District of Missouri pursuant to 28 U.S.C. § 1391(a)(1) because HCW resides in the Western District of Missouri.  *See* Exhibit "C" at ¶ 4.  Venue is also proper in the Western District of Missouri pursuant to 28 U.S.C. § 1391(a)(2) because the alleged events or omissions giving rise to the claims occurred in Branson, Missouri, which is located in the district.  *See* 28 U.S.C. § 1391(a)(2).

### 2.  Transfer of Venue to the Western District of Missouri Will Serve the Convenience of the Parties and Witnesses and the Interests of Justice.

Although in considering a motion for transfer, the court is limited to the three factors specifically mentioned in § 1404(a), these factors are "best viewed as placeholders for a broader set of considerations, the contours of which turn upon the particular facts of each case." *Coffey*, 796 F.2d at 219 n.3.  Accordingly, these factors are further divided into several "private interests":  "(1) the plaintiff's choice of forum; (2) the situs of the material events; (3) the relative ease and access to sources of proof; (4) the convenience of the parties; and (5) the convenience of the witnesses."  *First Nat'l Bank v. El Camino Res., Ltd.*, 447 F.Supp.2d 902, 911-912 (N.D.Ill. 2006).

In addition, courts must also consider the "public interests," that is, the interests of justice.  "This analysis focuses on the efficient administration of the court system, rather than the private considerations of the litigants."  *Amoco Oil Co. v. Mobil Oil Corp.*, 90 F.Supp.2d 958,

961 (N.D.Ill. 2000).  "Public interest factors include the court's familiarity with the applicable law, the speed at which the case will proceed to trial, and the desirability of resolving controversies in their locale."  *First Nat'l Bank*, 447 F.Supp.2d at 912.  Here, both the "private interests" and the "public interests" heavily favor transfer of this case to the Western District of Missouri.

### a.  Plaintiff's choice of forum.

Although a court must consider a plaintiff's choice of forum in the transfer analysis, "the plaintiff's choice of forum is also accorded less weight where the operative events giving rise to the lawsuit took place in another forum."  *E.g., Paul v. Lands' End, Inc.*, 742 F. Supp. 512, 514-15 (N.D. Ill. 1990); *Anchor Wall Sys., Inc. v. R&D Concrete Prods., Inc.*, 55 F. Supp. 2d 871, 874 (N.D. Ill. 1999); *Tensor Group, Inc. v. All Press Parts & Equip., Inc.*, 966 F. Supp. 727, 730 (N.D. Ill. 1997).

Here, as discussed above, there is little, if any, connection between the Northern District of Illinois and the operative facts of the case as alleged in the Complaint.  Although Plaintiff claims that its side of the Agreement's negotiations and "**some**" of its obligations were carried out in Illinois, it cannot be disputed that (1) the Branson Landing is located in Branson, Missouri; (2) the vast majority, if not all, of the underlying factual events took place in Branson, Missouri; and (3) the majority of both the party and non-party witnesses reside in or near Branson, Missouri.

### b.  The situs of the material events lies in the Western District of Missouri.

In a breach of contract case, "the situs is where the business decisions causing the breach occurred."  *Hyatt Corp. v. Pers. Comm. Indus. Ass'n*, 2004 WL 2931288, at *2 (N.D.Ill. Dec. 15, 2004).  The sole count of Plaintiff's Complaint requests damages for HCW's alleged "Breach of Contract."  *See* Complaint at ¶¶ 11-13.  This alleged breach stems from HCW's termination letter attached to the Complaint.  HCW made the decision to terminate Plaintiff and drafted the termination letter in Branson, Missouri.  *See* Exhibit "C" at ¶ 11.  Thus, the situs here lies in the Western District of Missouri.

**c. Convenience of parties heavily favors transfer.**

Transfer of this action to the Western District of Missouri will be more convenient to both parties. As an initial matter, litigating this case in the Western District of Missouri will be more convenient to HCW because all of its witnesses and all of its documents are located in Branson, Missouri. Thus, the convenience of parties issue is, at the very least, neutral.

Litigating this case in the Western District of Missouri will in no way inconvenience Plaintiff either. By its own admission, Plaintiff conducts business across the United States, and bills itself as "the nations' (sic) leading third-party real-estate manager." *See* Exhibit "D." Although Plaintiff is headquartered in Chicago, it is a Delaware company, and it boasts of offices in "Connecticut, Florida, Georgia, Iowa, Massachusetts, New Jersey, Texas, and Washington, DC." *See* Exhibit "D." Plaintiff is a licensed Landlord's Agent in Missouri, is registered to do business in the state of Missouri, and maintains a registered agent for service of process in Missouri. *See* materials attached to Exhibit "A"; Exhibit "E." Given its nationwide presence and specific business activities in Missouri, Plaintiff should be well-accustomed to litigating outside of Illinois such that it will not be inconvenienced by a transfer to the Western District of Missouri.

If anything, litigating this case in this Western District of Missouri may be even more convenient to Plaintiff than the Northern District of Illinois. Plaintiff has a significant connection to the Western District of Missouri with respect to the underlying facts of this case. Plaintiff employed many full-time employees on-site at the Branson Landing, at least five of which still reside in or near Branson, Missouri. *See* Exhibit "C" at ¶ 15. Further, prior to the Agreement's termination, Plaintiff maintained an office at the Branson Landing. *See* Exhibit "C" at ¶ 14. Thus, it stands to reason that Plaintiff's primary witnesses and most relevant documents are located in the Western District of Missouri.

Given Plaintiff's substantial contacts with Missouri, it has a reasonable expectation of litigating disputes with HCW in the Western District of Missouri. Further, it is equally convenient, if not more convenient, for Plaintiff to litigate this dispute in Missouri. The convenience of parties factor therefore weighs heavily in favor of transfer to the Western District of Missouri.

11

### d. Convenience of witnesses heavily favors transfer.

Litigating this case in the Western District of Missouri will also be much more convenient to the likely witnesses in this case. This court has repeatedly noted that the convenience of witnesses is "the most important factor in the transfer balance." *Kingsley v. Dixon Old People's Home Fund, Inc.*, 1996 WL 417548, at *2 (N.D.Ill. July 22, 1996). More particularly, the "convenience of non-party witnesses is often viewed as **the most important factor** in the transfer analysis." *Anchor Wall Sys., Inc. v. R&D Concrete Products, Inc.*, 55 F.Supp.2d 871, 873 (N.D.Ill. 1999)(emphasis added). The inability to compel the appearance of material, non-party witnesses "weighs in favor of transfer." *Karrels v. Adolph Coors Co.*, 699 F.Supp. 172, 176 (N.D.Ill. 1988); *see also Household Fin. Servs., Inc. v. Prestige Fin. Servs. Corp.*, 1999 WL 608705, at *2 (N.D.Ill. Aug. 6, 1999)(finding the "inability to compel the attendance of material non-party witnesses to be a **crucial factor** militating in favor of transfer")(emphasis added).

Here, the convenience of witnesses factor weighs heavily in favor of transfer to the Western District of Missouri. As discussed above, the vast majority of the individuals with relevant knowledge of the issues and events identified in the Complaint reside in or near Branson, Missouri. All of HCW's employees with knowledge of the allegations of the Complaint and the events giving rise to this lawsuit reside in or near Branson, Missouri. *See* Exhibit "C" at ¶ 12. Five of Plaintiff's former on-site employees still work at the Branson Landing and live in or near Branson, Missouri. *See* Exhibit "C" at ¶ 15. All 16 of the entities that signed the May 23, 2008 letter to HCW are still Branson Landing tenants, whose representatives reside in or near Branson, Missouri. *See* Exhibit "C" at ¶ 16.

Plaintiff can hardly dispute that the majority of the likely witnesses in this case reside in the Western District of Missouri. At least 21 of these witnesses are non-parties that could not be compelled to appear in court in the Northern District of Illinois. Further, even if they could be compelled to appear or wanted to appear voluntarily, it would undoubtedly be burdensome for these witnesses to travel from Branson, Missouri to Chicago, Illinois, some 550 miles, for hearings and the trial of this case. By contrast, the Western District of Missouri, Southern Division, is a mere 45 miles from Branson. The convenience of witnesses – the **"crucial"** and **"most important"** factor in the transfer balance – therefore heavily favors transfer of this case to the Western District of Missouri.

12

### e.  Relative ease of access to sources of proof favors transfer.

As discussed above, most of the likely relevant witnesses in this case reside in or near Branson, Missouri.  All of HCW's documents relevant to this action are located in Branson.  The decision to terminate the Agreement was made in Branson.  The Branson Landing shopping center itself, including Plaintiff's former office, is located in Branson.

To the extent that party and non-party witnesses have to be interviewed and deposed, documents have to reviewed, and the physical premises have to be inspected to determine the veracity and seriousness of the Branson Landing tenants' complaints (and the lack of action taken to resolve them), these tasks will have to take place in Branson, Missouri.  Access to sources of proof will therefore be much easier to come by in the Western District of Missouri.

### f.  Transfer would allow this case to proceed to trial sooner.

In considering a motion to transfer venue, courts should consider "the speed at which the case will proceed to trial." *First Nat'l Bank*, 447 F.Supp.2d at 911-912.  A transfer of this action to the Western District of Missouri would not cause significant delay or prejudice, and in fact would allow the parties to try their case even sooner.  This action was filed on June 26, 2008.  Thus, a transfer at this early stage in the lawsuit would not unduly delay the proceedings or cause undue prejudice.  Moreover, comparative statistics show that civil cases proceed to trial, on average, 7.7 months quicker in the Western District of Missouri than the Northern District of Illinois.  *See* Exhibit "F."

### g.  Governing law heavily favors transfer.

The Seventh Circuit Court of Appeals has recognized that in diversity cases, it is "advantageous to have federal judges try a case who are familiar with the applicable state law." *Coffey*, 796 F.2d at 221 (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).  Here, per the terms of the Agreement, Missouri law applies.  *See* Exhibit "A" at § 8.12.  While there is no dispute that the Judges of this Court could and would correctly apply Missouri law to the issues of this case, there are judicial efficiencies to be gained by having a Missouri judge who routinely deals with Missouri law handle this action that arises solely from Missouri law.  Thus, the Western District of Missouri presents an advantageous forum with respect to the governing law factor.

**h. Practical considerations indicating where the case can be tried more expeditiously and inexpensively favor transfer.**

This action will likely proceed more expeditiously and inexpensively in the Western District of Missouri because of the presence in that district of both Plaintiff and HCW, the location there of the relevant witnesses, and the location there of the Branson Landing shopping center and the majority of documents. A transfer to the Western District of Missouri would eliminate the need for the parties and witnesses to travel back and forth to Illinois to attend hearings and trial. Transfer is therefore appropriate for the convenience of the parties.

**i. Weighing of all factors.**

Of the many "private interest" and "public interest" factors the court must balance in deciding whether to transfer this case, precisely one – the plaintiff's choice of forum – militates against transfer. And where, as here, the events giving rise to the litigation occurred in a different district, the plaintiff's choice of forum must be accorded "less weight."

The other seven factors at issue in this case, including the "crucial" and "most important" convenience of witnesses, weigh heavily in favor of transfer.

Common sense dictates and the law generally confirms that "a motion to transfer to the district in which the events occurred is likely to succeed." 17 Moore's Federal Practice § 111.13[1][c]. Here, that district is the Western District of Missouri. This case should accordingly be transferred pursuant to 28 U.S.C. § 1404(a).

## IV.  CONCLUSION

For the foregoing reasons, Defendant HCW Development Company, LLC moves to the court to dismiss the claims of Plaintiff for lack of personal jurisdiction over this defendant pursuant to Federal Rule of Civil Procedure 12(b)(2), or alternatively to transfer this case to the United States District Court for the Western District of Missouri, Southern Division, pursuant to 28 U.S.C. § 1404(a).

July 30, 2008                              Respectfully submitted,

                                           HCW DEVELOPMENT COMPANY, LLC


                                           By:    /s James P. White
                                                  One of its attorneys

                                           James P. White (ARDC No. 3001032)
                                           J. Aron Carnahan (ARDC No. 6242642)
                                           HUSCH BLACKWELL SANDERS LLP
                                           120 South Riverside Plaza
                                           22nd Floor
                                           Chicago, IL 60606
                                           Phone: (312) 655-1500
                                           Fax: (312) 655-1501

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 30th day of July, 2008, the above and foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served via hand delivery upon the following:

Gregory J. Scandaglia
Scandaglia & Ryan
55 E. Monroe, Suite 3930
Chicago, IL 60603

          /s James P. White

URBAN RETAIL PROPERTIES, LLC,  )  
fka URBAN RETAIL PROPERTIES CO.,  )  
                Plaintiff,  )  
v.  )  
  )  
HCW DEVELOPMENT COMPANY, LLC,)  
             Defendant.  )  

Civil Action No. _____

(Removed from Circuit Court
 of Cook County, Illinois)

# Exhibit "A"

## Part 1 (pp. 1-29)

## PROPERTY MANAGEMENT AND LEASING AGREEMENT

THIS PROPERTY MANAGEMENT AND LEASING AGREEMENT (the "Agreement") made as of the 22ⁿᵈ day of February, 2005, by and between HCW Development Company, L.L.C., a Missouri limited liability company ("Owner"), and Urban Retail Properties Co., a Delaware corporation ("Manager").

## WITNESSETH, THAT:

WHEREAS, Owner is to operate and lease the shopping center to be known as known as Branson Landing ("Center"), located in Branson, Missouri;

WHEREAS, Manager possesses the personnel, skills and experience necessary for the professional management and leasing of the Center.

WHEREAS, Owner wishes to appoint Manager for the purpose of managing and leasing the Center, and Manager wishes to accept such appointment, all on the terms and conditions set forth below.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION I
## TERM

Section 1.1    Duration. Subject to the provisions of Section 7.1 hereof, the term (the "Term") of this Agreement shall be for a period commencing on the date hereof and terminating on the fifth (5ᵗʰ) anniversary of the date of the grand opening date of the Center (the "Grand Opening Date") (which date shall be determined solely by the Owner and communicated to the Manager) unless earlier terminated as provided in Section VII below. It is anticipated that the Grand Opening Date will be May 1, 2006. Unless

1

terminated as provided in Section VII below, the Term shall automatically renew on a year to year basis.

## SECTION II

## APPOINTMENT AND AUTHORITY OF MANAGER

Section 2.1    Appointment and Authority of Manager.  On and subject to the terms and conditions herein set forth, Owner hereby appoints Manager as an independent contractor to be the exclusive leasing agent (except as otherwise specifically provided herein) and managing agent for the Center and hereby authorizes Manager, subject to the limitations herein set forth, to exercise such powers in an efficient and satisfactory manner to the best of its abilities and to have such authority with respect to the Center as are customary for a manager and leasing agent of premium waterfront destinations in a major tourist area in accordance with first class shopping center standards and, in addition, such powers and authority as may be reasonably necessary for the performance of Manager's duties set forth herein and as more specifically described in Section IV below.  Manager hereby accepts such appointment and agrees to make available to Owner the advice, expertise and judgment of its organization relating to the management, operation, leasing, maintenance and repair of the Center.

Section 2.2    Certain Limitations on Authority; Emergencies.  Owner expressly withholds from Manager any power or authority to: (a) convey or otherwise transfer, pledge or encumber the Center, pledge the credit of Owner (except for purchases or transactions otherwise expressly authorized under this Agreement), or borrow money or execute any promissory note, mortgage, deed of trust, or security agreement in the name of or on behalf of Owner, or (b) make any structural changes in any building or make any other major alterations or additions in or to any such building or equipment therein, or incur any expense chargeable to Owner other than expenses arising from (i) Manager's exercise of the express powers vested herein in Manager, (ii) matters included in the Approved Annual Budget under Section III, or (iii) such emergency repairs or actions as may be required because of danger to persons or property or which are immediately necessary for compliance with Laws (as defined in Section 8.6 hereof) or are required to

2

avoid the suspension of any necessary service to the Center; provided, however, that with respect to such emergency repairs or actions, Manager will notify Owner as soon as reasonably possible as to the nature of and cost of such repair or action.

Section 2.3    Compliance with Underlying Documents. Manager acknowledges that (i) the Center is subject to a Redevelopment Contract dated February 1, 2003 (the "Redevelopment Contract") between Owner and the City of Branson, Missouri (the "City"), and a Ground Lease (the "Ground Lease") executed by the Owner and the City; (ii) the Center may be subject to additional agreements such as mortgage or other loan documents (the "Financing Documents"); (the Redevelopment Agreement, Ground Lease, and the Financing Documents are herein collectively called the "Underlying Documents"). Manager agrees to amend this Agreement to the extent it is in conflict with, or as is necessary to affect the purpose and duties of Owner in accordance with the Financing Documents, but only if such amendment does not materially alter Manager's rights and obligations hereunder.

Section 2.4    Confidentiality. Manager shall keep confidential (and will require any of its employees, officers and directors to keep confidential), and shall not disclose to any third party without Owner's direction or approval, any information regarding the Center to which Manager gained access as a result of Manager's performance of the services and not otherwise available to the public, unless required to do so by a court or governmental agency of competent authority.

## SECTION III
## ANNUAL BUDGET

Section 3.1    Preparation of Budget; Contents. Within thirty (30) days after the commencement of the Term, and on or before October 1 of each year with respect to the calendar year thereafter, Manager shall prepare and submit to Owner a budget (the "Annual Budget") substantially in the form then being used by Manager as a standard for similar properties managed by Manager, provided, however, that Manager shall produce a final budget for submission to public authorities in the form and manner directed by Owner. The Annual Budget shall include, among other matters:

3

3.1.1  Operating Budget.  An operating budget which shall set forth, among other matters, anticipated operating income, expenses, working capital and reserve requirements for such year.

3.1.2  Capital Budget.  A capital budget which shall set forth, among other matters, anticipated and proposed capital expenditures for such year and the source of funds in respect thereto.

3.1.3  Leasing Plan.  A statement of: (a) the space Manager expects to be leased or renewed during such year, (b) the rent it expects to obtain for such space, and (c) the other material economic provisions of the leases, including, as appropriate for commercial property, free rent, rebates and other concessions, any improvement allowances, brokerage commissions (including any payable to Manager hereunder), and payments by tenants toward operating expenses and taxes.

Section 3.2  Approval of Budget.  The term "Approved Annual Budget" shall mean the Annual Budget (as modified by revisions thereof) approved by Owner in accordance with the provisions hereof. An Annual Budget or a revision thereof shall be deemed approved by Owner only if it is approved in writing by Owner (and Manager acknowledges and agrees that Owner may be required to obtain approval of governmental entities prior to Owner giving approval to an Annual Budget). Any disapproval by Owner shall be specific with respect to particular items objected to in the Annual Budget submitted by Manager.

If Owner has not approved the proposed Annual Budget for any year prior to the commencement of such year, Manager shall continue to manage the Center during the year in accordance with the Approved Annual Budget in effect for the immediately preceding fiscal year (except as it relates to capital expenditures and leasing expenditures, which shall not be incurred until Owner approves the same) until the time that an Annual Budget for such fiscal year is approved, with the right, until such approval, to incur (i) the expenses specified in clauses (b), (c), (d) and (e) of Section 3.3 and, (ii) except to the extent, if any, that the same would duplicate the coverage of clause (i) above, the expenses (other than capital expenditures or leasing expenditures) allowed in the Approved Annual Budget for the immediately preceding year.

4

Section 3.3    Permitted Expenses.  The Manager shall not incur any expenses other than:  (a) expenses projected in the Approved Annual Budget (or supplements or revisions thereto); or (b) expenses which are required in connection with an emergency which, if in the reasonable judgment of Manager, are necessary to protect persons from death or injury or to preserve property, provided that the Manager shall notify Owner within five (5) business days after incurring such expenses ("Emergency Expenses") and with respect to which it is either impractical to seek prior approval of Owner, or if such approval is being sought, is not received in a timely manner; or (c) expenses which do not exceed five  percent (5%) in excess of the amount projected for (i) the respective item of expense in the Approved Annual Budget, or (ii) with respect to a line item which has not yet been approved, for the immediately preceding calendar year (the amounts set forth in clauses (i) and (ii) of clause (c) referred to herein as "Non-Projected Expenses"), provided, however, that the sum of all Non-Projected Expenses of all types shall not exceed $100,000 in any fiscal year without the prior written consent of Owner; or (d) expenses which, regardless of amount, result from increases in property taxes or other assessments or levies, insurance premiums, per capita labor costs, ground rent, debt service and utility charges, which are not within the reasonable control of Owner or Manager, but which are necessary for the operation of the Center; or (e) expenses which are specifically authorized by the terms of this Agreement.

**SECTION IV**

**MANAGER'S SERVICES**

Section 4.1    Services in General.  Manager agrees, in performing its duties hereunder, to use that level of the premium standard of skill for waterfront destinations in a major tourist area in accordance with the standards required of a first class shopping center.  Manager shall, with respect to the Center, perform such duties as are customarily performed with respect to similar properties by such management firms and, without limitation on the foregoing, shall perform those duties set forth in this Section IV, subject to all express limitations on Manager's authority contained in other provisions of this Agreement.  Without limiting the generality of the foregoing, Owner hereby grants

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft0222205IV-clean.doc

Manager the authority and power (all or any of which may be exercised by Manager as agent on behalf of Owner) to perform the services more specifically described hereinafter in this Section IV (at Owner's expense).

Section 4.2    Advertising and Promotion.    Manager shall be authorized to advertise and conduct promotional activities relating to the Center and to display signs thereon as limited by the Approved Annual Budget.    Such advertising and promotion shall include: developing a property-specific marketing plan, including advertising, tourism, special events, public relations, websites, and customer service; developing a customized marketing budget; and directing cost-savings programs, including holiday décor purchases, advertising agency fees, and creative and media placement costs.

Section 4.3    Books and Records. Manager shall maintain the books, records and accounts of Owner with respect to the management and operation of the Center and shall retain those records during the Term and, shall deliver the same to Owner upon termination of the Term (provided Manager may retain photocopies thereof for Manager's files).

Said records and accounts shall be the property of Owner and shall be available to Owner, or its duly designated representative, for examination and inspection at any reasonable time during usual business hours at Manager's office at the Center and for audit as provided in Section 4.3.1 hereof.

At all times during the Term, Manager shall maintain, on an accrual and on a cash basis (with cash basis records and accounts to be computed with reserves for such items as real estate taxes and insurance), and in accordance with generally accepted accounting principles, consistently applied, records and accounts that accurately reflect all revenues earned, funds received, expenses incurred and disbursements made in connection with Manager's duties hereunder.

Within twenty (20) days after the end of each and every month during the Term, the Manager shall furnish Owner with an operating statement containing a statement of cash receipts and disbursements for the month then ended and a description of all other pertinent information reasonably requested. Each such statement shall:

6

(a)    Accurately reflect all revenues received, funds received and expenses and disbursements made, by relevant category of the Approved Annual Budget, or in the case of unbudgeted revenues, receipts, expenses and disbursements on an itemized basis;

(b)    Compare the amounts received and expended with the estimated receipts and expenses set forth in the Approved Annual Budget, for the preceding calendar month, calendar quarter and calendar year to date ;

(c)    Show the balance in any Account (as defined herein) and other information reasonably requested by Owner;

(d)    Contain such information as may be necessary to permit Owner to prepare its financial statements and tax returns;

(e)    Be accompanied by an aged statement of all delinquent rentals and other charges for the use and occupancy of the Center;

(f)    Be accompanied by copies of current bank statements of the Accounts;

(g)    Be accompanied by a lease status report; and

(h)    Be accompanied by a statement showing detailed calculations of percentage rent payable in such month under the Leases; and

with respect to the operating statement related to each December during the Term, such statement shall be accompanied by (x) a summary in reasonable detail of the operations of the Center on a cash basis for the preceding twelve (12) month period and (y) a statement indicating the estimated portion of income attributable to the operation of escalation provisions for taxes and operating expenses provided in the leases for the Center for such twelve (12) month period.

4.3.1    Owner shall be entitled to examine or audit the books and records maintained by Manager with respect to the Center during normal business hours, after two (2) days written notice to Manager (unless Manager is the defaulting party hereunder or Owner has the right terminate this Agreement, in which event no notice shall be required). In the event that any audit permitted hereunder discloses an overpayment or underpayment of management fees or other compensation or reimbursement payable to Manager hereunder, Owner or Manager shall promptly pay to the other party the amount of such overpayment or underpayment, as the case may be. If such audit discloses (x) an

7

overpayment of such fees through incorrect billing by Manager of more than five percent (5%) of the correct management fee due or (y) any other material failure of Manager to comply with this Agreement, then Manager shall pay all costs and expenses of such audit without any right whatsoever to be reimbursed by Owner. If such result occurs more than two (2) times during the Term, Owner shall have the right to terminate this Agreement.

Section 4.4    <u>Employment of On-Site Personnel</u>. Manager shall be authorized to hire, discharge and pay all on-site personnel, including without limitation (but subject to the Approved Annual Budget): (a) a property manager, one or more assistant property managers and/or operations managers, marketing personnel, specialty leasing personnel (on or off-site prior to the Grand Opening Date of the Center and on-site thereafter), bookkeepers and accountants, clerical and secretarial personnel, all of whom shall be on Manager's payroll with reimbursement by Owner, and (b) engineers, janitors, maintenance, landscaping, custodial, parking, and security personnel (subject to the provision of Section 4.5 hereof, all or any of whom shall at Manager's option, be on Manager's payroll with reimbursement by Owner, or on the payroll of an independent contractor whose costs and fees will be paid by Owner). All employees placed on Manager's payroll shall be bonded in amounts and with a company reasonably determined by Manager and Owner. Owner shall have the right to approve the property manager and leasing representatives assigned to the Center, which approval shall not be unreasonably withheld or delayed.

Section 4.5    <u>Maintenance and Repairs</u>. Manager shall, on behalf of Owner, maintain the Center in a good, clean, sanitary and sightly condition and perform all ordinary repairs, maintenance and decorating, and purchase all supplies necessary for the proper operation of the Center. Manager, in its capacity as such, shall not be required (without additional compensation satisfactory to Manager) to undertake the making or supervision of extensive construction or reconstruction of the Center or any part thereof. All such work shall be provided by independent contractors or employees of the Manager at a cost not in excess of the prevailing market rate in the area of which the Center is located. Manager hereby agrees to give an affiliate of the Owner the first opportunity to perform any landscaping or normal maintenance work at the Center so long as such

8

services are performed at a cost not in excess of the prevailing market rate and subject to customary terms in the area where the Center is located. Owner may notify Manager at any time during the Term that it requires such affiliate to perform such services.

Section 4.6   <u>Collection and Disbursement of Revenue</u>. Manager shall collect rent and all other revenue from the Center and deposit the same promptly in a bank account (the "Operating Account") established in the name of and for the benefit of Owner. All receipts collected by Manager shall be received, held and disbursed by Manager through the Operating Account for the account of Owner. Either Owner or Manager shall be entitled to draw upon such Operating Account, but all such money shall be deemed to be the property of Owner. Such monies of Owner shall not be commingled with the funds of Manager. Manager may withdraw from the Operating Account (subject to the limitations set forth in this Agreement) disbursements required or permitted to be made under this Agreement; provided, however, that except as otherwise agreed in writing by Owner, disbursements by Manager out of the Operating Account shall be limited (subject to the provisions of this Agreement) to the purposes set forth in the Approved Annual Budget and to the amounts for such purposes which do not exceed the corresponding sums allocated to the same in the Approved Annual Budget or as otherwise allowed hereunder. Manager shall render monthly reports to Owner showing the fees and other compensation and reimbursement to which Manager is entitled under this Agreement. In addition, upon Owner's request, Manager shall provide to Owner such other periodic reports as may be required to satisfy the requirements of any loan or other agreement affecting the Center. If Manager is a defaulting party or Owner otherwise has the right to terminate this Agreement under Article VII hereof, the representatives of Manager shall have no further authority as signatories of the Operating Account or Security Account (as hereinafter defined) until such default is cured and the right to terminate is no longer applicable. The Operating Account and Security Account (collectively referred to herein as the "Accounts") shall be segregated and in no event commingled with other funds of Manager, Owner or any other person. Such Accounts shall be, if available, interest bearing at the highest available rates payable where deposited, consistent the primary objective of preservation of principal, and in all events

9

shall be insured by the Federal Deposit Insurance Corporation. Income realized from the investment of the Accounts shall be for the benefit of and payable to Owner.

Section 4.7   Security Deposits.   Manager shall deposit all security deposits for the Center in a separate project account (the "Security Account") in the name of Owner on which either Owner or Manager may draw.  Manager shall be authorized to withdraw monies from the Security Account at such time as the security deposits are returnable to tenants or in the event of a tenant default.  It is expressly understood and agreed that all disbursements, transfers and refunds made by Manager from the security deposits shall be made by a check drawn on the appropriate account or appropriate journal or bookkeeping entries and shall be substantiated by appropriate records and accounting procedures.

Section 4.8   Payments.   Except as otherwise directed from time to time by Owner, Manager shall make or cause to be made (but only to the extent cash receipts from the Center are available therefor or to the extent Owner provides the funds therefor) the payment when due of all obligations, the existence of which was approved by Owner as part of the Approved Annual Budget or otherwise or which were incurred in accordance with the provisions hereof, including, without limitation, Section 3.3 hereof.

Section 4.9   Contracts and Leases.

4.9.1   Service and Purchase Contracts.   Manager may, without the prior written consent of Owner, to the extent the obligations of Owner thereunder do not exceed the amounts provided for in the Approved Annual Budget or the other amounts set forth in Section 3.3 hereof, negotiate and enter into on behalf of Owner contracts for terms no longer than one (1) year for electricity, gas, fuel, water, telephone, window cleaning, vermin extermination, janitorial services, landscape maintenance and such other supplies, materials, services and other matters for the Center, and so long as such contracts are terminable without cause by Owner upon no more than 30 days notice. Any contracts with a term of more than one (1) year must be approved by Owner. Manager shall not enter into any single contract on behalf of the Owner requiring payment, in the aggregate, of more than $50,000 per fiscal year without the prior written consent of Owner unless the same  (x)  is already in the Approved Annual Budget or (y) constitutes an Emergency Expense. All work for maintenance and repair of the Center shall be performed by

·10

independent contractors or employees of Manager, at Manager's discretion, subject to Section 4.5 hereof. Any cash and trade discounts, refunds, credits concessions or other incentives obtained by Manager in connection with any such contracts shall belong to Owner.

4.9.2. Leases.  Subject to the subsequent provisions of this Section 4.9.2, Manager shall use reasonable efforts to rent and keep the Center rented by procuring tenants for the Center pursuant to leases in accordance with the Approved Annual Budget.  Without limitation on the foregoing, Manager shall negotiate, on behalf of Owner, in accordance with the Approved Annual Budget, the business terms of new leases, expansions, amendments, cancellations, or extensions thereof (all such new leases, expansions, amendments, cancellations, or extensions now existing or hereafter entered into being herein individually and collectively referred to as a "Lease" or "Leases").  All Leases shall be subject to Owner's direction and approval and shall be executed by Owner.  Manager will assist Owner in the negotiation of Leases, but Owner may engage outside legal counsel (or use Owner's in-house counsel) to negotiate and prepare Leases on behalf of the Owner, and Owner shall be responsible for all outside legal fees and expenses incurred in connection therewith.  If any Lease, operating agreement or other document or instrument affecting the Center requires the consent of a third party, upon request of Owner, Manager will assist Owner in obtaining such consent.  Owner's approval or execution of a Lease shall serve as authorization for Manager to expend such amounts as are required to comply with the Lease on Owner's behalf (whether or not contained in the Approved Annual Budget).  Manager shall provide reports of leasing activity to Owner on a monthly basis unless Owner otherwise directs. Manager shall deliver at least three (3) original tenant-executed copies of each Lease hereafter made and any and all amendments or modifications to Owner so that the same may be approved and executed by Owner.

4.9.2.1 Excluded Leases.  Notwithstanding the foregoing, in the event Owner elects to negotiate any Lease with, or market any space in the Center to, a Related Party (as hereinafter defined), (a) Owner shall notify Manager thereof, identifying the tenant and premises in question, and (b) Manager shall not receive any commissions

11

provided herein with respect to such Lease with a Related Party. A "Related Party" shall mean Owner; BLR Development Company, L.L.C. ("BLR"); the members and subsidiaries of Owner and BLR; and any entity in which the members or subsidiaries of Owner and BLR hold a 25% or more ownership interest. Manager will not be entitled to any commission for the Lease entered into with Bass Pro Shop or Westgate Resorts, Ltd.

4.9.3   Other Contracts. Manager, in its capacity as such, shall not enter into any other contract or agreement on behalf of Owner, unless the same is consented to in writing in advance by Owner.

4.9.4   Manager's Affiliates. For purposes of this Agreement, the term "Affiliate" means any corporation, partnership, venture or other entity which controls, is controlled by, or is under common control with Manager, and the officers, employees, partners and venturers of such entity.

Section 4.10   Legal Action. Manager shall, on behalf of and at the cost of Owner, institute through competent counsel approved in writing by Owner, all necessary legal action or proceedings for the collection of rent or other income from the Center, or for the ousting or dispossessing of tenants or other persons therefrom, and shall promptly notify Owner of the institution of all such actions. In addition, Manager shall promptly notify Owner of any lawsuit or threat thereof involving or affecting the Center of which Manager receives actual knowledge.   Manager shall not be authorized to settle, compromise and release such actions or suits or reinstate tenancies without the prior written consent of the Owner. The retention or use of any attorneys or legal assistants approved by Owner shall be at Owner's sole cost and expense. Any use of Manager's in-house legal staff for such services shall be subject to the advance approval of Owner and Manager. This Agreement shall not be construed to require that Manager or its Affiliates provide legal services, and the provision of such services shall not be construed as the practice of law by such parties.

Section 4.11   Tenant Requests. Manager shall receive and respond to complaints and requests of tenants. Records shall be maintained showing the action taken with respect to each complaint or request. Complaints or requests of a material nature shall, after investigation of such complaints by Manager, be promptly reported in writing by

12

Manager to Owner. Manager shall include in such written report to Owner all relevant details and appropriate recommendations.

Section 4.12   Impounds and Capital Reserves.   In the event that under the terms or provisions of any mortgage or deed of trust to which the Center is subject, the mortgagor or trustor is required to deposit in installments an amount against or based upon taxes, insurance premiums or other sums, then Manager shall make such deposits to the extent of available funds from receipts from the Center collected by Manager or if Owner provides the funds therefore and notice of such requirements.

Section 4.13   Payments to Owner.   Within twenty (20) days after the end of each calendar month or partial calendar month during the term of this Agreement, Manager shall pay to Owner, but only to the extent out of Receipts remaining in the Operating Account after the payment of all expenses and other and other amounts required or provided to be paid by Manager pursuant to this Agreement and after (a) setting aside the amount of any reserves required under an Approved Annual Budget in effect from time to time, and (b) retaining a reasonable minimum balance in the Operating Account, the balance of such Receipts.

Section 4.14   Fidelity Bonds.   Manager shall maintain throughout the Term hereof, at Owner's expense, such fidelity bonds as Owner shall from time to time require for the full protection of the interests of Owner and Manager and such other parties as may be required by the provisions of any Underlying Document. Any such bond or bonds shall be in such reasonable amount as required by Owner from time to time and obtained from such companies as may be required by the Underlying Documents, or as Owner shall approve. Manager shall furnish certificates to Owner showing such bonds to be in effect, together with an agreement that the company will endeavor to notify Owner not less than ten (10) days prior to the expiration, modification or cancellation of such bonds.

## SECTION V

## BEARING OF EXPENSES

13

To the extent available, Manager shall use the cash receipts from the Center to pay the cost and expense of discharging its obligations and duties hereunder which are attributable to or arise during or with respect to the Term. Any excess of such costs and expenses over such cash receipts (whether or not contained or accurately reflected in the Annual Budget submitted by Manager or the Approved Annual Budget as approved by Owner), shall be borne solely by Owner and Manager shall not be obligated to advance its own funds therefor.

## SECTION VI

## COMPENSATION

Section 6.1    Management Fees. Manager shall be entitled to receive a monthly management fee in accordance with the schedule attached as Exhibit A hereto and as further described therein.

Section 6.2    Leasing Commissions and Other Compensation.

6.2.1    Leasing Commissions. Manager shall be entitled to receive commissions for all leases executed with tenants for the Center, and other compensation, in accordance with the schedule attached as Exhibit A hereto and as further described therein.

6.2.2    Other Compensation. Manager shall be entitled to receive such additional fees and commissions as specified in Exhibit A hereto.

Section 6.3    Renovation Fees. If Owner desires to perform a renovation, expansion, base building improvement or redevelopment at the Center, and Owner requests Manager to provide such services and Manager is willing to provide additional services in connection therewith, Owner shall pay additional fees on such terms as the parties shall mutually agree in writing. If this Agreement is terminated while any such project is pending, the fees for such project shall be equitably prorated.

Section 6.4    Manager's Office. Owner shall provide a reasonable and appropriate space within the Center, rent-free, to serve as Manager's on-site office, shall fully furnish and equip the same, and shall pay all direct costs of operating said on-site office, including, without limitation, utilities, telephone and office supplies. All of such personal property furnished by Owner shall remain the property of Owner and shall remain at the Center upon termination of this Agreement.

14

Section 6.5    <u>Payments and Reimbursements.</u>  Manager may pay directly out of the Operating Account, or Manager shall be entitled to receive reimbursement (which it may withdraw from the Operating Account) for the fees and commissions earned pursuant to this Section VI, on the dates provided in Exhibit A attached hereto, and for the following costs to the extent such costs are directly allocable to the Center and if such costs are included within an Approved Annual Budget:  (a) the cost of long-distance telephone and data communication between the Center and Manager's regional and home offices, and Manager's on-site costs, including software and hardware, associated with financial reporting and property accounting for the Center; (b) Manager's travel (including transportation, lodging and meals) and entertainment costs; (c) amounts paid to third parties in connection with architectural and engineering design, plan review, lease outline drawing preparation, printing and copying costs, messenger and courier charges and review, supervision and inspection, both on and off-site, relating to construction in the Center; (d) amounts paid to third parties in connection with real estate or property tax consulting (including preparation of documents related thereto), and efforts to maintain or reduce taxes applicable to or against the Center; (e) the costs of marketing brochures and the expenses, both direct and indirect, incurred relative to on- and off-site marketing and promotional services rendered or contracted for by Manager for the Center; (f) any sales tax, gross receipts tax, license fee or other tax, fee or charge imposed on the payment or receipt of fees, commissions or other amounts hereunder (other than any income or franchise tax payable by Manager); (g) costs and expenses referred to in Section 6.4 hereof; and (h) color or other non-routine photocopying charges and courier charges incurred at Manager's home or regional office.

Except as expressly provided otherwise herein or as expressly set forth in an Approved Annual Budget, in no event shall Owner be required to pay, or shall Manager be entitled to any reimbursement for (i) Manager's home or regional office overhead, office or administrative expenses or (ii) the cost of gross salary and wages and other compensation, payroll taxes, insurance, workers' compensation, pension benefits and any other benefits of Manager's home or regional office personnel; or (c) any travel and lodging costs of employees of Manager above the level of regional manager located at

15

the Manager's home office, except for travel of such employees done at the request of Owner to provide services for the Center. No reimbursement to the Manager shall be allowed for the compensation of the leasing staff of the Manager, other than the temporary leasing person assigned to the Center through the Grand Opening Period (as defined in Paragraph 6 of Exhibit A hereto) and any on-site temporary leasing person solely dedicated to such services thereafter.

Section 6.6    No Other Compensation.   Manager shall receive no compensation or reimbursement of any kind or nature for or during the Term for services performed under this Agreement, except as expressly provided in this Agreement.

Section 6.7    Workmen's Compensation Insurance.   Manager shall carry any and all workmen's compensation insurance required by applicable laws on employees of Manager who are assigned to the Center.

## SECTION VII

## TERMINATION

Section 7.1    Termination by Owner.   Owner may terminate this Agreement effective upon the expiration of the stated Term or any extension thereof upon not less than sixty (60) days prior written notice to Manager.  In addition, Owner may terminate this Agreement (by written notice to Manager) at any time upon the occurrence of any of the following occurrences:

7.1.1    Default.  In the event of a failure by the Manager to observe or perform any material obligation to be observed or performed by Manager under this Agreement, which failure shall continue uncured for a period of thirty (30) days after written notice thereof to Manager, provided that Manager's time period to cure such failure shall be extended for a period reasonably required to complete the cure thereof, if the cure of such failure within such thirty (30) day period is not capable of performance with reasonable efforts, provided  (i) the Manager shall have commenced actions to cure such failure within such thirty (30) day period and shall diligently pursue the curing of such failure until fully remedied and (ii) the cure period shall not in any event exceed ninety (90) days;

16

7.1.2  Bankruptcy.  The occurrence of any of the following by, against or with respect to Manager:

(a)    The commencement of a case under Title 11 of the U.S. Code, as now constituted or hereafter amended, or under any other applicable federal or state bankruptcy law or other similar law (which, in the case of an involuntary proceeding, is not dismissed within 60 days after such commencement);

(b)    An assignment for the benefit of creditors;

(c)    The appointment pursuant to any judicial proceeding of a trustee or receiver to take possession of all or a major portion of Manager's property, which possession is not restored to Manager within 60 days after such appointment;

(d)    An attachment, execution or other judicial seizure of all or a major portion of the property of Manager (where such seizure is not discharged within 60 days after the date the same is effected); or

(e)    In any legal proceeding, the adjudication or stipulation of insolvency or inability to pay debts as and when they come due.

7.1.3  Casualty or Condemnation.  Owner permanently discontinues the operation of the Center on account of damage to or destruction of, or a taking by (or sale under threat of) eminent domain of a substantial part of the Center.

7.1.4  Occupancy.  (a) If at any time after the Grand Opening Date less than seventy-five (75%) percent of the rentable square footage of the Center (excluding spaces for Belks, Bass Pro Shop and any premises for which Owner has provided notice pursuant to Section 4.9.2.1 hereof regarding a Related Party) (the "Applicable Space") is leased (an "Occupancy Event"), then Owner may terminate this Agreement, but only if (i) Owner gives written notice to Manager that an Occupancy Event has occurred, and (ii) such Occupancy Event has been in effect for (A) not less than two hundred forty (240) days during the preceding three hundred and sixty five (365) day period or (B) one hundred and eighty (180) consecutive days.

(b)    If on the Grand Opening Date, Manager has failed to secure executed Leases for not less than eighty five percent (85%) of the Applicable Space. Owner shall have the right to terminate this Agreement pursuant to this Section 7.1.4(b) only so long

17

as such termination notice is received by Manager within thirty (30) days after the Grand Opening Date. If Manager does not receive such termination notice provided in this Section 7.1.4(b) within thirty (30) day period, Owner's right to terminate this Agreement pursuant to this Section 7.1.4(b) shall thereafter be void and of no further force or effect.

7.1.5    Sale of the Center. Upon the sale of all or substantially all of the Center.

7.1.6. Financing Termination. This Agreement shall be subject to termination in the event that Manager fails to execute any agreement required by the Financing Documents in connection with the financing of the Center.

7.1.7: Termination of Development Agreement. Upon the termination of that certain Development, Consulting and Leasing Agreement dated as of May 15, 2003, as amended from time to time (the "Development Agreement") by and between the Owner and Manager as a result of a default thereunder by Manager.

Section 7.2    Termination by Manager. In the event of a failure by Owner to observe or perform any material obligation to be observed or performed by Owner under this Agreement, which failure shall continue uncured for a period of ten (10) days after written notice for any required funding obligation of Owner hereunder, and for thirty (30) days after written notice thereof to Owner for any other material obligation, provided that the Owner's time period to cure such failure within such thirty (30) day period is not capable of performance with reasonable efforts, provided (i) the Owner shall have commenced actions to cure such failure within such thirty (30) day period and shall thereafter diligently pursue the curing of such failure until fully remedied and (ii) the cure period shall not in any event be permitted to exceed ninety (90) days.

Section 7.3    Effect of Termination. Termination of this Agreement shall terminate all rights and obligations of the parties hereunder (but such termination shall not affect the rights and obligations of the parties arising during or relating to the period prior to the date of such termination, or otherwise expressly provided to survive such termination under this Agreement, and shall not prejudice the rights of either party against the other for any prior breach of this Agreement, except as expressly provided to the contrary herein). Without limitation on the generality of the foregoing, termination of this Agreement shall terminate any and all rights of Manager to act in such capacity on

18

behalf of or with respect to the Center (and Manager shall, if Owner so requests, execute a notice to third parties that such rights of Manager have been so terminated). Except as otherwise provided herein, in the event of the termination of this Agreement, Manager shall be paid all compensation theretofore earned under the terms of this Agreement.

Section 7.4  Final Accounting.  Upon the termination of this Agreement for any reason whatsoever, Manager shall, without any further compensation, cooperate with Owner and do all things reasonably necessary to achieve an efficient transition of the management of the Center without detriment to the rights of the Owner or to the continued management of the Center (which obligation shall survive the termination of this Agreement). Manager, shall deliver to Owner, or to such person or persons as Owner may direct, all property documents, permits, books, records and accounts, rent rolls, insurance policies, files and other materials relating to the Center, including documentation required to transfer sole control over the Center Accounts to Owner or its designee as well as appropriate assignments to Owner or Owner's designee of any service or supply contracts. Within thirty (30) days after termination of the Agreement, Manager shall deliver a final accounting to Owner reflecting all income and expenses of the Center as of the date of such termination.

## SECTION VIII

## MISCELLANEOUS

Section 8.1    No Joint Venture.  This Agreement shall not be construed as effecting a partnership or joint venture between Owner and Manager.   Subject to the express provisions set forth herein, each of the parties shall have the right to engage in other businesses and business transactions and the other party shall have no right or interest therein.

Section 8.2    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided that Manager shall not be entitled to assign this Agreement without the prior written consent of Owner except to Manager's Affiliate, but no such assignment shall release the Manager from its obligations under this Agreement. Owner shall have the

19

absolute right to assign its rights and obligations under this Agreement without the need for any consent whatsoever by Manager.

Section 8.3    Insurance and Waiver of Subrogation.

8.3.1  Insurance.  Owner shall maintain, and upon the written request of Owner, Manager shall assist Owner to effect and maintain such insurance as Owner designates (which must include at least all insurance required by Owner's mortgagee to be effected and maintained and which coverage shall be primary for all claims with respect to the Center) and in no event shall such commercial general liability insurance, combined single limit per occurrence be less than Twenty Five Million Dollars ($25,000,000.00). Owner agrees to look solely to such insurance coverage for any covered  claims at the Center; provided, however, that the foregoing provision shall in no event limit Manager's obligations under Section 8.5 hereof. Owner shall cause copies of all insurance policies or certificates thereof to be delivered to Manager promptly upon issuance or renewal of each policy. Manager, at Owner's request, will work in consultation with Owner's insurance broker or consultant to identify coverage carried by other first class shopping centers. Owner acknowledges that Manager is not engaged in the business of procuring or advising on insurance matters and earns no fee or income of any kind with respect to the placement of insurance. All decisions with respect to such insurance are at the sole discretion of Owner and Manager makes no representation and is not liable with respect to the adequacy, or the limits of such coverage. All such policies of insurance shall include as named insureds, Owner, Manager and any mortgagee, as their respective interests may appear and shall contain a lender's loss payable endorsement as required by any deed of trust on the Center.  No such insurance which names Manager as a named insured shall be cancelled non-renewed or reduced without providing thirty (30) days prior written notice of the same to Manager.

Manager shall maintain, as an expense of the Center or otherwise at Owner's expense, workers' compensation and unemployment insurance in amounts required or permitted by statute and employers' liability insurance in the amount of at least $500,000 per occurrence (if on-site workers will be on Manager's or its Affiliate's payroll), and

20

such other insurance, if any, as Manager deems reasonable and appropriate so long as such expenses are included within the Approved Annual Budget.

8.3.2  Waiver of Subrogation and Right of Recovery.  Owner and Manager waive any right to recover against each other for claims covered by their respective policies of insurance.  This provision is intended to waive fully, and for the benefit of Owner and Manager, any rights and/or claims which might give rise to a right of subrogation in favor of any insurance carrier. Without limiting the foregoing, neither Owner or Manager shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage even though such loss or damage may have been caused in whole or in part by the negligence of such party, its agents or employees.

Section 8.4    Owner Indemnity. Owner shall defend (through counsel selected or approved by Manager), indemnify and hold Manager and its Affiliates harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, back-pay awards, costs and expenses (including, without limitation, court costs and experts' and attorneys' fees) relating to the Center or otherwise arising out of or in connection with this Agreement or the performance by Manager of its obligations and duties hereunder, and Owner hereby waives all claims against Manager in connection therewith, except to the extent that a court of competent jurisdiction rules that any of the foregoing were caused solely by Manager's gross negligence, willful misconduct, intentional misrepresentation, or acts outside the scope of Manager's authority as provided herein.

Section 8.5    Manager Indemnity.  Manager shall defend, indemnify and hold Owner harmless from and against any and all losses, liabilities, damages, claims, demands, judgments, orders, fines, penalties, back-pay awards, costs and expenses (including, without limitation, court costs and experts' and attorneys' fees) arising, as determined by a court of competent jurisdiction, solely by reason of Manager's gross negligence, willful misconduct, intentional misrepresentation, or acts outside the scope of Manager's authority as provided herein.

Section 8.6    Violations of Laws; Environmental Liabilities.  If either Owner or Manager becomes aware of any "Violations of Laws" or of any "Environmental Liabilities" (as such terms are defined below) relating to the Center, each shall promptly advise the other party.  Owner represents and warrants that, to the best of its knowledge after reasonable investigation, the Center is not subject to any Violations of Laws, and to the best of its knowledge after reasonable investigation, the Center is not subject to any Environmental Liabilities, except those which Owner has disclosed in writing to Manager.  "Laws" herein shall mean all federal, state, county and local governmental or municipal laws, ordinances, regulations, judgments, orders, rules and other such requirements, decisions by courts in cases where such decisions are binding precedents in the state in which the Center is located, and decisions of federal courts applying the Laws of such state, at the time in question, including but not limited to all "Environmental Laws" (as defined below) and those pertaining to fair employment, fair credit reporting, health, safety, building code, rent control, taxes, equal access or fair housing, including, but not limited to, any law prohibiting, or making illegal, discrimination on the basis of race, sex, creed, color, religion, national origin, economic or governmentally subsidized status, or physical, mental or other disability or condition, and any labor laws. "Environmental Laws" herein shall mean the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601, et seq., Hazardous Materials Transportation Act, 49 U.S.C. 1801, et seq., Resource Conservation and Recovery Act of 1976, 42 U.S.C. 6901 et seq., Clean Air Act, 42 U.S.C. 7401 et seq., Clean Water Act, 33 U.S.C. 1251, et seq., Safe Drinking Water Act, 14 U.S.C. 300f, et seq., Toxic Substances Control Act, 15 U.S.C. 2601, et seq., Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. 136 et seq., Atomic Energy Act of 1954, 42 U.S.C. 2014 et seq., and any similar federal, state or local Laws, and all regulations, guidelines, directives and other requirements thereunder, all as may be amended or supplemented from time to time.    "Environmental Liabilities" herein shall mean conditions that involve the presence (whether actual or alleged) of any Hazardous Substance, conditions that are subject to any Environmental Laws, and all claims relating thereto.  The term "Hazardous Substance" for purposes hereof shall mean any flammable,

explosive, toxic, radioactive, biological, corrosive or otherwise hazardous chemical, substance, liquid, gas, device, form of energy, material or waste or component thereof including, without limitation, all items now or hereafter listed, defined or regulated as a hazardous or toxic chemical, substance, liquid, gas, device, form of energy, pathogen, material or waste or component thereof by any federal, state or local governing body or agency having jurisdiction. "Violations of Laws" herein shall mean all actual and alleged violations of any Laws.

8.6.1  Notwithstanding any other provision of this Agreement to the contrary, Manager shall have no liability for conducting any environmental response activity, including without limitation, emergency response, investigation and cleanup, unless Manager specifically agrees in writing to conduct such response activity and Manager's additional compensation for conducting such activity is set forth as part of such agreement.  (Any emergency response taken by Manager shall not be deemed to be an agreement to conduct any response activity.)  Owner shall attend all meetings with regulatory agencies concerning Environmental Liabilities affecting the Center, and Owner shall be responsible for consulting with Manager in making all decisions concerning responses to such regulatory agency activities.

Section 8.7    Software.  Any software provided by either party in connection with this Agreement shall: (a) remain the property of such party, (b) be used only in the manner authorized by such party from time to time, and (c) be returned upon termination of this Agreement, or earlier as requested by such party.

Section 8.8    Limitation of Liability.  Neither parties' shareholders, officers, directors, employees, affiliates or agents shall have any liability under or in connection with this Agreement or relating to the Center.  For purposes of all provisions of this Agreement requiring that Owner insure, defend or indemnify Manager, the term "Manager" shall include Manager's Affiliates (as defined in Section 4.9.4). The liability of Owner under this Agreement shall be limited to Owner's interest in the Center.

Section 8.9    Attorneys' Fees.  If any party obtains a judgment against any other party by reason of breach of this Agreement, the prevailing party shall be entitled to recover its enforcement costs, including, without limitation, reasonable attorney's fees,

23

Section 8.10    No Waiver.  Time is of the essence of this Agreement.  No waiver by either party of any default by the other party or of any event, circumstance or condition permitting a party to terminate this Agreement shall constitute a waiver of any other default by such other party or of any other event, circumstance or condition permitting such termination, whether of the same or of any other nature or type and whether preceding, concurrent or succeeding; and no failure on the part of either party to exercise any right it may have by the terms hereof or by law upon a default by the other party and no delay in the exercise of such right shall prevent the exercise thereof by the non-defaulting party at any time when the other party may continue to be so in default, and no such failure or delay and no waiver of default shall operate as a waiver of any other default, or as a modification in any respect of the provisions of this Agreement. The subsequent acceptance of any payment or performance pursuant to this Agreement shall not constitute a waiver of any preceding default by a defaulting party or of any preceding event, circumstance or condition permitting termination hereunder, other than default in the payment of the particular payment or the performance of the particular matter so accepted, regardless of the non-defaulting party's knowledge of the preceding default or the preceding event, circumstance or condition, at the time of accepting such payment or performance, nor shall the non-defaulting party's acceptance of such payment or performance after termination constitute a reinstatement, extension or renewal of this Agreement or revocation of any notice or other act by the non-defaulting party.  No waiver of any provision of this Agreement shall be effective unless signed by the party against whom the waiver is asserted.

Section 8.11  Integration; Amendment.  This Agreement, including the exhibits attached hereto, constitutes the entire agreement between the parties hereto relative to the subject matter hereof.  Any prior negotiations, correspondence or understandings relative to the subject matter hereof shall be deemed to be merged in this Agreement.  This Agreement may not be amended or modified except in writing, executed by each of the parties hereto.

Section 8.12    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the state in which the Center is located.

24

Section 8.13    Notices.  All notices and other communications provided for in this Agreement shall be in writing and may be personally delivered or mailed by certified or registered United States mail, return receipt requested, or by recognized overnight mail service postage prepaid and addressed as follows:

    (a)    If to Owner, to:
           HCW Development Company, L.L.C.
           3027 W. Country Music Boulevard
           Branson, MO 65616
           Attention: Richard E. Huffman

    (b)    If to Manager, to:
           Urban Retail Properties Co.
           900 North Michigan Avenue
           Chicago, Illinois 60611
           Attention:  General Counsel

or to such other address as any party shall hereafter designate by notice to the others as herein provided.  Any notice, demand or request shall be effective upon receipt.

Section 8.14    Captions.  The Section headings herein contained are for purposes of identification only and shall not be considered in construing this Agreement.

Section 8.15    Inspection by Owner.  Neither this Agreement nor anything contained herein shall be deemed to limit Owner's right to enter upon or inspect the Center or to perform any repair or maintenance or to do or perform any matter or thing required of Manager hereunder in the event of Manager's failure to do so, and, without limitation of Owner's other rights as owner of the Center, Owner shall have the right to do any or all of the foregoing in the event of such failure.

Section 8.16    Counterparts.  This Agreement may be executed in any number of counterparts and each shall be considered an original and together they shall constitute one and the same instrument.

Section 8.17    Licenses.  Manager hereby represents and warrants to Owner that Manager is a duly licensed broker under the laws of the State where the Center is located

25

and has provided Owner the disclosure set forth in Exhibit B attached hereto and made a part hereof.

[SIGNATURE PAGE TO FOLLOW]

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205IV-clean.doc

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

Owner: HCW Development Company

By: _____

Title: _____

Manager: Urban Retail Properties Co.

By: _____

Michael Law, Designated Broker and
Authorized Party

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

Owner: HCW Development Company

By: _____

Title: _____

Manager: Urban Retail Properties Co.

By: _____

Michael Law, Designated Broker and Authorized Party

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft0222051V-clean.doc

URBAN RETAIL PROPERTIES, LLC, )
fka URBAN RETAIL PROPERTIES CO., )
     Plaintiff, )  Civil Action No. _____
v.         )
         )  (Removed from Circuit Court
HCW DEVELOPMENT COMPANY, LLC,)  of Cook County, Illinois)
     Defendant. )

# Exhibit "A"

## Part 2 (pp. 30-54)

**EXHIBIT A**

**MANAGEMENT FEES AND LEASING COMMISSIONS**

1.    Management Fee. Manager shall receive a monthly management fee equal to the greater of (a) Twelve Thousand Dollars ($12,000.00) (the "Minimum Monthly Payment") or (b) three and one half percent (3.5%) of Receipts (as hereinafter defined) per calendar month (the "Management Fee"). Any Management Fee for any partial calendar months shall be prorated on a per diem basis. The term "Receipts" as used herein shall mean the (x) gross amount of payments received as base, fixed or minimum rent, percentage or overage rent from tenants at the Center; provided, however, for purposes of this clause (x), only an amount equal to the minimum rental payable by Westgate Resorts, Ltd. under its lease (the "Westgate Tours Lease") with Owner shall be included for such tenant, with minimum rent being $40 per square foot, (y) rental loss insurance proceeds received by Owner in lieu of the rent payable to Owner as set forth in clause (x) above for the Center and (z) the Marina Base Payment. "Receipts" shall not include (i) all fees, charges and payments by tenants and other parties for real estate taxes, insurance, common area or other expenses, heating, ventilating, air-conditioning or other utilities, (ii) any parking revenue from the Parking Garage, (iii) any receipts from Sponsor Payments, (iv) any proceeds received and collected from (A) the financing or sale of all or any portion of the Center; (B) the condemnation or taking of all or any portion of the Center by eminent domain; (C) insurance polices (except for rental loss insurance proceeds as set forth above), (D) any extraordinary or non-recurring event, (other than Termination Fees as provided below) including but not limited to proceeds from any litigation other than rent collections and interest collected thereon, (E) security deposits (unless applied upon rent), (F) interest on invested funds and (G) amounts paid to Owner by tenants in reimbursement for costs of materials and labor for improvements made by Owner in tenants' premises and not included in minimum rents. The Manager shall be entitled to receive the Minimum Monthly Payment commencing on the first day of the month 120 days prior to the Grand Opening Date determined by the Owner and on the first day of each month thereafter during the Term. Any portion of the Management Fee in excess of the Minimum Monthly Payment shall be payable twenty (20) days after the end of the applicable calendar month and based upon the monthly report delivered and received by Owner for such applicable month. In the event that Owner receives an early termination fee (a "Termination Fee") for any termination of a lease, the Termination Fee included within Receipts shall be equal to the lesser of (a) the Termination Fee actually received by the Owner or (b) an amount equal to twelve (12) months of minimum rent due from such tenant from and after the date of such termination.

2.    Commission Rates.  For leases (other than those for the Belk's Lease, Bass Pro Lease, the Westgate Tours Lease or a Temporary Lease (as defined herein), commissions shall be as follows:

a.    New Leases: $5.00 per rentable square foot.

b.    Renewals:    One-half (1/2) of the amount payable for a New Lease. No renewal commission fee shall be payable for any existing option to renew exercised by a tenant for such premises under its Lease.

c.    Expansions:  New lease rate for new area to be occupied by such tenant and renewal rate for original space of such tenant for any extended term

Notwithstanding any provision herein to the contrary, except as otherwise expressly set forth in the last sentence of Section 3 below, in the event any tenant procured by Manager defaults under its lease for such space, other than Belk's or Temporary Lease tenants (the "Default Space") and such lease is terminated within the first eighteen (18) months of the commencement date thereof, Manager shall receive 50% of the commissions listed above for procuring the next replacement tenant for the Default Space and shall be entitled to the applicable New Lease rate for any additional space leased in excess of the Default Space.

2A.    Belk's Lease.  Manager shall be paid a commission of $150,000.00 for the lease (the "Belk's Lease") entered into by Owner and Belk's. Manager acknowledges that Manager has received a commission of $75,000 with respect to the Belk's Lease as of the date hereof. The remaining portion of the commission for the Belk's Lease shall be due and payable upon the opening of Belk's with the general public and the payment of the first minimum rent payment by Belk's under the Belk's Lease. Upon any request from Owner to Manager to provide consulting services post opening with respect to the Belk's Lease, Manager shall be paid the hourly fees for such services based on the schedule set forth in Exhibit D attached hereto and made a part hereof.

3.    Payment of Commissions.  For new leases (a "New Lease") (other than the Belk's Lease, Bass Pro Shop Lease, Westgate Tour Lease or any Temporary Lease), (a) one-half of the commission shall be paid on execution of the New Lease by Owner and such tenant (the "Execution Date") and (b) one-half of such commission on the date such tenant under the New Lease opens for business at the Center with the general public and pays its first monthly payment of minimum rent (the "Commencement Date"). For renewal leases with existing tenants and for leases dealing with expansion space for existing tenants, the full commission shall be payable upon execution of the lease for such existing tenants. In the event that the Owner agrees to the abatement of rent for any tenant (an "Abatement Tenant"), the remaining installment of such commission with respect

29

to such Abatement Tenant shall be due and payable on the date that such Abatement Tenant opens for business with the general public. In the event that Manager fails to receive any second installment of the lease commission because the Commencement Date does not occur and such lease of such tenant is terminated within the first eighteen (18) months of the commencement thereof, the Manager shall be entitled to a full commission with respect to the re-leasing of such Default Space and not limited to fifty per cent (50%) of such commission as otherwise provided in paragraph 2 hereof.

4.    Temporary Leases.  A commission shall be payable with respect to any kiosk tenancies, license agreements, retail merchandising unit tenancies, month-to-month tenancies and any leases with a term of one year or less (collectively referred to as "Temporary Leases") in the amount of ten percent (10%) of the monthly gross receipts payable with respect to such Temporary Leases and such amounts shall be due and payable within twenty (20) days after the end of such month such receipts are received by Owner from such sources and based on the monthly reports received by Owner from Manager with respect to the same. In the event this Agreement expires or is terminated for any reason, any portion of such commission which is based on gross receipts which have not yet been collected, shall be due and payable within thirty (30) days of the date of such expiration or termination. Any employee of Manager dedicated solely for such purpose shall be at the sole cost and expense of Owner.

5.    Documents Entered After Termination.  (a) Within thirty (30) days after termination of this Agreement for any reason other than as described in clause (b) of this Paragraph 5, Manager shall submit to Owner a written list of parties: (a) to whom Manager has presented a written proposal prior to termination of the Agreement, and (b) who have responded to such proposal in writing prior to termination of this Agreement. If Owner or its representative, or any successor to Owner, shall execute a lease with any such party respecting the Center within ninety (90) days after this Agreement has been terminated, Manager shall be entitled to a commission on the terms described above when the lease is executed by Owner and such tenant. The obligation to pay such commission to Manager shall survive the termination of this Agreement.

(b)    In the event the Development Agreement is terminated pursuant to the terms of Section 1.7 (b) thereof, and as a result of such termination this Agreement is terminated pursuant to Section 7.1.1 hereof, then:

(i)    Manager shall be entitled to receive a commission (on the terms described above) for any lease respecting the Center executed within three (3) years of the date of termination of this Agreement by Owner or its representative, or any successor to Owner, and tenant, which was an Approved Deal as of or prior to the effective date of such termination. An "Approved Deal" is a proposed lease transaction where

30

both (A) the basic economic terms of such lease have been approved by Owner in writing; and (B) tenant and Owner or Manager are negotiating the remainder of the terms of such lease. Manager shall submit a written list of such Approved Deals to Owner within thirty days after termination of this Agreement.

(ii)    In addition to a list of Approved Deals, within thirty (30) days after termination of this Agreement, Manager shall submit to Owner a written list of parties: (A) to whom Manager has presented a written proposal prior to termination of the Agreement, and (B) who have responded to such proposal in writing prior to termination of this Agreement. If Owner or its representative, or any successor to Owner, shall execute a lease with any such party respecting the Center within one hundred eighty (180) days after this Agreement has been terminated, Manager shall be entitled to a commission on the terms described above when the lease is fully executed.

The obligation to pay to Manager the commissions described in this Paragraph 5(b) shall survive the termination of this Agreement.

6.    Tenant Coordination Fees. Manager shall perform the tenant coordination services for Owner described on Schedule II attached hereto and made a part hereof. Manager shall prepare a proposed budget (such budget and any revision thereto approved in advance by the Owner is referred to herein as "PGO Budget"), and the PGO Budget which has been approved as of the date hereof is attached hereto as Schedule III, for the cost of providing such services during the period from October 1, 2004 through May 30, 2006 (such period referred to herein as the "Grand Opening Period"). As compensation for performing such tenant coordination services during the Grand Opening Period, Manager shall receive the lesser of (a) the amount set forth in the PGO Budget for staff time costs for the Grand Opening Period (the "Budgeted Amount") and (b) the actual staff time costs incurred by Manager for such period based on the rates set forth in Schedule IV attached hereto and made a part hereof. Such fees shall be paid monthly within thirty (30) days after receipt by Owner of an invoice from Manager for such services. After the Grand Opening Period, except for Excluded Tenants (as herein defined), Manager shall receive for tenant coordination services a flat fee (the "Tenant Coordination Fee") of (a) $1,500 for each lease with square footage of 2500 rentable square feet of less and (b) $3,000 for each lease with square footage of in excess of 2500 rentable square feet and up to 15,000 rentable square feet, for staff time for tenant coordination services provided by Manager at the request of Owner. Any tenant coordination fees for leases in excess of 15,000 square feet shall be negotiated by the parties on a deal by deal basis. Excluded Tenants shall mean any restaurant tenants and those tenants set forth on Exhibit E attached hereto and made a part hereof. For each Excluded Tenant, the Tenant Coordination Fee shall be $5,000. Such services shall specifically include the

31

review and approval of any tenant allowance payments payable to any tenant under a lease. After the Grand Opening Period, Owner shall pay the Tenant Coordination Fee within thirty (30) days of the date such tenant opens for business at the Center; provided, however, that such fee shall be payable within thirty (30) days after invoice for any tenant which fails to open for business at the Center after such services have been performed by Manager.

The Owner shall be responsible for any third party expenses incurred by Manager up to the amount set forth in the PGO Budget. Manager shall not incur any third party expenses in excess of the amount set forth in the PGO Budget without the prior approval of Owner, which approval shall be in the sole and absolute discretion of Owner. After the Grand Opening Period, no third party expenses shall be incurred in excess of amounts provided in the Approved Annual Budget without the prior written consent of the Owner.

The parties presently contemplate that the Grand Opening Date for the Center will be May 1, 2006 (the "Scheduled Date") and the PGO Budget is based on such date. In the event that the grand opening of the Center does not occur on or before the Scheduled Date, the Budgeted Amount for purposes of clause (a) of the third sentence of this paragraph 6 shall be increased based on the budgeted amount for such services set forth in the PGO Budget for the month of April, 2006. By way of example, and not by way of limitation, if the PGO Budget sets forth a Budgeted Amount of $500,000 and a monthly budget of $50,000 for the month of April in 2006, and the Center does not open on the Scheduled Date, if the Center opens on June 1, 2006, the Budgeted Amount would be increased to $550,000.

7.      Landlord Work Supervision Fee.   If requested to provide such service by Owner, Manager shall receive a supervision fee (the "Supervision Fee") in connection with supervising the construction work required to be performed by Owner under a lease at the Center (other than the Belk's Lease). Such Supervision Fee shall be negotiated on a deal by deal basis with Manager if Owner desires Manager to provide such services. Any Supervision Fee shall be payable as agreed upon by Owner and Manager.

8.   Marketing Fee. For services described in Section 4.2 of the Agreement, Manager shall receive an annual fee (the "Marketing Fee") of five percent (5%) of all contributions by tenants at the Center to any marketing fund (the "Marketing Fund") in place at the Center from time to time. Manager shall not be entitled to receive any Marketing Fee with respect to any sums contributed by Owner to the Marketing Fund. The Marketing Fee will be paid on a monthly basis no later than the twentieth (20th) day of each calendar month with respect to such contributions made in the preceding month and based upon the monthly report provided by Manager to Owner for such applicable month.

Prior to the Grand Opening Date, Owner shall reimburse Manager for marketing services performed by a personnel employed at Manager's home office at the rate of $150 per hour, subject to a maximum amount, to be agreed upon in a marketing budget to be agreed upon by Owner and Manager. It is agreed and acknowledged that such services are in addition to the services to be provided by the marketing director based at the Center (and who prior to completion of the Center may be based elsewhere and all compensation payable to such person is to be included as part of the Approved Annual Budget).

9.     Lease Documentation Fees.  In the event that Owner requests Manager to prepare the Leases for the Center and Manager has sufficient staff time available to do so, Manager's staff shall prepare such Leases. As compensation therefor, Owner shall pay Manager a fee (the "Lease Documentation Fee") of $3,500 for each Lease (a) of ten thousand square feet (10,000) or less of rentable space and (b) not a Lease for a restaurant (any such Lease described as a "Standard Lease"). For any lease other than a Standard Lease to be prepared by the Manager's in-house legal staff, the parties agree that the fee shall be based on Manager's in house staff hourly rate set forth below. No such fee shall be payable with respect to the Belk's Lease.  Except as set forth herein, the Lease Documentation Fee for a Standard Lease shall be due and payable upon execution of the lease by the tenant and Owner; provided, however, that if lease negotiations are terminated prior to lease execution, Manager shall be paid within thirty (30) days of presentation of an invoice to Owner the lesser of (a) $3500 or (b) time spent on such lease negotiation multiplied by the hourly fee set forth below. The Lease Documentation Fee for all Leases which are not Standard Leases shall be payable monthly within thirty (30) days of presentation of an invoice therefor. The Manager agrees to cause its in-house staff to keep time records in connection with the negotiation of any lease and the agreed rate for such work shall be $185.00 per hour.  Such fees are subject to an annual increase of the lesser of (a) four percent (4%) per annum or (b) the increase in the Consumer Price Index published by the United States Department of Labor, Bureau of Labor Statistics, for All Urban Consumers, U.S. City Average, All Items (1982-84=100) (the "CPI") for the last month in such immediately preceding year..

No outside legal counsel shall be utilized without the prior written consent of the Owner.  The Owner shall be responsible for the payment of any outside legal counsel.

For services of Manager's lease administrators for coordination of the preparation of lease documentation prepared by outside counsel, Owner shall pay Manager a fee of $125.00 per hour for time spent on such services. Such fees are subject to an annual increase of the lesser of (a) four per cent (4%) per annum or (b) the increase in the CPI for the last month in such immediately preceding year. Such fees shall be due and payable monthly within thirty (30) days after receipt of the invoice by Owner from Manager.

33

10. Outside Brokers. Manager will not work with any outside broker (an "Outside Broker") on any lease transactions unless Owner has given its consent in advance. Any such commission payable to an Outside Broker so approved by Owner is herein called an "Approved Outside Broker Commission". If Owner does so consent, Owner will pay the Approved Outside Broker Commission and Manager's commission with respect to any lease transaction shall not be reduced. The Outside Broker shall be paid at the same time that Manager is paid its commission.

The Owner hereby agrees to pay the Manager its standard leasing commission of $5.00 per rentable square foot for the leases set forth on Exhibit C attached hereto and made a part hereof and the amounts set forth as the Approved Outside Broker Commission to the Outside Broker listed in Exhibit C.

11. Sponsorship Payment. For obtaining corporate sponsorship payments (a "Sponsor Payment") from sponsors, Manager shall receive a sponsorship fee of ten percent (10%) of the gross revenue payable to Owner in connection with such Sponsor Payment (the "Sponsor Fee"). No agreement with any sponsor shall be entered into without the prior written approval of Owner, which approval may be withheld in the sole and absolute discretion of Owner. A "Sponsor" is any person or entity entering into one or more agreements (a "Sponsor Agreement") with Owner, the primary purpose of which is to increase brand name or product exposure by means of advertising, product sales or providing services or other consideration to Owner in connection with the Center. The Sponsor Fee shall be payable within twenty (20) days of the date the Owner receives the Sponsor Payment. In the event that any Sponsor Payment is received after the termination of this Agreement, the obligation of Owner to pay the Sponsor Fee shall survive the termination of the Agreement. No Sponsor Payment shall be due in the event a Sponsor obtained by Manager enters into an agreement with Owner to obtain naming rights for any physical feature at the Center. Any such fee for such naming rights shall be determined by the parties on a deal by deal basis.

12. Marina Payment. Manager acknowledges that Owner will be entering into an agreement (the "Marina Agreement") with a third party operator for operation of the marina. For purposes of determining Receipts, only the base minimum rent payable under the Marina Agreement (the "Marina Base Payment") shall be included. Manager shall not be entitled to receive any additional fee with respect to the services it performs with respect to the marina.

13. Parking Garage. Manager acknowledges that Owner will be entering into a parking agreement with a third party operator with respect to the operation of a parking garage located at the Center (the "Parking Garage"). Owner agrees that Manager shall have the right to bid to provide such services with respect to the Parking Garage. The term Receipts shall not include any revenue received by Owner from the Parking Garage.

34

14.    Incentive Fees.  (a)  In the event that as of the Grand Opening Date, at least 90%, but less than 95%, of the Applicable Space at the Center is subject to executed Leases, then Owner shall pay to Manager, an amount equal to $1.00 per rentable square foot for such Leases in addition to the amounts provided in paragraph 2 of this Exhibit A.

(b)    In the event as of the Grand Opening Date, 95% or more of the Applicable Space at the Center is subject to executed Leases, then Owner shall pay to Manager, an amount equal to $1.25 per rentable square foot for such Leases in addition to the amounts provided in paragraph 2 of this Exhibit A.

(c)    Such incentive fees for any Lease shall be due and payable by Owner to Manager within thirty (30) days after the Grand Opening Date if such tenants shall be open within thirty (30) days after the Grand Opening Date, and, on the Commencement Date of such Lease, if such tenant shall not be open for business within thirty (30) days after the Grand Opening Date.

**EXHIBIT B**

**MISSOURI DISCLOSURE FORM**

EXHIBIT B

### Other Agency Relationships

Missouri law does not prohibit written agency agreements which provide for duties exceeding that of a limited agent described in this pamphlet.

**This brokerage authorizes the following relationships:**

- ☐ Seller's Limited Agent
- ☒ Landlord's Limited Agent
- ☐ Buyer's Limited Agent
- ☐ Tenant's Limited Agent
- ☐ Sub-Agent
- ☐ Disclosed Dual Agent
- ☐ Designated Agent
- ☐ Transaction Broker
- ☒ Other Agency Relationship

Broker or Entity Name and Address

Urban Retail Properties Co.
900 N. Michigan Avenue
Chicago, IL 60611

## MISSOURI BROKER DISCLOSURE FORM



This disclosure is to enable you, a prospective buyer, seller, tenant or landlord of real estate, to make an informed choice BEFORE working with a real estate licensee."

Missouri law allows licensees to work for the interest of one or both of the parties to the transaction. The law also allows the licensee to work in a neutral position. How the licensee works depends on the type of brokerage service agreements involved. Since the sale or lease of real estate can involve several licensees, it is important that you understand what options are available to you regarding representation and to understand the relationships among the parties to any transaction in which you are involved.

Missouri laws require that if you want representation, you must enter into a written agreement. This may or may not require you to pay a commission. You do not need to enter into a written agreement with a transaction broker unless you intend to compensate this licensee. These agreements vary and you may also want to consider an exclusive or nonexclusive type of relationship.

If you choose not to be represented by an agent, the licensee working with you may be working for the other party to the transaction.

Promulgated by the Missouri Real Estate Commission as of January, 2002

EXHIBIT B

## CHOICES AVAILABLE TO YOU IN MISSOURI

### Seller's or Landlord's Limited Agent

Duty to perform the terms of the written agreement made with the seller or landlord, to exercise reasonable skill and care for the seller or landlord, and to promote the interests of the seller or landlord with the utmost good faith, loyalty and fidelity in the sale, lease, or management of property.

Information given by the buyer/tenant to a Broker acting as a Seller's or Landlord's Limited Agent will be disclosed to the seller/landlord.

### Buyer's or Tenant's Limited Agent

Duty to perform the terms of the written agreement made with the buyer or tenant, to exercise reasonable skill and care for the buyer or tenant and to promote the interests of the buyer or tenant with the utmost good faith, loyalty and fidelity in the purchase or lease of property.

Information given by the seller/landlord to a Broker acting as a Buyer's or Tenant's Limited Agent will be disclosed to the buyer/tenant.

### Sub-Agent
#### (Agent of the Agent)

Owes the same obligations and responsibilities as the Seller's or Landlord's Limited Agent, or Buyer's or Tenant's Limited Agent.

### Disclosed Dual Agent

With the written consent of all parties, represents both the seller and the buyer or the landlord and the tenant.

A Disclosed Dual Agent may disclose any information to either party that the licensee gains that is material to the transaction.

A dual agent may not disclose information that is considered confidential, such as:
- Buyer/Tenant will pay more than the purchase price or lease rate
- Seller/Landlord will accept less than the asking price or lease rent
- Either party will agree to financing terms other than those offered
- Motivating factors for any person buying, selling or leasing the property
- Terms of any prior offers or counter offers made by any party.

### Designated Agent

Acts as your specific agent, whether you are a buyer or tenant, or seller or landlord. When the broker makes this appointment, the other real estate licensees in the company do not represent you.

There are two exceptions with both remaining in dual agency:
1. The agent representing you as a buyer or tenant is also the agent who listed the property you may want to buy or lease.
2. The supervising broker of two designated agents becomes involved in the transaction.

### Transaction Broker

Does not represent either party; therefore, does not advocate the interest of either party.

A transaction broker is responsible for performing the following:
- Protect the confidences of both parties
- Exercise reasonable skill and care
- Present all written offers in a timely manner
- Keep the parties fully informed
- Account for all money and property received
- Assist the parties in complying with the terms and conditions of the contract
- Disclose to each party of the transaction any adverse material fact known by the licensee
- Suggest that the parties obtain expert advice.

A transaction broker shall not disclose:
- Buyer/tenant will pay more than the purchase or lease price
- Seller/Landlord will accept less than the asking or lease price
- Motivating factors of the parties
- Seller/Buyer will accept financing terms other than those offered.

A transaction broker has no duty to:
- conduct an independent inspection of, or discover any defects in, the property for the benefit of either party
- conduct an independent investigation of the buyer's financial condition.

Page 2 of 2

**EXHIBIT C**

Outside Broker

| New Lease | Approved Outside Broker Commission |
|---|---|
| Dress Barn | $13,467.00 |
| Jason's Deli | $15,000.00 |
| J. Jill | $40,000.00 |
| Chico's | $17,300.00 |
| White House | $13,315.00 |
| 3 Dog Bakery | $ 5,000.00 |

L:\WORKING\KRIS\MARY\MAN-AGRM\Branson\ownerdraft022205[V-clean.doc

Exhibit D
Anchor Store Consulting Fees

President---$360.00 per hour
Vice President---$225.00 per hour

Such fees are subject to a an increase equal to the lesser of (a) 4% per annum or (b) the increase in the CPI for the last month in such immediately preceding year..

Exhibit E

Excluded Tenants

Perform Shops

Popcorn Shops

Cooked Pretzel Shops

Nail Salons

Hair Salons

SCHEDULE II

1/04/05

# TENANT COORDINATION SERVICES FOR
# BRANSON LANDINGS

**SET-UP SERVICES to be done in Chicago**

- Work closely with leasing to provide design feasibility and preliminary budgeting for any work above Landlord standard
- Study the feasibility of all reconfigurations
- Review Base Building Documents as they relate to Tenant Construction and the creation of a criteria manual
- Establish a format for the Lease Outline Drawings
- Create the architectural and engineering criteria manual
- Customize Urban Retail Properties Co.'s Access Database for this project.
- Meet with the city building official and establish procedures for tenants to obtain permits
- Create a code manual for Tenants
- Review standard lease and all relevant exhibits (already completed)
- Work with Website designer to put the design criteria and tenant construction bulletins on a website

**SET-UP SERVICES to be done after May 1, 2005 in Branson**

- Set-up project office and hire project assistant
- Distribute permit procedures to Tenants
- Create a fire alarm manual
- Schedule meetings with each trade to establish a list of qualified regional sub-contractors

**DEAL PROCESS**

- Send out customized Tenant Packages, including the LOD on disk – these will be sent as soon as they are completed either from Chicago or from Branson
- Closely monitor the progress of each tenant deal, their drawings, etc.
- Make follow-up phone calls
- Establish contact with all tenant architects and designers.
- In-house architectural review of Tenant working drawings
- Sensitively resolve Tenant design issues during drawing review phase.
- Provide a detailed summary of the architectural and engineering comments to the tenant and tenant's architect

SCHEDULE II

## ON - SITE SERVICES

- Field verify each LOD for dimensions and utility stubs
- Issue Work Orders for changes to the Base Building Contractor for utility and demising wall modification due to leasing changes.
- Conduct a comprehensive Pre-construction Meeting with each Tenant's site superintendent
- Observe Tenant's construction on a daily basis and troubleshoot all problems
- Using Urban's sophisticated tracking system monitor, daily all phases of the Tenant construction process
- Notify Tenant of any build-out behind schedule and recommend a solution.
- Resolve design/construction issues in the field
- Perform detailed punch lists for each tenant as work nears completion.
- Process Tenant Allowances.
- Issue bulletins weekly or as needed to keep contractors informed of code and mall issues

## COMMUNICATION

- Hold weekly (or more often as needed) status meetings with leasing, legal, and the development teams
- Maintain and create reports from the Access Database
- Advise legal regarding construction related lease issues
- Conduct regular meetings with city building officials regarding tenant permitting issues
- Meet weekly during the last 3 months with Management, Marketing and Security to coordinate activities.
- Meet weekly with the Base Building General Contractor and major sub-contractors to resolve discrepancies.
- Coordinate inspections for the city and the fire marshal
- Format and continuously update and publish Lease Plan

## SPECIAL SERVICES

- Design, price, hire architects, contractors, and write contracts for Landlord work for "Vanilla Boxes" and other types of Landlord Work
- Design, price and contract for barricade designs needed for Grand Opening
- Color CAD
- Kiosk and Cart coordination

SCHEDULE III

January 6, 2005

Rick Huffman
HCW Development Company LLC
3027 West Hwy 76, Suite B
Branson, MO 65616

Re:   Branson Landing

Rick:

As discussed in your telephone conversation with Charles Porter on Monday, I have revised the Tenant Coordination budget for the project to reflect the actual costs through the end of 2004 and the costs of Jason Westrope starting full time on this project on January 17th. If you review page two, entitled Staff Timeline and Staff Costs, you will see that the costs are slightly lower than the original budget that we gave you in September. I have also revised the Travel, Office and Miscellaneous Expenses to reflect our discussion that HCW would provide office space free of charge for the Tenant Coordination staff. This revision along with some other revisions that always occur with more knowledge of the project has reduced these numbers. The Summary Sheet, page one, reflects all of these changes and a slightly reduced total estimate for the project.

It is important that the Tenant Coordination team get into full gear now. We all understand the importance of getting 50% of the leases fully executed by March. In order to accomplish this goal many of the tenants will demand answers on their construction issues prior to signing the lease. To date, I have been able to handle these questions myself, but with the increased number of deals in the system and the number of deals projected to come in the next few weeks it is critical that one person devote 100% of their time to the project. In addition, as soon as the construction documents are complete we need to start the architectural and engineering criteria manuals, as well as the code manual. Many of the tenants will want to see these manuals prior to lease execution. So that you can more clearly see which tasks will be accomplished by Jason prior to him moving to the Branson area, I have revised the statement of Tenant Coordination Services to reflect what we hope to accomplish prior to May 1st.

It is important that you know that Jason Westrope is an outstanding candidate to fill both the on-site Development responsibilities as well as head up the Tenant Coordination team. He has worked on four Grand Opening projects since 1999; three for Urban and one for another company. He handled both the development and tenant coordination responsibilities of Mainstreet at Southpoint, the outdoor retail area. In 2002 and 2003 he had both development and tenant coordination responsibilities on the Glen, a mixed use development northwest of Chicago, that includes retail and residential. He has an undergraduate degree in Mechanical Engineering

Page 1

Rick Huffman
January 6, 2005
Page 2

and a Masters in Architecture. He is extremely well organized and self-disciplined as well as being a very good designer.

As I have stated previously, I will stay involved with the Branson Landings project through the Grand Opening. I will not only participate in status calls, but I will be traveling to Branson frequently to assess the progress of the project from a tenant coordination perspective.

In order to accomplish all of above and to meet the timeframe of the project, we will need to bill increased time for tenant coordination beginning on January 17th. As stated above, these amounts are reflected in the attached budget.

Please approve the attached budget by signing this letter and returning it to me either via e-mail or fax.

Hope you and your family had a great holiday.

Sincerely,

Urban Retail Properties Co.


Martha J. Spatz
Senior Vice President
(312) 915-3821 Telephone
(312) 915-3784 Fax
spatzm@urbanretail.com

Attachments

Cc:    Ross Glickman
       Mike Levin
       Charles Porter


HCW DEVELOPMENT COMPANY, L.L.C.,
a Missouri limited liability company


by:    _____
       Richard E. Huffman, Manager

SCHEDULE III

1/8/05

**Urban Retail Properties Co.**
**Branson Landing Grand Opening Tenant Coordination Budget**

Summary of Costs

| | |
|---|---|
| Staff Costs | $486,931 |
| Travel / Expenses | $50,910 |
| Miscellaneous Costs | $114,250 |
| Office Expenses* | $25,800 |
| **Overall Total** | **$677,891** |

\* some of these could be eliminated if provided by owner

Page 3

**SCHEDULE III**

Ethan Rudd Properties Co. Tenant Coordination Budget for Hanson Meeting

Revised January 6, 2005

Based on May 1, 2006 Opening

*Staff Timeline*

| | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Total Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Staff Architect 1 | | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Project Assistant 1 | | | | 100% | 100% | 100% | 80% | 80% | 60% | 60% | 80% | 80% | 80% | 80% | 80% | 70% | 80% | 100% | 100% | 100% | |
| CADD Operator | | | | 15% | 15% | 15% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Staff Architect 2 | | | | | | | | | | | | | | | | | | 100% | 100% | 100% | |
| Construction Coordinator | | | | | | | | | | | | | | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Project Executive | | | | 5% | 5% | 5% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 5% | |

*This item is to the Chicago office

**Staff Costs**

| | Oct-04 | Nov-04 | Dec-04 | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Total Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Staff Architect 1 | | | | $7,000 | $12,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $14,000 | $237,000 |
| Project Assistant 1 | $325 | $100 | $750 | $1,450 | $1,500 | $3,500 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $8,000 | $84,621 |
| CADD Operator | $1,450 | $1,250 | $3,000 | $1,000 | $1,000 | $1,200 | $1,200 | $1,200 | $2,000 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | $215 | | | | $12,795 |
| Staff Architect 2 | | | | | | | | | | | | | $13,500 | $13,500 | $13,500 | $13,500 | $13,500 | $13,500 | $13,500 | $13,500 | $96,200 |
| Construction Coordinator | | | | | | | | | | | | | | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | $28,000 | |
| Project Executive | $5,400 | $4,559 | $3,150 | $4,575 | $4,575 | $4,275 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | $3,150 | | $25,075 |
| **Total Staff Costs** | $7,275 | $2,501 | $2,250 | $11,728 | $16,575 | $18,275 | $24,275 | $24,875 | $22,500 | $22,500 | $27,500 | $27,500 | $27,500 | $30,555 | $30,555 | $30,555 | $30,555 | $30,555 | $30,555 | $30,555 | $368,961 |

**We have not budgeted this permits today, we thought this two could use estimates from the Hanson project site*

The above chart shows only Tenant Coordination Direct Development time & expenses.

Page 4



SCHEDULE III

Urban Retail Properties Co. Tenant Coordination Budget for Russman Lsn-Diop
Based on May 1, 2005 Opening:

1/2/05

*This time is in the Chicago office

Page 5

SCHEDULE III

1/6/95

## Branson Grand Opening Proposal
## Travel / Office / Miscellaneous Expenses

### Housing, Airfare, Meals

| | | | | TOTALS |
|---|---|---|---|---|
| **Housing** | | | | |
| Staff Architect 1 | 10 nights in hotel* | $100/night | $1,000 | |
| Staff Architect 1 | 3.5 months in temp. housing – Chgo. | | $9,500 | |
| Staff Architect 1 | 13 months in furnished apartment | AAA | | |
| Staff Architect 2 | 7 months in furnished apartment | AAA | | |
| Project Executive | 12 nights in hotel | $100/night | $1,200 | |
| **Airfare** | | | | |
| Staff Architect 1 | 8 roundtrips | $825/roundtrip | $4,650 | |
| Staff Architect 2 | 14 roundtrips | $525/roundtrip | $7,350 | |
| Project Executive | 12 roundtrips | $525/roundtrip | $6,300 | |
| **Meals** | | | | |
| Staff Architect 1 | 30 meals | $10/meal | $300 | |
| Project Executive | 36 meals | $10/meal | $360 | |
| Team meals | one per week | 52 meals | $70/meal | $3,640 | |
| **Car Rental** | | | | |
| Staff Architect 1 | 5 trips | $100/trip | $500 | |
| Staff Architect 1 | 18 months | $900/month | $11,700 | |
| Staff Architect 2 | 7 months | $750/month | $5,250 | |
| Project Executive | 12 trips | $55/trip | $660 | |
| **Total Travel Expenses** | | | $50,910 | $50,910 |

*prior to move to Branson Area
AAA furnished apartment assumed to be provided or paid for by owner of the project

Office Expenses (based on a conversation with Rick Holtman, Urban's TC offices in Branson will be provided by HCW at no cost to Urban.
It is also possible that some of these expenses can be deleted if they are shared with HCW).

| | | | |
|---|---|---|---|
| Fax machine - purchase | 1 | $200 | $200 |
| Copy machine ( monthly rental) | 13 months | $250/month | $3,250 |
| Dedicated phone lines | 5 lines | $250/line | $1,250 |
| New telephones | 5 phones | 150/each | $750 |
| Telephone bills - monthly | 13 months | $400/month | $5,200 |
| Construction drawing plan holder | 1 | $350 | $350 |
| Office supplies (files, folders | 13 months | $300/month | $3,900 |
| Paper, pens, tape, staplers, etc.) | | | |
| Letter postage | 13 months | $50/month | $650 |
| Offices or trailer | 13 months | provided by owner | $0 |
| Security for trailer | 13 months | provided by owner | $0 |
| Office utilities | 13 months | provided by owner | $0 |
| Office furniture | 8 people | provided by owner | $0 |
| Cell phones/radios | 8 people | | $6,000 |
| Broadband internet connections | 8 people | | $3,250 |
| Broadband internet connection installation | 1 | $1,000 | $1,000 |
| | | | |
| **Office Expenses Total** | | **$25,800** | **$25,800** |

Page 2



**SCHEDULE III**

## Miscellaneous Costs

| | | | | |
|---|---|---|---|---|
| Building/Department Incentives | | | $1,000 | $1,000 |
| Contractor Incentives | | | $5,000 | $5,000 |
| Engineering Drawing Reviews | | | $20,000 | $20,000 |
| Printing Costs (100 terrains x 20 sheets x 2 sets) | 4,000 sheets | | $3/sheet | $12,000 |
| Computers | 5 | | $900 | $4,500 |
| Computer Fixtures | 5 | | $250 | $1,250 |
| Lasers Outlet Design | 100 | | $500 | $50,000 |
| Shipping Packages (Single/desk x 100) | 100 | | $flatg | $4,500 |
| Criteria Printing and Binding | 300 | | $10/manual | $3,000 |
| Computer Technician to network and create hook-ups | 300 | | $2,500 | $2,500 |
| Website for criteria and bulletins | | | $7,500 | $7,500 |
| | | | | |
| Miscellaneous Costs Total | | | $114,250 | $114,250 |

Page 3.

Page 8

## SCHEDULE IV

| | |
|---|---|
| Mike Levin | $370.00 |
| Charles Porter | $260.00 |
| Martha Spatz (project executive) | $230.00 |
| Jason Westrope | $ 75.00 |
| Administrative Assistant – Chicago | $ 50.00 |
| Administrative Assistant – Branson | $ 35.00 |
| Cad Person | $ 45.00 |
| Staff Architect 2 | $ 75.00 |

08CV4330
JUDGE NORGLE
MAG. JUDGE VALDEZ
J. N.

# Exhibit "B"

May 23, 2008

Mr. Richard Huffman
President & CEO
HCW Private Development, LLC
Branson, Mo. 65616

Dear Mr. Huffman:

We are writing to express directly to you, the President of HCW Private Development, LLC, the serious, critical short term and long term concerns of the tenants identified by name and signature on the attachment to this letter. We believe that these are issues that significantly and substantially impact both the short term and long term economic viability, sustainability and profitability of "both tenants and the landlord" of Branson Landing. In our opinion, failure of HCW, the landlord, to address these concerns in a "meaningful way" will result in the failure of many, many businesses at Branson Landing, put HCW in an uncomfortable, if not untenable economic position, negatively impact the City's financial interest in the development and associated tourism tax revenue generated, negatively impact the perception of the development and in fact the reputation and perception of the Branson area. We would also point out that while many of the corporate tenants' managers or General Managers cannot specifically comment or sign the attachment, we can tell you with great certainty, after soliciting their feedback, that they too are very troubled by negative trends, a great many concerns outlined in this letter and more importantly about their corporate decision makers' dissatisfaction with their Branson Landing results and long term viability. Many report receiving repeated calls advising them that they are "last or near the bottom for sales in their region and what in the world is going on at Branson Landing." This should be of significant concern for you also as the landlord.

We have repeatedly expressed these concerns to HCW's property management company, Urban Retail Properties and have been met with completely unsatisfactory and unacceptable results. Recently, a representative from Urban Retail Properties as well as Mark Williams of HCW attended a meeting with a group of very concerned tenants. With many tenants in desperate need of some type of financial relief, particularly some "economic" rent relief most notably during the barren, deserted wasteland at Branson Landing during the long winter months, the Urban representative advised all at the meeting to simply submit their P&Ls' to Urban requesting economic relief and they would be reviewed on an individual basis for consideration of some economic relief. Every submission to the best of our knowledge, no matter how evident and compelling that economic relief was truly needed, was summarily and flatly declined (simply allowing some deferral on rent payments is not real economic relief). Urban Retail representative's statement now appears to all that this was merely a comment to stall, delay or in fact simply and temporarily pacify tenants at the meeting. None of us believe that there is any intention whatsoever by Urban, at the specific direction of HCW, to provide "any economic relief whatsoever to any tenant." In the article that appeared in

the Branson Independent regarding "concerned Branson Landing tenants," you were quoted as saying you "had discussed these concerns with some of the tenants." With whom did you personally discuss our concerns? Which tenants did you speak with and what individual did you speak with? We do not know of *any tenant contacted by you personally and concerns discussed.* Please enlighten us as to whom you spoke.

If you were to look at every tenant's (large and small) P&L year-to-date, it is our contention (confirmed by a substantial number of tenants) that you would find a vast majority are losing money going into mid-May. Some losses YTD are well up into the six figures. Tenants are incurring ever increasing transportation costs (mainly in the form of fuel surcharges) for their freight/inventories, food and paper deliveries and even from the landlord mandated pest control company, Mr. Bug Killer, who is now charging a fuel surcharge when they are 'two blocks' from the Landing. Costs for inventories, food and paper products have risen dramatically and there is only so much tenants can pass on to the end customer in order to remain competitive. Yet, it would appear to all of us that HCW/Urban pass on every landlord cost increase, excess CAM charges, etc directly to all tenants. It may be within our prerogative to demand a full internal audit, albeit no one would like to incur the costs and no doubt HCW would vehemently oppose such an audit.

Also, as we all received our new rent/CAM charges letter prior to January 1st of this year, there was a "specific dollar amount in the new rent factor for *Advertising/Promotion.*" Since this is a charge specifically identified in the letter, we have every right to demand knowing what your total marketing budget is for 2008, how the money we are paying is being spent, and receiving a full accounting of all advertising/promotional expenditures already made or planned for the remainder of the year. Initial legal counsel advice is clear: there is accountability and a responsibility on your part as landlord to fully and comprehensively provide all tenants with transparent and full disclosure of how these monies are being spent.

We submit to you that we are "HCW's customers." Fundamental business principles have always and historically proven that any successful business enterprise is directly related to 1) how their customers are treated, 2) the business truly "listens" to the customer, 3) they provide outstanding and value-added services and responses to customers, 4) they proactively work with their customers to solve, address and positively approach problems and that there is a strong sense of concern for the customer. Further, in the case of any large development or mall, the landlord's ultimate success or lack thereof is inexplicably tied to the ultimate success of their "tenant customers." None of us feel or believe that we are "your customers," but rather we are simply occupiers of Branson Landing spaces that are here at your pleasure, adhere to your edicts, listen to only one-way communication (landlord through Urban to occupier), dismiss suggestions/requests out of hand and of course pay the exceedingly high fixed expenses promptly irrespective of the fact that Branson Landing is not what was "sold to us by your leasing agent" and that is that Branson Landing would be a year round, exciting development with promotional, marketing activity bringing large numbers of visitors 12 months a year.

The facts are that Branson Landing is not being promoted, marketed during the long winter months where one can look down the promenade and see a lonely figure only here and there all day long. HCW and Urban, as your property management company, in fact has actually discouraged even "local area residents" from visiting the Landing by charging covered parking garage fees. So many of our loyal, local customers, including many from our closest population center of Springfield, tell us that they would indeed visit and frequent the Landing during the winter if they could park in a covered garage without having to pay parking fees. They overwhelmingly state that they are not going to park in the far reaches of the outdoor parking lots and walk long distances to any business in ten degree weather. One can take a drive through the parking garage during January, February, early March and perhaps count 20-40 vehicles, many of which are tenants' managers/employees' cars.

Branson Landing was, from day one, managed by former General Manager, Todd Hiepler, in an egotistical, narcissistic fashion with tenants being treated as "annoyances and common bugs to be swatted off his shoulder." He refused to hold tenant meetings, preferring rather to issue Napoleanic one-way, dictatorial edicts by hand delivered memos. How many times did any Urban or HCW member actually visit their "tenant customers personally?" We submit to you that Mr. Hiepler rarely visited any tenant's premises except to demand that some insignificant thing be corrected. Again, would not fundamental business sense lead the property manager AND a landlord member to occasionally stop at every tenant's premises and inquire about business, any issues that need to be addressed, and any feedback that could enhance the perception or operation of Branson Landing? Mr. Hiepler has now departed and with his departure, an adversarial relationship had clearly been developed. Attempts to involve HCW, as landlord, by some tenants, were quickly swatted back to the property management company. In other words, HCW does not consider us as "your customers."

The overwhelmingly strong feelings, comments and concerns of tenants at Branson Landing as we enter the fifth month of the year are as follows:
- A vast majority of tenants enter May with traffic counts significantly and substantially down from one year ago.
- A vast majority of tenants enter this month with a P&L in "the RED year-to-date."
- Many are so far "in the red" at this point in the year that it is virtually impossible to recover in the remaining months of the year.
- A vast majority of tenants report sales down from 12% to as much as 60% from one year ago.
- A significant number of tenants are experiencing great difficulties in paying rent and ever increasing CAM charges, with virtually no one understanding Urban Retail's cloudy and ambiguous CAM reconciliation sheets which were "rushed out prior to Mr. Hiepler's departure."
- December and Christmas were most disappointing to most tenants. The "Winter Wonderlanding" was nothing more than a few lights strung around existing lightpoles and the "offensive to some," big reindeer with very large private parts. Simple neighborhoods in Branson and other nearby cities were far more

impressive than what should arguably be "THE showplace of Branson and indeed southwest Missouri and Northern Arkansas."

- It seems inconceivable and astonishing that a $420 million showplace would not have even a single billboard on the main north and south Hwy 65 four lanes into Branson or up on the strip. Urban tells us that billboards are expensive and ineffective, yet so many of our customers arrive in Branson not even knowing what Branson Landing is, yet alone how to find it. We all hear our customers say that they ended up at Branson Landing "by accident" either by asking stores at the other malls about additional shopping places, Wal-Mart and other businesses/hotels in Branson. And some find the Landing by inquiring in Old Historic Downtown Branson district about what is that big development they see down by Lake Taneycomo or by someone on the "strip" mentioning it. Just between Springfield and Branson there are about 7 billboards for Tanger Mall and numerous for Factory Merchants Mall. None for Branson Landing. Just think, if the number of visitors to the Landing are what Urban claims and many are here "by accident," what if the 8.4 million visitors to Branson actually knew about the Landing and how to get here? What if the increase were only 5%, perhaps 10%? That could possibly mean another 300,000 to 600,000 visitors and potential customers. However, none of us believe for a moment that approximately 6 million people visited Branson Landing last year! If you are relying on electronic vehicle counters at the signal lights, then there is absolutely no way these counters can distinguish between actual visitor vehicles and the hundreds and hundreds of tenant cars, employee cars, and service and trade vehicles that come and go each and every day.
- Directional signals to Branson Landing are non-existent. There is no signage of any kind except for "Branson Landing Blvd" where so many of our customers have told us they end up going west on Hwy 248 and having no idea where it is. Some stop and ask for directions, while no doubt many others simply forego the visit to the Landing if they know about it or have heard about it.
- Actual promotional and marketing budget should be shared with tenants. Ideas and creative thinking should be requested from tenants..........many have some outstanding ideas to attract people to the Landing. Many other malls and newer developments actually want their tenants to be "partners" and participate in an active Merchants Association to put collective and creative minds together to assist the mall/development in attracting critical mass.
- High school bands, high school choirs, Army bands, auditions, etc. do absolutely nothing to draw critical mass numbers to the Landing yet they are very prominent in the marketing memos on "promotional events."
- Area "wannabe bands" attract only a limited number of people and do not make a difference.
- No "big name" entertainment appears........... why not a Joe Diffie concert say on one given big weekend?? Or any other big name entertainer that would actually draw thousands of visitors and music/entertainment fans???
- Outrageous trash disposal charges. Many stores and tenants with other locations all around the country are paying only about 1/3 of what we are being charged. We have been repeatedly told by Urban management that this has been "put out to

bid and something should be resolved to provide some relief." Nothing has
materialized and we have not been told anything.

- Garage parking should be FREE during the months of Jan, Feb and March at
minimum to encourage local area people to visit the Landing.

- The ultimate compelling need is some rent relief to all tenants during Jan-March:
50% of base rent, given the total absence of what was purported to be a year
round attraction drawing visitors 12 months of the year.

- If rent relief during these miniscule sales months is not forthcoming, then you will
find in the near future more and more empty spaces with tenants "throwing in the
towel." The number could be staggering if you could look at every tenant's P&Ls
and then draw a simple conclusion as to viability of sustaining a presence in
Branson Landing.

- If empty spaces start showing up all over the Landing, then you, as landlord,
would have to be open to "cutting some deals with other potential tenants" just to
fill a vast number of empty spaces. What happens then with all your other tenants
who are stuck paying the "full meal deal as outlined in respective leases?" You
will have a real uprising in our humble opinion.

- What happens with so many of your tenants struggling financially when various
rent escalation figures kicks in?? It will be even more economically difficult and
likely impossible for many to pay these increased amounts.

- The two anchor stores' management teams indicate great disappointment in sales,
number of visitors, lack of "meaningful promotion and marketing by the
landlord," and the absence of no directional signals and billboards about the
Landing. How many times has "any Urban Retail manager/executive or member
of HCW actually personally visited these very important anchor stores?
Management there say they have never seen anyone inquiring about their
business, sales, traffic, customer attitudes/comments, etc. This should be a
significant worry to you as landlord. Have you personally talked to Johnny Morris
or the Belk family and asked them if their stores have met their expectations?

- Does any member of HCW or any HCW employee have an ownership interest in
Ernie Biggs Piano bar, the one tenant that appears to have received the most
flexible lease terms ever envisioned by any other tenant. They open whenever
they so desire, they close whenever they so desire. When the weather is bad, they
don't open at all. They were allowed to block a large portion of the sidewalk,
forcing our visitors to walk out around the fenced off concrete covered patio. If
any member of HCW or HCW employee has an ownership interest in this
business, then we would submit to you that an inherent and obvious "conflict of
interest" exists. It also is a real magnet for "fights and brawling" and most
certainly does not contribute to the "family oriented development" that was
supposedly the centerpiece theme of Branson Landing.

Have you considered taking a survey and actually asking your "customers" what they
think about everything associated with Branson Landing? What does the City think about
Branson Landing? What are their expectations and what position within the City is the
responsible party to oversee and protect the City's financial interest in Branson Landing?
We intend to find out.

Virtually all of us believe that Branson Landing is a beautiful development located in a beautiful area and should be the Pride of Branson as an attraction for shopping, dining, entertaining, etc. The vast majority of our customers frequently opine that they had no earthly idea such a gorgeous, picturesque, and upscale development even existed in Branson and they are sincerely impressed with the Landing. Having said that, many of the restaurateurs were told that there would be 6-8 full service restaurants and approximately 4 fast or fast casual restaurants. There appears to be near 20 now. And Wedding Italiano continues to be a blight on the north end of the Landing with its barricade literally falling apart and that whole area dark and completely uninviting at dusk. There is absolutely no sign of any construction going on and many north end Landing employees are afraid to even go to their vehicles after their shift in the evenings.

Also, what happened to the "skywalk" that was reportedly to be built from the Branson Convention Center and full service Hilton?? This would direct significantly more traffic to the Landing and no doubt generate additional sales for many, many tenants.

We are very much united in our strong desire for you as landlord to promptly address these concerns and personally involve yourself in that effort, including addressing concerned tenants rather than sending surrogates. Real economic relief is drastically needed, especially during the winter months and we would greatly appreciate your consideration to this and all the other issues outlined in this letter. If your customer tenants are successful, you as landlord will be successful. If not, this beautiful $420 million development is destined at some point to be a very expensive Red Roof Mall with 50% vacancy rates, deteriorating infrastructure, no marketing and ever declining visitor counts.

We respectfully request your response to this letter within seven days or we will act collectively and in a unified fashion to involve the City and the press if necessary. In addition, many concerned tenants will consider attorney(s) involvement as many of us believe that there was significant misrepresentation on the part of both HCW and specifically your leasing agent when businesses were in the process of due diligence and the decision making process of whether to locate at Branson Landing or not.

Sincerely,

SEE ATTACHMENT

c.c. Mr. Tim Olson, Urban Retail Properties
     Mayor Reanne Presley, Branson, Mo.

---

ATTACHMENT TO HCW LETTER

| Tenant Name | Signature/Title |
| --- | --- |

Virtually all of us believe that Branson Landing is a beautiful development located in a beautiful area and should be the Pride of Branson as an attraction for shopping, dining, entertaining, etc. The vast majority of our customers frequently opine that they had no earthly idea such a gorgeous, picturesque, and upscale development even existed in Branson and they are sincerely impressed with the Landing. Having said that, many of the restaurateurs were told that there would be 6-8 full service restaurants and approximately 4 fast or fast casual restaurants. There appears to be near 20 now. And Wedding Italiano continues to be a blight on the north end of the Landing with its barricade literally falling apart and that whole area dark and completely uninviting at dusk. There is absolutely no sign of any construction going on and many north end Landing employees are afraid to even go to their vehicles after their shift in the evenings.

Also, what happened to the "skywalk" that was reportedly to be built from the Branson Convention Center and full service Hilton?? This would direct significantly more traffic to the Landing and no doubt generate additional sales for many, many tenants.

We are very much united in our strong desire for you as landlord to promptly address these concerns and personally involve yourself in that effort, including addressing concerned tenants rather than sending surrogates. Real economic relief is drastically needed, especially during the winter months and we would greatly appreciate your consideration to this and all the other issues outlined in this letter. If your customer tenants are successful, you as landlord will be successful. If not, this beautiful $420 million development is destined at some point to be a very expensive Red Roof Mall with 50% vacancy rates, deteriorating infrastructure, no marketing and ever declining visitor counts.

We respectfully request your response to this letter within seven days or we will act collectively and in a unified fashion to involve the City and the press if necessary. In addition, many concerned tenants will consider attorney(s) involvement as many of us believe that there was significant misrepresentation on the part of both HCW and specifically your leasing agent when businesses were in the process of due diligence and the decision making process of whether to locate at Branson Landing or not.

Sincerely,

SEE ATTACHMENT

c.c. Mr. Tim Olson, Urban Retail Properties
     Mayor Reanne Presley, Branson, Mo.

---

ATTACHMENT TO HCW LETTER

| Tenant Name | Signature/Title |
| --- | --- |
| Turtle Bay Clothing Co LLC | |
| D/B/A Fresh Produce Handprinted | |

Virtually all of us believe that Branson Landing is a beautiful development located in a beautiful area and should be the Pride of Branson as an attraction for shopping, dining, entertaining, etc. The vast majority of our customers frequently opine that they had no earthly idea such a gorgeous, picturesque, and upscale development even existed in Branson and they are sincerely impressed with the Landing. Having said that, many of the restaurateurs were told that there would be 6-8 full service restaurants and approximately 4 fast or fast casual restaurants. There appears to be near 20 now. And Wedding Italiano continues to be a blight on the north end of the Landing with its barricade literally falling apart and that whole area dark and completely uninviting at dusk. There is absolutely no sign of any construction going on and many north end Landing employees are afraid to even go to their vehicles after their shift in the evenings.

Also, what happened to the "skywalk" that was reportedly to be built from the Branson Convention Center and full service Hilton?? This would direct significantly more traffic to the Landing and no doubt generate additional sales for many, many tenants.

We are very much united in our strong desire for you as landlord to promptly address these concerns and personally involve yourself in that effort, including addressing concerned tenants rather than sending surrogates. Real economic relief is drastically needed, especially during the winter months and we would greatly appreciate your consideration to this and all the other issues outlined in this letter. If your customer tenants are successful, you as landlord will be successful. If not, this beautiful $420 million development is destined at some point to be a very expensive Red Roof Mall with 50% vacancy rates, deteriorating infrastructure, no marketing and ever declining visitor counts.

We respectfully request your response to this letter within seven days or we will act collectively and in a unified fashion to involve the City and the press if necessary. In addition, many concerned tenants will consider attorney(s) involvement as many of us believe that there was significant misrepresentation on the part of both HCW and specifically your leasing agent when businesses were in the process of due diligence and the decision making process of whether to locate at Branson Landing or not.

Sincerely,

SEE ATTACHMENT

c.c. Mr. Tim Olson, Urban Retail Properties
    Mayor Reanne Fresley, Branson, Mo.

ATTACHMENT TO HCW LETTER

| Tenant Name | Signature/Title |
|-------------|-----------------|
| PeaceFrogs | TJ Hymson, Owner |

Charleys Grilled Subs — Tony Jill

Stone Smith Jewelry — Toni Smith

Bath Junkie — Sue Ellen Elgin

Auntie Anne's Soft Pretzels — Lynn McGhee

BRANSON Quilts — David P. Revell

Integrity Designs + Embroidery — Keith Hartman

WAXY O'SHEA'S IRISH PUB — W.E. Cooper

WAXY O'Shea's Pub

GRAND GL.+2

Haagen-Dazs — Stephen Mansfield

Gloria Jeans I — Stephen Mansfield

Gloria Jeans II — Stephen Mansfield

Leigh Ann Denison — Temporary Airbrush Tattoos

— Famous Dave's

Myron Blackwell — Rocky Mountain Chocolate Factory

# Exhibit "C"

## AFFIDAVIT OF RICHARD HUFFMAN

STATE OF MISSOURI    )
                    ) ss.
COUNTY OF TANEY    )

1.     My name is Richard Huffman. I am of sound mind, requisite age, and I give this statement freely and voluntarily.

2.     I am a member and the Chief Executive Officer of HCW Development Company, LLC ("HCW").

3.     I have reviewed and am familiar with the allegations in the Complaint styled *Urban Retail Properties, LLC v. HCW Development Company, LLC*, filed in the Circuit Court of Cook County, Illinois (the "Complaint"). I have personal knowledge regarding the facts set forth in this affidavit.

4.     HCW is a Missouri limited liability company with its headquarters and principal place of business in Branson, Missouri. None of HCW's officers, members, or employees resides in Illinois.

5.     HCW has no offices or other business premises in Illinois. HCW is not registered to do business in Illinois and does not maintain a registered agent or officer for service of process in Illinois.

6.     HCW has no telephone listing or business listing in Illinois. Nor does HCW have any bank accounts, financial holdings or property, real or personal, in Illinois.

7.     In late 2004/early 2005, HCW began negotiating with Urban Retail Properties ("URP") to have URP manage a shopping center that HCW was then developing in Branson, Missouri called the Branson Landing. During this time period, I and other HCW representatives did have written and telephonic discussions with URP while URP was located in Illinois. However, no one from HCW ever traveled to Illinois to meet with URP during these negotiations.

8.     In February 2005, HCW entered into a Property Management and Leasing Agreement with URP (the "Agreement"). A copy of the Agreement is attached to the Complaint. I executed the Agreement on behalf of HCW while I was located in Branson, Missouri.

9.     From February 2005 to June 2008, URP attempted to carry out its obligations under the Agreement. During this time period, URP had several employees on-site at the Branson Landing. URP employed six employees on-site in June 2008.

10.    In 2008, HCW began receiving numerous communications from Branson Landing tenants complaining that URP was not responding to their requests and complaints. These communications culminated with my receipt of a letter from 16 Branson Landing tenants on or about May 23, 2008 stating that the tenants had "repeatedly expressed (their) concerns

to…Urban Retail Properties and (had) been met with completely unsatisfactory and unacceptable results," and that "from day one," URP's general manager had managed the Branson Landing in "an egotistical, narcissistic fashion." The 16 tenants signing this letter were representatives of: Turtle Bay Clothing Company, Peace Frogs, Charlie's Grilled Subs, Stone Smith Jewelry, Bath Junkie, Auntie Anne's Soft Pretzels, Branson Quilts, Integrity Designs and Embroidery, Waxy O'Shea's Irish Pub, Grand Glitz, Haagen-Dasz, Gloria Jean's I, Gloria Jean's II, Temporary Airbrush Tattoos, Famous Dave's, and Rocky Mountain Chocolate Factors.

11.    Unable to resolve our issues with URP, in June 2008, I sent a letter to URP's General Counsel terminating the Agreement. I drafted the termination letter in Branson, Missouri. A copy of my letter is attached to the Complaint. My termination letter gave rise to this lawsuit.

12.    I and all other HCW officers and employees with knowledge of the allegations of the Complaint and the events giving rise to this lawsuit reside in or near Branson, Missouri.

13.    All of HCW's documents relevant to the allegations of the Complaint are located in Branson, Missouri. HCW has no documents in Illinois relevant to the Complaint and is not aware of the existence of any documents in Illinois relevant to the Complaint since no events in this case occurred in Illinois.

14.    The Branson Landing shopping center is located in Branson, Missouri. Prior to the Agreement's termination, URP maintained an office at the Branson Landing.

15.    Of the six individuals that URP employed on-site at the time HCW terminated the Agreement, at least five still work at the Branson Landing in some capacity and live in or near Branson, Missouri. Those individuals are: Melissa Hudson, Maria Smith, Tammy Scholten, Allison White, and Kathy Kruger.

16.    The 16 entities that sent the May 23, 2008 letter to HCW are all still Branson Landing tenants. To my knowledge, each of the individuals that signed the May 23, 2008 letter still resides in or near Branson, Missouri. I am not aware of any of these individuals residing in Illinois.

Further affiant sayeth not.

_Richard Huffman_

Subscribed and sworn to before me this 29th day of July, 2008.

_Tracy Hamilton_

Notary Public

My commission expires:

04·06·09

# Exhibit "D"

# company information

Urban Retail is an independently privately held company, and the developer of over 75 domestic and international premier shopping destinations and mixed use products including Water Tower Place and 900 North Michigan Shops in Chicago, Copley Place in Boston, and the redevelopment of the Houston Galleria and Old Orchard Center in Skokie, Illinois. Headquartered in Chicago, IL and with offices in Connecticut, Florida, Georgia, Iowa, Massachusetts, New Jersey, Texas and Washington, DC, Urban Retail Properties, LLC is also the nations' leading third-party real-estate manager, managing over 40 million square feet of space in 19 states and the District of Columbia. The company was formed more than 30 years ago and manages a diverse portfolio that includes retail, office, residential and government projects.

Urban Retail is a renowned industry leader in all aspects of both development and property management. Urban Retail is a full service organization that provides in house expertise for all management, marketing, leasing and development issues. The company has 10 specialized departments that work together on each managed property. These services can be tailored individually or strategically combined to meet the specific needs as required by client. The specialized services are:

- Development
- Management
- Leasing
- Marketing
- Tenant Coordination
- Environmental & Technical Services
- Accounting
- Computer Services & Technology
- Due Diligence
- Market Research

Company Information | Our Services | Company News | Properties | Success Stories | Contact Us

© 2007, Urban Retail Properties, LLC

# Exhibit "E"

# State of Missouri



### Robin Carnahan
### Secretary of State

CERTIFICATE OF REGISTRATION
FOREIGN LIMITED LIABILITY COMPANY

WHEREAS,

*Urban Retail Properties, LLC*
*FL0905106*

Using in Missouri the name

*Urban Retail Properties, LLC*

and existing under the laws of the State of Delaware has filed with this state its Application for Registration and whereas this Application for Registration conforms to the Missouri Limited Company Act.

NOW, THEREFORE, I, ROBIN CARNAHAN, Secretary of State of the State of Missouri, by virtue of authority vested in me by law, do hereby certify and declare that on the 1st day of July, 2008, the above Foreign Limited Liability Company is duly authorized to transact business in the State of Missouri and is entitled to any rights granted Limited Liability Companies.

IN TESTIMONY WHEREOF, I hereunto set my hand and cause to be affixed the GREAT SEAL of the State of Missouri. Done at the City of Jefferson, this 1st day of July, 2008.







Secretary of State

# Delaware

PAGE  1

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "URBAN RETAIL PROPERTIES, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TENTH DAY OF JUNE, A.D. 2008.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE BEEN PAID TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "URBAN RETAIL PROPERTIES, LLC" WAS FORMED ON THE TWELFTH DAY OF MAY, A.D. 1993.

2336053  8300

080679362

You may verify this certificate online at corp.delaware.gov/authver.shtml

Harriet Smith Windsor, Secretary of State

AUTHENTICATION:  6648911

DATE:  06-10-08

# Exhibit "F"

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **MISSOURI WESTERN** | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
| OVERALL CASELOAD STATISTICS | Filings* | | 2,920 | 3,304 | 3,417 | 3,119 | 2,987 | 3,073 | U.S. | Circuit |
| | Terminations | | 3,058 | 3,606 | 3,119 | 3,115 | 3,012 | 3,229 | | |
| | Pending | | 2,426 | 2,572 | 2,842 | 2,485 | 2,465 | 2,523 | | |
| | % Change in Total Filings | Over Last Year | | -11.6 | | | | | 83 | 9 |
| | | Over Earlier Years | | | -14.6 | -6.4 | -2.3 | -5.0 | 45 | 7 |
| | Number of Judgeships | | 6 | 6 | 6 | 6 | 6 | 6 | | |
| | Vacant Judgeship Months** | | 5.0 | .0 | .0 | .0 | .0 | 10.2 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 488 | 551 | 570 | 521 | 498 | 513 | 30 | 4 |
| | | Civil | 340 | 400 | 420 | 386 | 363 | 399 | 38 | 3 |
| | | Criminal Felony | 104 | 111 | 117 | 106 | 110 | 89 | 20 | 6 |
| | | Supervised Release Hearings** | 44 | 40 | 33 | 29 | 25 | 25 | 16 | 4 |
| | Pending Cases | | 404 | 429 | 474 | 414 | 411 | 421 | 37 | 4 |
| | Weighted Filings** | | 486 | 529 | 563 | 550 | 521 | 525 | 33 | 3 |
| | Terminations | | 510 | 601 | 520 | 519 | 502 | 538 | 25 | 4 |
| | Trials Completed | | 24 | 23 | 23 | 12 | 18 | 25 | 31 | 5 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 10.8 | 11.2 | 10.3 | 8.9 | 8.9 | 9.0 | 67 | 8 |
| | | Civil** | 8.5 | 8.2 | 9.4 | 10.0 | 10.3 | 10.4 | 38 | 2 |
| | From Filing to Trial** (Civil Only) | | 22.0 | 23.4 | 20.4 | 21.5 | 21.0 | 18.0 | 32 | 3 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 45 | 47 | 39 | 33 | 43 | 31 | | |
| | | Percentage | 2.9 | 2.7 | 1.9 | 1.8 | 2.3 | 1.5 | 29 | 4 |
| | Average Number of Felony Defendants Filed Per Case | | 1.5 | 1.4 | 1.4 | 1.5 | 1.4 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 66.26 | 59.83 | 45.40 | 39.89 | 42.59 | 44.71 | | |
| | | Percent Not Selected or Challenged | 52.4 | 47.7 | 38.8 | 36.4 | 38.3 | 34.1 | | |

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2037 | 295 | 59 | 658 | 36 | 10 | 128 | 235 | 125 | 38 | 303 | 3 | 147 |
| Criminal* | 611 | 8 | 123 | 56 | 241 | 79 | 25 | 33 | 10 | 12 | 6 | 7 | 11 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| ILLINOIS NORTHERN | | | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 8,422 | 8,093 | 9,056 | 10,584 | 11,126 | 11,135 | | |
| | Terminations | | 7,929 | 8,255 | 8,805 | 11,461 | 10,888 | 10,709 | | |
| | Pending | | 8,091 | 7,711 | 7,914 | 7,706 | 8,699 | 8,587 | | |
| | % Change in Total Filings | Over Last Year | | 4.1 | | | | | 27 | 2 |
| | | Over Earlier Years | | | -7.0 | -20.4 | -24.3 | -24.4 | 81 | 6 |
| | Number of Judgeships | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months** | | 15.8 | 5.7 | 12.0 | 9.6 | 22.1 | 17.8 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 382 | 367 | 412 | 481 | 505 | 506 | 62 | 4 |
| | | Civil | 346 | 330 | 369 | 437 | 461 | 459 | 36 | 3 |
| | | Criminal Felony | 24 | 26 | 34 | 32 | 38 | 39 | 93 | 7 |
| | | Supervised Release Hearings** | 12 | 11 | 9 | 12 | 6 | 8 | 77 | 6 |
| | Pending Cases | | 368 | 351 | 360 | 350 | 395 | 390 | 48 | 3 |
| | Weighted Filings** | | 462 | 443 | 485 | 512 | 526 | 525 | 39 | 3 |
| | Terminations | | 360 | 375 | 400 | 521 | 495 | 487 | 66 | 5 |
| | Trials Completed | | 11 | 11 | 13 | 12 | 12 | 14 | 86 | 6 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 14.7 | 13.9 | 12.9 | 10.3 | 9.9 | 10.3 | 90 | 7 |
| | | Civil** | 6.2 | 6.5 | 6.9 | 5.9 | 5.5 | 5.5 | 7 | 2 |
| | From Filing to Trial** (Civil Only) | | 29.7 | 26.4 | 27.0 | 28.4 | 26.0 | 26.0 | 65 | 5 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 456 | 500 | 388 | 337 | 442 | 461 | | |
| | | Percentage | 6.5 | 7.4 | 5.6 | 5.0 | 5.6 | 6.0 | 65 | 6 |
| | Average Number of Felony Defendants Filed Per Case | | 1.7 | 1.8 | 1.9 | 1.9 | 1.7 | 1.7 | | |
| | Jurors | Avg. Present for Jury Selection | 45.20 | 45.07 | 51.46 | 39.36 | 45.57 | 43.63 | | |
| | | Percent Not Selected or Challenged | 31.8 | 30.9 | 36.9 | 31.0 | 37.3 | 34.8 | | |

**12-MONTH PERIOD ENDING SEPTEMBER 30**

| 2007 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 7620 | 118 | 150 | 701 | 53 | 55 | 1504 | 902 | 563 | 428 | 1614 | 23 | 1509 |
| Criminal* | 527 | 1 | 152 | 59 | 43 | 107 | 80 | 13 | 6 | 17 | 11 | 11 | 27 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
\*\* See "Explanation of Selected Terms."